UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 09 CR 383 |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| VICENTE JESUS ZAMBADA-NIEBLA, | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
<u>DISCOVERY REGARDING DEFENSE OF PUBLIC AUTHORITY</u>**

**<u>INTRODUCTION</u>**

Defendant, Vicente Jesus Zambada-Niebla, submitted his initial discovery request on the United States government on September 24, 2010. The Government objected to many of the discovery requests as not being "relevant" in its response dated November 8, 2010, particularly as they related to the requests set forth in the attached motion for discovery regarding the defense of public authority. Mr. Zambada-Niebla has filed his notice of the defense of public authority pursuant to Fed. R. Crim. P. 12.3, thereby making his discovery requests relevant and exculpatory as set forth below. In that notice, Mr. Zambada-Niebla asserts the defense of actual and/or believed public authority, for acts that began from at least on or about January 1, 2004 and continued to and included on or about March 19, 2009, and or entrapment by estoppel, on behalf of the United States Department of Justice, Drug Enforcement Administration, and the Federal Bureau of Investigation. The discovery requested herein is necessary for the investigation and preparation of that defense.

## BACKGROUND

Humberto Loya-Castro (Loya) is a high ranking member of the leadership of the Sinaloa Cartel and is a close confidante of Joaquin Guzman Loera (Chapo) and Ismael Zambada-Garcia (Mayo), the father of Mr. Zambada-Niebla, who are also charged in the indictment and are named as the heads of the Sinaloa Cartel. The Sinaloa Cartel has been described as one of the largest drug trafficking organizations in the world. Both Chapo and Mayo have been the subject of several federal indictments in the United States and have been the subject of extradition requests from the United States to Mexico. It has been reported that the United Stated government has offered a five million dollar reward for the apprehension of both Chapo and Mayo. Loya, who is a Mexican attorney, is not only a principal advisor to Chapo and Mayo in their alleged drug trafficking operations, but is also involved in their alleged drug trafficking operations.

Loya was indicted along with Chapo and Mayo in 1995 in the Southern District of California and charged with participation in a massive narcotics trafficking conspiracy (Case No. 95CR0973). That case was dismissed on the prosecution's own motion in 2008 after Loya became an informant for the United States government and had provided information for a period of over ten years.

Sometime prior to 2004, and continuing through the time period covered in the indictment, the United States government entered into an agreement with Loya and the leadership of the Sinaloa Cartel, including Mayo and Chapo. Under that agreement, the Sinaloa Cartel, through Loya, was to provide information accumulated by Mayo, Chapo, and others, against rival Mexican Drug Trafficking Organizations to the United States government. In return, the United States government agreed to dismiss the prosecution

2

of the pending case against Loya, not to interfere with his drug trafficking activities and those of the Sinaloa Cartel, to not actively prosecute him, Chapo, Mayo, and the leadership of the Sinaloa Cartel, and to not apprehend them. The Defendant is alleged in the indictment to be a high ranking member of the Sinaloa Cartel.

United States government agents in Mexico, including but limited to the DEA and ICE, were told by Loya that Mayo and Chapo and other alleged members of the Sinaloa Cartel, and Mr. Zambada-Niebla, were providing information to the United States government under the agreement with Loya, who would then pass along the information to the agents. Loya told United States government agents when he was going to meet with Chapo and Mayo and was told that they would not follow him to and from his meetings with Mayo and Chapo so that Mayo and Chapo could be assured that their whereabouts would not be known to government agents. The relationship between Loya and the leadership of the Sinaloa Cartel was such that Loya was permitted to sit in on meetings and discussions that the DEA was having regarding the Sinaloa Cartel, without regard to the likelihood that Loya would pass that information along to Mayo and Chapo. In addition, the defense has evidence that from time to time, the leadership of the Sinaloa Cartel was informed by agents of the DEA through Loya that United States government agents and/or Mexican authorities were conducting investigations near the home territories of cartel leaders so that the cartel leaders could take appropriate actions to evade investigators-even though the United States government had indictments, extradition requests, and rewards for the apprehension of Mayo, Chapo, and other alleged leaders, as well as Mr. Zambada-Niebla.

3

In addition, Mayo and Chapo were informed through Loya that the United States government would not share any of the information they had about the Sinaloa Cartel and/or the leadership of the Sinaloa Cartel with the Mexican government in order to better assure that they would not be apprehended and so that their operations would not be interfered with. Mr. Zambada-Niebla was a party to the agreement between the United States government and the Sinaloa Cartel and provided information to the United States government through Loya pursuant to the agreement. Loya himself continued his drug trafficking activities with the knowledge of the United States government without being arrested or prosecuted.

Mr. Zambada-Niebla was aware that Mr. Loya-Castro was permitted to continue his drug trafficking activities so long as Mr. Loya-Castro and the leadership of the Sinaloa Cartel provided information to the United States government. The DEA was aware that Mr. Zambada-Niebla was providing information to Loya pursuant to the agreement because Loya told them. Representatives of the DEA told Loya that they were grateful for the information provided by Mr. Zambada-Niebla.

Pursuant to the agreement, Loya arranged for Mr. Zambada-Niebla to meet with United States government agents at the Sheraton Hotel in Mexico City in March of 2009 for the purpose of introducing Mr. Zambada-Niebla to the agents and for the purpose of his continuing to provide information to the DEA and the United States government personally, rather than through Loya. Loya's federal case had been dismissed in 2008 and the DEA representative told Mr. Loya-Castro that they wanted to establish a more personal relationship with Mr. Zambada-Niebla so that they could deal with him directly under the agreement. Mr. Zambada-Niebla believed that under the prior agreement, any

4

activities of the Sinaloa Cartel, including the kind described in the indictment, were covered by the agreement, and that he was immune from arrest or prosecution. Loya was told by United States government agents, and told Mr. Zambada-Niebla, that Mr. Zambada-Niebla would not be arrested if he met personally with the DEA agents, even though the DEA agents knew that there was an extradition warrant outstanding for his arrest. DEA agents told Mr. Loya-Castro to tell Mr. Zambada-Niebla that they wanted to continue the same arrangement with him as they had with Mr. Loya-Castro. Mr. Loya-Castro relayed that message to Mr. Zambada-Niebla. When Mr. Zambada-Niebla met voluntarily with the government agents in Mexico City in the presence of Mr. Loya-Castro, the aforementioned assurances were repeated to Mr. Zambada-Niebla. Mr. Zambada-Niebla was told he would not be arrested, that the agents knew of his prior cooperation through Loya, and that they just wanted to continue receiving information from him. Mr. Zambada-Niebla was also told that the arrangements with him had been approved at the highest levels of the United States government. Mr. Zambada-Niebla was told that a Washington, D.C. indictment would be dismissed and that he would be immune from further prosecution. There is also evidence that at the hotel, Mr. Zambada-Niebla did accept the agreement and thereafter in reliance on that agreement, provided further information regarding rival drug cartels. Mr. Zambada-Niebla was told that the government agents were satisfied with the information he had provided to them and that arrangements would be made to meet with him again. Mr. Zambada-Niebla then left the meeting. Approximately five hours after the meeting, Mr. Zambada-Niebla was arrested by Mexican authorities.

Based on the above, Mr. Zambada-Niebla is entitled to discovery of documents and other files in the possession, custody, or control of the United States government that relate in any way, shape, or form to the circumstances surrounding the above-outlined activities. The defense has information that indicates that the government has in its possession documents, files, recordings, notes, and additional forms of evidence that are exculpatory and would tend to support the allegations set forth above in his defense of public authority. The defendant herein incorporates by reference the points and authorities submitted in support of his motion for the production of exculpatory evidence.

## ARGUMENT

The United States government and its various agencies have a long history of providing benefits, permission, and immunity to criminals and their organizations to commit crimes, including murder, in return for receiving information against other criminals and other criminal organizations. Perhaps no better example is the celebrated case of Whitey Bulger, the Boston crime boss and murderer, who along with other members of criminal organizations, were given carte blanche by the FBI to commit murders in order to receive information in return about the Italian mafia and other criminal organizations in the New England area (*See New York Times Editorial June 29, 2011*). This tactic has been used extensively by the justice department and its various agencies in the "war on drugs" without concern for the loss of lives in both Mexico and the United States and without concern for the continued smuggling of illicit drugs into the United States or ending their consumption.

As Robert C. Bonner, the former head of the DEA and Commissioner of the United States Customs Department pointed out in his recent article in Foreign Affairs

6

magazine titled "The New Cocaine Cowboys, How to Defeat Mexico's Drug Cartels" (July/August 2010, p.25), the United States government's plan to destroy the Cali and Medellin drug cartels in Colombia was based (as in this case) on giving carte blanche to rival cartels to continue their drug smuggling operations in the United States without concern for its associated death and destruction in both countries, in return for their assistance against the Cali and Medellin cartels. He makes it clear that in Colombia, "the objective was to dismantle and destroy the Cali and Medellin cartels-not to prevent drugs from being smuggled into the United States or to end their consumption" (p.42). He goes on to say "the United States must accept that the goal in Mexico is similar; the destruction of the large Mexican cartels, nothing more and nothing else" (p.42, 43) (emphasis added).

This strategy, which he calls "Divide & Conquer," using one drug organization to help against others, is exactly what the Justice Department and its various agencies have implemented in Mexico. In this case, they entered into an agreement with the leadership of the Sinaloa Cartel through, among others, Humberto Loya-Castro, to receive their help in the United States government's efforts to destroy other cartels. Under that agreement, the Sinaloa Cartel under the leadership of defendant's father, Ismael Zambada-Niebla and "Chapo" Guzman, were given carte blanche to continue to smuggle tons of illicit drugs into Chicago and the rest of the United States and were also protected by the United States government from arrest and prosecution in return for providing information against rival cartels which helped Mexican and United States authorities capture or kill thousands of rival cartel members. Indeed, United States government agents aided the leaders of the Sinaloa Cartel.

7

Among other benefits received by the leadership of the Sinaloa Cartel was that United States government agents did not share any of the information they received relating to the Sinaloa Cartel with the Mexican government and the leadership of the Sinaloa Cartel was kept informed of both Mexican and United States government operations in areas near their location. Indeed, Mr. Loya-Castro was permitted to be present while government agents were discussing strategies regarding operations they were conducting in Mexico. Moreover, no effort was made by United States government agents to apprehend Ismael Zambada-Niebla or "Chapo" Guzman, who had been indicted several times in the United States and were subjects of extradition requests by the United States government.

In addition, Mr. Loya-Castro, who had been providing information to the United States government for over ten years, had his indictment in the United States District Court in San Diego, California, dismissed on government motion in 2008 and was knowingly permitted by United States government agents to continue his participation in drug trafficking activities in both the United States and Mexico. He had been told by government officials that he was immune from prosecution and the United States lived up to its agreement with him.

Mr. Zambada-Niebla was a party to Mr. Loya-Castro's agreement, and was a party to the agreement reached with the Sinaloa Cartel leadership, and received the same assurances. There is also evidence that Mr. Zambada-Niebla acted in accordance with and reliance upon that agreement and provided information regarding rival drug cartels through Mr. Loya-Castro to the United States government for several years before he voluntarily met with United States government agents in Mexico City on or about March

17, 2009. United States government agents were told by Mr. Loya-Castro and knew that Mr. Zambada-Niebla had been providing information against rival drug cartels through him for a substantial period of time prior to the meeting. That meeting was arranged through Mr. Loya-Castro and Mr. Zambada-Niebla was assured that he would not be arrested or prosecuted even though there was a United States indictment against Mr. Zambada-Niebla out of the United States District Court in Washington D.C. (Case No. 03-CR-00034), and even though he had been for at least eight months the subject of an investigation which resulted in the indictment in this case. In addition, these assurances were made even though the United States had petitioned the Mexican government for extradition of Mr. Zambada-Niebla on the Washington, D.C. case. Moreover, Mr. Zambada-Niebla was assured by United States government representatives that Mexican authorities would not be informed that the Mexico City meeting on or about March 17, 2009 was going to take place. There is also evidence that Mr. Zambada-Niebla went to the hotel pursuant to the previous agreement and was assured by government agents that the agreement would remain in effect if he continued to provide information against rival drug cartels. Mr. Zambada-Niebla was told by government agents that with the approval and authorization of the United States Justice Department in Washington D.C., the Washington, D.C. indictment would be dismissed and he would have immunity from arrest, prosecution, and any further charges, so long as he continued to provide information against rival drug cartels. In reliance on that agreement, Mr. Zambada-Niebla provided further information that evening regarding rival drug cartels.

After the meeting, Mr. Zambada-Niebla was permitted to leave and arrangements were made for him to meet again with United States government representatives.

However, the next morning, Mr. Zambada-Niebla was arrested by Mexican government authorities.

The thrust of the majority of the requests for information to be provided in Mr. Zambada-Niebla's motion for discovery regarding his public authority defense, are focused on obtaining information from the United States government relating to the facts and circumstances surrounding the United States government's agreements with Mr. Loya-Castro, the Sinaloa Cartel leadership, and Mr. Zambada-Niebla, and the related interactions between the United States government, Mr. Loya-Castro, the Sinaloa Cartel leadership, and Mr. Zambada-Niebla as a result of those agreements and relationships. Mr. Zambada-Niebla has evidence that the materials requested exist, are exculpatory, and support the public authority defense.

The United States government considered the arrangements with the Sinaloa Cartel an acceptable price to pay, because the principal objective was the destruction and dismantling of rival cartels by using the assistance of the Sinaloa Cartel-without regard for the fact that tons of illicit drugs continued to be smuggled into Chicago and other parts of the United States and consumption continued virtually unabated.

Essentially, the theory of the United States government in waging its "war on drugs" has been and continues to be that the "end justifies the means" and that it is more important to receive information about rival drug cartels' activities from the Sinaloa Cartel in return for being allowed to continue their criminal activities, including and not limited to their smuggling of tons of illegal narcotics into the United States. This is confirmed by recent disclosures by the Congressional Committee's investigation of the

latest Department of Justice, DEA, FBI, and ATF's "war on drugs" operation known as "Fast & Furious."

Mr. Zambada-Niebla in requests #48-51, seeks to obtain information regarding Operation "Fast & Furious" and the findings regarding that operation in the Joint Staff Report prepared for Darrell R. Issa, Chairman of the United States House of Representatives Committee on Oversight and Government Reform and Senator Charles E. Grassley, the ranking member of the United States Committee on the Judiciary, because the materials requested are relevant to his defense of public authority and are exculpatory.

The Joint Staff Report revealed that the operation known and authorized at the highest levels of the Justice Department and which included agents from ATF, DEA, FBI, ICE, and the IRS, allowed guns to be illegally purchased in the United States and transported to Mexico to end up in the hands of members of drug cartels. This chain of events inevitably placed the guns in the hands of violent criminals which the Department of Justice not only was aware of, but sponsored and supported. The Department of Justice and its agency partners knew that the foreseeable result of this strategy was that death and destruction would occur in Mexico. Indeed, as confirmed in the report, violence and death did occur in Mexico and the result was not only approved but regarded with "giddy optimism by ATF supervisors" (*See Congressional Committee Report on Fast & Furious*). Not only was Congress and the public not informed about what was going on, but more importantly, as is true in this case, the Mexican government and the intended victims of such actions were not informed, thereby preventing them from being able to take any precautionary measures. It is estimated that approximately

three thousand people were killed in Mexico as a result of "Operation Fast & Furious," including law enforcement officers in the state of Sinaloa, Mexico, the headquarters of the Sinaloa Cartel. The Department of Justice's leadership apparently saw this as an ingenious way of combating drug cartel activities.

It has recently been disclosed that in addition to the above-referenced problems with "Operation Fast & Furious," the DOJ, DEA, and the FBI knew that some of the people who were receiving the weapons that were being allowed to be transported to Mexico, were in fact informants working for those organizations and included some of the leaders of the cartels. The evidence seems to indicate that the Justice Department not only allowed criminals to smuggle weapons, but that tax payers' dollars in the form of informant payments, may have financed those engaging in such activities. Neither the ATF or Congress were apparently informed of that situation.

Only July 5, 2011, representative Issa and Senator Grassley sent a letter to United States Attorney General Eric Holder suggesting that multiple United States agencies were employing as informants members of Mexican drug organizations who were responsible for importing into their nation thousands of weapons from the United States, leading to more than forty thousand homicides in Mexico's drug war since late 2006. Acting Director of the ATF Kenneth Melson has also asserted that cartel leaders were paid informants of the DEA and FBI and were among the individuals who knowingly received weapons pursuant to "Operation Fast & Furious." Several of the requests in Mr. Zambada-Niebla's request for discovery re public authority defense are focused on obtaining government information to determine whether leaders and/or members of the Sinaloa Cartel were among the individuals who received the weapons and to determine

whether their receiving of the weapons was pursuant to the agreement that was originally entered into between the United States government and Mr. Loya-Castro and the leaders of the Sinaloa Cartel, which is still in effect.

Director Melson confirms what Mr. Zambada-Niebla is asserting in the matter before this Court; i.e. that the United States government at its highest levels entered into agreements with cartel leaders to act as informants against rival cartels and received benefits in return, including, but not limited to, access to thousands of weapons which helped them continue their business of smuggling drugs into Chicago and throughout the United States, and to continue wreaking havoc on the citizens and law enforcement in Mexico. It is clear that some of the weapons were deliberately allowed by the FBI and other government representatives to end up in the hands of the Sinaloa Cartel and that among the people killed by those weapons were law enforcement officers.

Mr. Zambada-Niebla believes that the documentation that he requests will confirm that the weapons received by Sinaloa Cartel members and its leaders in Operation "Fast & Furious" were provided under the agreement entered into between the United States government and Mr. Loya-Castro on behalf of the Sinaloa Cartel that is the subject of his defense re public authority. Mr. Zambada-Niebla believes that the documentation will also provide evidence showing that the United States government has a policy and pattern of providing benefits, including immunity, to cartel leaders, including the Sinaloa Cartel and their members, who are willing to provide information against rival drug cartels, as is alleged by Mr. Zambada-Niebla herein.

Mr. Zambada-Niebla also requests in #42 that the United States government produce material relating to the 2003 "House of Death" murders, which took place in

13

Juarez, Mexico, and were committed by United States government informants. As confirmed in the Joint Assessment Report prepared by government authorities investigating those murders, agents of the United States government had prior knowledge that murders were going to be committed by their informants but did not take any measures to either inform the Mexican government or the intended victims, because government representatives determined it was more important to protect the identity of their informants. The informants were assisting the United States government in the investigations of major drug traffickers and the government determined that the killings of over a hundred Mexican citizens was an acceptable price to pay for enabling them to continue their narcotics investigations.

  Mr. Zambada-Niebla believes that the materials requested in request #42 will confirm his allegations that the United States has a policy of entering into agreements with individuals who they know are violent narcotics traffickers, so long as those persons are willing to provide information against other drug traffickers, and that they entered into such an agreement with the leadership of the Sinaloa Cartel. Such individuals have also been permitted to commit murders and other violent acts. Mr. Zambada-Niebla also believes that the materials requested confirm that as in the case before this Court, the United States government had a policy and a pattern of not sharing information with the Mexican government even if that meant that narcotics trafficking and death and destruction, would continue to take place.

## **CONCLUSION**

Based on the above, it is respectfully submitted that Mr. Zambada-Niebla is entitled to the discovery requested in his motion.

Dated: July 29, 2011                    Respectfully submitted,

                                                        <u>/s/ Alvin S. Michaelson</u>
                                                        ALVIN. S. MICHAELSON
                                                        1901 Avenue of the Stars, Suite 615
                                                        Los Angeles, California 90067-6098
                                                        (310) 278-4984
                                                        Michaelsonlaw@justice.com

**CERTIFICATE OF SERVICE**

   The undersigned counsel for defendant Vicente Jesus Zambada-Niebla certifies in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electronic Case Filing (ECF), the attached Memorandum of Points and Authorities in Support of Motion for Discovery Re The Defense of Public Authority was, on July 29, 2011, served pursuant to the district court's ECF system as to ECF filers:

Thomas D. Shakeshaft
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604

John R. DeLeon
Law Offices of John R. DeLeon
53 West Jackson Boulevard, Suite 1430
Chicago, Illinois 60604

              /s/ Alvin S. Michaelson
              ALVIN. S. MICHAELSON
              1901 Avenue of the Stars, Suite 615
              Los Angeles, California 90067-6098
              (310) 278-4984
              Michaelsonlaw@justice.com