UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

PEDRO FLORES and
MARGARITO FLORES

No. 09 CR 383

Chief Judge Ruben Castillo

**GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION TO
DEPART FROM THE APPLICABLE GUIDELINE RANGE**

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T.
FARDON, United States Attorney for the Northern District of Illinois, respectfully
submits the following sentencing memorandum and motion to depart from the
applicable Guideline range pursuant to USSG § 5K1.1 and 18 U.S.C. § 3553(a) with
respect to defendants Pedro Flores and Margarito Flores:

I.    <u>Introduction</u>

In 2008, Pedro Flores and Margarito Flores voluntarily broke away from
their positions in the highest echelons of the cartel world to transform themselves
into extraordinary witnesses. Despite great personal risk to themselves and their
families, the Flores brothers amassed substantial evidence that directly allowed the
government to build cases, which were unprecedented in this district, targeting the
leadership structure of two Mexican cartels. Not only did the Flores brothers'
actions facilitate the targeting of these criminal enterprises from the top down, but
their cooperation further enabled the government to completely dismantle the
Flores brothers' own organization and convict over a dozen large-scale domestic

customers. As explained in further detail below, the Flores brothers' unparalleled assistance to the government sufficiently offsets their considerable criminal culpability to such a degree that the government recommends that the Court impose sentence at or near the low-end of the agreed range of 10-16 years' imprisonment set forth in their plea agreements.

## II.  <u>Procedural Background</u>

Defendants surrendered themselves to the custody of the U.S. Marshals Service on or about November 30, 2008, and were subsequently charged in the First, Second, and Third Superseding Indictments in this matter with conspiracy to possess with intent to distribute and to distribute controlled substances in violation of Title 21, United States Code, Section 846 (Count One), and conspiracy to import a controlled substance into the United States, in violation of Title 21, United States Code, Section 963 (Count Two).[1]  R. 7, 75, and 157.  On August 22, 2012 and August 23, 2012, defendants pled guilty pursuant to plea agreements to Count One of the Third Superseding Indictment.  R. 348, 359, and 360.

---

[1] Pedro Flores and Margarito Flores are twin brothers who jointly ran their drug trafficking organization as co-equals.  As explained in further detail below, the Flores brothers began jointly cooperating with the government in or about October 2008.  The government is unaware of any material differences between the brothers with respect to their criminal culpability, cooperation credit, or any sentencing factors listed in 18 U.S.C. § 3553(a); accordingly, the government does not intend to distinguish between the brothers in its sentencing submissions to the Court.

### III.    <u>The Offense Conduct</u>

Between May 2005 and December 2008, the Flores brothers operated a Chicago-based distribution cell for the Sinaloa Cartel and the Beltran Leyva Organization ("BLO").  On average, this cell received 1,500-2,000 kilos of cocaine per month.  Approximately half of this cocaine was distributed to the Flores brothers' Chicago-area customers; the other half was distributed to customers in additional cities, including Columbus, Cincinnati, Philadelphia, New York, Washington, D.C., Detroit, and Vancouver.

In particular, the Flores brothers negotiated directly with the leaders of the Sinaloa Cartel and BLO, as well as their principle lieutenants, to obtain large shipments of cocaine and heroin on credit.  The Flores brothers knew that the cartels transported cocaine from Colombia to Mexico using multiple methods, including planes, boats, and submarines.  The drugs provided to the Flores brothers were then smuggled across the U.S.-Mexico border using the cartels' transportation infrastructure.  Once inside the U.S., the drugs were transported to the Chicago area using a system of stash houses, warehouses, and vehicles with hidden trap compartments.  In Chicago, a team of workers operating at the Flores brothers' direction were responsible for: (1) offloading the drug shipments; (2) storing the drugs at various stash houses and warehouses; (3) distributing the drugs to customers; and (4) collecting and packaging drug proceeds.  The drug proceeds were

then transported back to Mexico, once more through the cartels' infrastructure, where they were delivered to the Flores brothers and their sources of supply.

## IV.    Objections to the PSR

The government concurs with the Guidelines calculations in the defendants' PSRs and does not have any objections or suggested corrections to the PSRs.

## V.    Defendants' Cooperation and Government's Motion to Depart from the Applicable Guideline Range

The government submits that the defendants have provided the full and truthful cooperation required by their plea agreements. Accordingly, pursuant to the terms of the plea agreements, the government now respectfully moves this Court, pursuant to USSG § 5K1.1, 18 U.S.C. § 3553(e), and Fed. R. Crim. P. 11(c)(1)(C), to depart from the advisory Guidelines range and sentence defendants at or near the low-end of the agreed range of 10-16 years set forth on the plea agreements.

The defendants earned their departures through extraordinary cooperation. The defendants jointly decided to dissolve their criminal enterprise and cooperate with the government. Pedro Flores first met directly with a DEA agent assigned to the Chicago Field Division and an NDIL AUSA in early November 2008. During this meeting, Pedro agreed on behalf of both brothers to cooperate for a period of time and then surrender to U.S. authorities. The Flores brothers then proactively cooperated until their surrender on November 30, 2008. The brevity of this proactive cooperation was dictated by its extreme risk, heightened by the fact that

4

the multiple seizures described below caused the Flores brothers to quickly incur massive debts to the leaders of the Sinaloa Cartel and the BLO.

Debriefing the Flores brothers to obtain all of the historical information they possessed took approximately six months of near daily proffer sessions. During this process, the Flores brothers provided information freely and to the best of their abilities. They each testified before the grand jury numerous times after the raw information they provided had been distilled into organized statements on each of the categories of defendants. These statements led directly to the charging of approximately 54 defendants in 2009.[2] Following their testimony, the Flores brothers were sent to BOP facilities outside of Chicago, but still continued their cooperation through frequent telephone proffers and in-person visits by the government. This ongoing cooperation has led directly and indirectly to multiple additional defendants being charged and has contributed to probable cause findings in search warrants and wiretaps through the use of information provided by the Flores brothers (attributed to them as confidential sources) in affidavits filed in support of such requests.[3]

---

[2] A complete list of defendants charged in substantial part due to the Flores brothers' cooperation is attached to this memorandum as Exhibit C.

[3] Many of the matters in which involve information provided by the Flores brothers remain under seal or are otherwise law enforcement sensitive. For this reason, the government cannot fully describe these matters even in this redacted filing. With the agreement of the defendants, the government will provide full descriptions of these matters directly to the Court in an *ex parte*, under seal manner.

***The Flores Brothers Cooperation Against Cartel Leaders***

As part of their proactive cooperation in Mexico, the Flores brothers interacted with multiple high-level cartel members and associates to negotiate the acquisition of loads of cocaine and heroin.  Where possible, the Flores brothers recorded these conversations.  In total, the Flores brothers recorded more than 70 conversations with cartel members, many of which were associated with seizures of drugs or money in United States facilitated by the Flores brothers.[4]

Of great significance, the recordings made by the Flores brothers included two conversations recorded with the then-leader of the Sinaloa Cartel, Joaquin Guzman Loera ("Chapo"), multiple conversations with Chapo's son and lieutenant, Jesus Alfredo Guzman Salazar ("JAGS"), and multiple conversations with a courier for Chapo, all regarding a 20-kilo shipment of heroin in the Northern District of Illinois.  Specifically, the Flores brothers negotiated the load with Chapo and JAGS and recorded multiple conversations with JAGS regarding these negotiations and delivery logistics.  The Flores brothers then arranged for an undercover agent to pose as a courier for the Flores brothers' organization and take possession of the heroin in this district.  After this delivery, the Flores brothers recorded two conversations directly with Chapo during which they negotiated a price reduction—

---

[4] A summary of all of the recordings made by defendants is attached to this memorandum as Exhibit A.  A summary of all of the seizures facilitated by the defendants as part of their cooperation is attached to this memorandum as Exhibit B.

from \$55,000 per kilo to \$50,000. In the recordings, which have been voice identified as Chapo by multiple additional cooperating witnesses, Chapo acknowledged both the conspiracy's existence and the agreed terms of this transaction before approving a price reduction. Following this agreement, the Flores brothers recorded equally inculpatory conversations with JAGS to arrange for payment of the heroin.[5] These recordings and accompanying seizure in NDIL form the basis of a strong case against Chapo and JAGS.[6]

The Flores brothers orchestrated similar seizures, and made additional explicit, inculpatory recordings involving numerous additional Sinaloa Cartel leaders in doing so. For example, in October 2008, Margarito Flores met directly with Chapo, Sinaloa Cartel co-leader Ismael Zambada Garcia ("Mayo"), Mayo's son Vicente Zambada Niebla ("VZN"), and multiple high-level Sinaloa Cartel lieutenants, including Felipe Cabrera Sarabia. During this meeting, Mayo instructed the Flores brothers to work with Cabrera Sarabia to distribute heroin in Chicago. Following the meeting, the Flores brothers recorded a series of calls with Cabrera Sarabia setting up a 15-kilo heroin delivery in Chicago. As with the heroin from Chapo, the Flores brothers arranged for a UC to pick up the heroin from Cabrera Sarabia's courier. The Flores brothers then used the two shipments of heroin received from Chapo and Mayo as a predicate to record multiple

---

[5] This payment was reported to the government in advance of being made and was authorized by the government in order to further the defendants' cooperation.

[6] Chapo has yet to be extradited to the U.S., and JAGS remains a fugitive.

conversations with Sinaloa Cartel leadership, including the two conversations with Chapo referenced above. Although later lab testing performed by DEA revealed that both shipments of heroin had purity levels above the 90th percentile, the Flores brothers used a ruse that the heroin received from Mayo was of inferior quality to the heroin from Chapo in order to further their cooperation. The Flores brothers asked Chapo to agree to a reduced rate because it was harder for them to pay promptly due to their difficulties in distributing the lesser-grade heroin from Mayo. The Flores brothers recorded similar conversations with Cabrera Sarabia and VZN discussing the heroin shipment and the payment made afterward.[7] All told, the recordings made by the Flores brothers with respect to the two heroin deliveries and seizures were invaluable in building cases against numerous leadership-level figures in the Sinaloa Cartel.

In addition to the heroin conversations, the Flores brothers likewise facilitated massive cocaine seizures backed by recorded conversations that directly allowed the government to charge additional high-ranking cartel members. In November 2008, the Flores brothers negotiated the purchase of just over one ton of cocaine from BLO leader Arturo Beltran Leyva. The Flores brothers also involved Manuel Fernandez Valencia in this load by partnering with him on the purchase. At the time of this transaction, the Sinaloa Cartel and BLO were engaged in a

---

[7] As with the shipment received from Chapo, the government permitted the defendants to make a payment to Cabrera Sarabia, which was reported to VZN in a recorded conversation, in order to further their cooperation.

bloody war that is believed to have directly and indirectly claimed hundreds, if not thousands, of lives in Mexico. Due to proclamations from both cartels that their associates were forbidden from working with the other side, the Flores brothers' simultaneous engagement and cooperation against the Sinaloa Cartel and BLO was highly perilous. Beyond the ever present danger of having their cooperation discovered, either side could have reacted violently had they discovered that the Flores brothers were engaging in transactions with the enemy. This danger was discussed in depth in recorded conversations with Fernandez Valencia and one of Beltran Leyva's lieutenants referred to as "Musico." Following the recorded telephone negotiations, the Flores brothers facilitated the seizure of approximately 1,044 kilos of cocaine in the Los Angeles area that was ultimately bound for Chicago. Beltran Leyva, Fernandez Valencia, and Musico were all charged in 09 CR 670 (J. Guzman) in connection with this transaction. Beltran Leyva was subsequently killed in Mexico; Fernandez Valencia was arrested in Mexico, extradited to the United States, and his case remains pending before Judge Guzman; and Musico remains a fugitive in Mexico.

Similarly, the Flores brothers negotiated another approximate 574-kilo cocaine load from Chapo's cousin and lieutenant, Juan Guzman Rocha. As with the other shipments, the Flores brothers recorded a number of highly inculpatory conversations with Guzman Rocha and then facilitated the seizure of the cocaine in the Los Angeles area before it was transported to Chicago. These recordings and

seizures served as the lynchpin of the case against Guzman Rocha and provided further corroboration of the involvement of others in the conspiracy, including Chapo. Guzman Rocha was subsequently killed in Mexico in Cartel-related violence. In addition, the Flores brothers recorded an in-person conversation with Alfredo Vasquez Hernandez regarding a 276-kilo cocaine load. Although these drugs were not seized, the Flores brothers' cooperation still enabled the charging of Vasquez Hernandez.[8] Finally, the Flores brothers further recorded conversations and facilitated seizures of heroin which ultimately led to Tomas Arevalo Renteria being charged with the drug trafficking offenses to which he has pled guilty before this Court.

All of these seizures in rapid succession placed the Flores brothers in grave danger in Mexico. When directed by the government to do so on November 30, 2008, the Flores brothers surrendered to U.S. authorities and were ultimately transported to this district. The focus of their proactive cooperation then shifted to their wholesale customers in the United States, who were as of yet unaware of the Flores brothers' cooperation or extraction from Mexico.

### The Flores Brothers' Cooperation Led to the Arrest of Dozens of High-Level U.S.-Based Drug Customers

Beginning on December 1, 2008, the Flores brothers placed a series of recorded calls to their customers to set up enforcement actions by the government.

---

[8] Vasquez Hernandez recently pled guilty and was sentenced to 22 years in prison.

The Flores brothers negotiated the delivery of shipments of cocaine to the customers, who were then arrested when they showed up to pick up the cocaine. The Flores brothers' proactive cooperation, coupled with their grand jury testimony and the cooperation of the Flores brothers' workers (who are addressed below), led to the charging of more than a dozen high-level customers who received, on average 50-100 kilos of cocaine per month. Each of these customers either pled guilty or was found guilty following trial. In the ordinary course, each of these cases, made almost exclusively through the Flores brothers' cooperation, would merit exceptional consideration at sentencing. These defendants served as the primary link between the cartel suppliers and wholesale and retail distributors in Chicago and elsewhere in the country. While not as high-profile as the cartel figures, the successful prosecution of these defendants made a very real difference in combating the scourge of drug trafficking that fuels so much violence and the destruction of communities in Chicago.

### The Flores Brothers Dismantled Their Own Organization

Through their cooperation, the Flores brothers facilitated the complete dismantlement of their own organization. As with the customers, each of the Flores brothers' workers were convicted after they were charged. While the Flores brothers' actions in this regard represented downstream cooperation against comparably less culpable defendants, these prosecutions were nonetheless essential to the overall success of the case to ensure that none of the workers rose up to fulfill

the void left by the Flores brothers' voluntary surrender. The Flores workers were collectively responsible for the distribution of ton quantities of cocaine and the laundering of more than $1 billion through the course of the conspiracy. In addition, the Flores brothers' cooperation spurred many of the workers to cooperate as well. These workers had dealt directly with customers and cartel couriers, and the cooperating workers' testimony was invaluable in securing convictions against these defendants. As such, the Flores brothers should also receive credit for causing this cooperation to occur where it is likely that it would not have otherwise, at least in as timely a fashion and on the same scale as the mass cooperation that followed the disclosure of the Flores brothers' cooperation to the workers.

### The Flores Brothers' Cooperation Directly Assisted In Extraditions

The Flores brothers have also signed multiple declarations that were submitted to the Government of Mexico as part of successful extradition requests for multiple defendants in this district, including Vicente Zambada Niebla, Alfredo Vasquez Hernandez, and Tomas Arevalo Renteria. The Flores brothers have also signed, or have agreed to sign at the appropriate time, declarations for additional NDIL defendants in Mexico, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Each of these declarations has been or will be made known to the defendants for whom extradition is sought, placing the Flores brothers in increased danger of retaliation.

### *The Flores Brothers' Cooperation Outside the Northern District of Illinois*

The Flores brothers' cooperation has further aided additional U.S. Attorney's Offices throughout the country, including ███████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ The Flores brothers' cooperation has also provided valuable intelligence and actionable information to DEA, FBI, HSI, and ATF offices throughout the country and in Mexico.

### VI.    Analysis of the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a)

The 3553(a) factors are difficult to apply in a traditional sense to these defendants. Each of the factors contribute to the issue at the heart of this sentencing—striking an appropriate balance between criminal conduct that likely qualifies the Flores brothers as the most significant drug traffickers in Chicago's

history against cooperation that almost certainly qualifies as the most significant in a drug trafficking and money laundering context in the history of this district. Taking even the low-end of the average quantity of cocaine distributed by the Flores brothers per month, 1,500 kilos, yields a total amount of 64,500 kilos over the course of the charged conspiracy. This is an almost incomprehensible quantity of cocaine to be distributed in Chicago and other communities throughout the United States, with resulting harm that is incalculable, but without question horrific. Absent their cooperation, the government would argue life imprisonment is the appropriate sentence for these defendants. However, they are not being sentenced absent cooperation. Instead, in order to determine a sentence that is sufficient, but not greater than necessary to accomplish the 3553(a) goals, the defendants' conduct must be offset by cooperation that is unprecedented in this district. This balance affects each of the 3553(a) factors.

### *Seriousness of the Offense*

With respect to the seriousness of the offense, this Court is well aware of the factual circumstances of this case and the government will not belabor those facts here. In short, the defendants operated at the highest level of drug trafficking in the world. While they themselves were not cartel leaders, they were the pipeline that allowed those leaders to push tons of drugs into the hands of wholesale customers, who in turn fed the destructive distribution machines that exist throughout this country. While the cartels could have found other outlets, the

14

Flores brothers were so successful a channel for the cartels that they created massive economies of scale, which made it significantly easier and more efficient for the cartels to distribute drugs hundreds of kilos at a time with substantially reduced risk.

But consideration of the seriousness of the defendants' offense goes hand-in-hand with consideration of the Flores brothers' cooperation. For example, and briefly mentioned earlier, the Flores brothers facilitated the arrival of 276 kilograms of cocaine in Chicago that had been transported by co-defendant Alfredo Vasquez Hernandez. In the process of facilitating the drugs' arrival, the Flores brothers recorded a phone conversation with Vasquez Hernandez discussing the load. They also provided a detailed explanation of how the load was picked up by one of their workers in Chicago. This evidence led to the successful prosecution of Vasquez Hernandez. But providing such evidence to the government on such a significant drug load and drug trafficker would not have been possible absent the Flores brothers own involvement in serious, high-level international and domestic drug trafficking.

With respect to this particular facet of cooperation by the Flores brothers, however, the court must also consider not just the result of their cooperation (the successful prosecution of Vasquez Hernandez), but also the way in which it came to be. One aggravating factor of the Flores brothers' cooperation is their failure to report the arrival of the 276 kilos of cocaine, resulting in its distribution in the

Chicago area. The fact that the Flores brothers caused such a vast quantity of cocaine to be distributed, rather than seized by the government, during the pendency of their cooperation certainly offsets some of the positive results they otherwise achieved. When asked by the government why they initially failed to report this cocaine, the Flores brothers stated that they needed the money from this load to avoid the danger of falling too far behind in their payments to the Cartel.

Despite their initial failure to report the load, following their surrender, the Flores brothers told the government about the existence of the load and provided a detailed explanation of how the load was picked up by one of their workers in Chicago. While this candor in no way excuses their actions in allowing the drugs to be distributed, it did preserve their credibility and enabled their further and ongoing cooperation. As to this particular load, that cooperation helped lead to the conviction of Vasquez Hernandez, who admitted to his participation in moving the drugs. As to this transaction and others, the Flores' information and testimony has been consistently and compellingly corroborated by witnesses, documents, drug and asset seizures, and dozens of recordings.

Beyond their grand jury testimony, the Flores brothers have not been called as live witnesses in any other judicial proceedings. The brothers have been, and remain, prepared to testify truthfully in court. To date, the government has exercised its discretion not to call them. Among other factors, the government must consider the extreme danger associated with physically producing the brothers in

16

any venue outside of their protected custodial locations. This risk, and the steps and resources required to mitigate this risk have weighed heavily in the government's decisions not to call the brothers to date. To be clear, however, the government believes the Flores brothers are viable and credible witnesses, and the government anticipates using them in the future.

The seriousness of the offense is also highlighted by the enormous sum of money involved in the conspiracy. In total, the Flores brothers admitted to facilitating the transfer of approximately $1.8 billion dollars of drug proceeds from the United States to Mexico, primarily through bulk cash smuggling. Even after paying the cartel sources of supply and other expenses associated with running their organization, the Flores brothers profited mightily from their drug trafficking. What became of the Flores brothers' profits was a heavy focus of the government's investigation. The Flores brothers were extracted from Mexico on a few hours' notice and left millions of dollars of assets behind in Mexico, including numerous homes, properties, and vehicles. Although the Flores brothers provided a truthful accounting of these items, because they were not lawfully obtained in Mexico in the Flores brothers' names, the government was not able to successfully pursue forfeiture or seizure. The Flores brothers themselves came to the United States via airplane with little but clothing and the evidence they gathered in Mexico. Their family members entered the United States with a small number of personal

belongings, a relatively small amount of cash, and multiple high-end vehicles that they were driving.[10]

The government's investigation revealed allegations that the Flores brothers facilitated the collection of millions of dollars of drug proceeds from customers in the United States who still owed debts to the Flores brothers. The allegations continued that the Flores brothers had caused this money to be secreted from the government through multiple means, including through burying money in various locations. In response to this information, the government took several investigative steps, including exhaustive asset checks of the Flores brothers, their family members, and associates, as well as the simultaneous and separate interview of the Flores brothers and their family. The Flores brothers both admitted to causing their associates to collect approximately several million dollars of drug proceeds from a customer in the Washington D.C. area shortly after their arrival in Chicago in December 2008. The Flores brothers further admitted that they took these actions without reporting them to the government, even though they were otherwise actively cooperating. This money was then transported back to Chicago and used by the Flores brothers and their families, at times for impermissible reasons, without informing the government, including for the purchase of a Bentley as a gift for Pedro Flores's wife and other wholly inappropriate expenditures. The

---

[10] Where appropriate, these vehicles were subsequently seized and forfeited by the government.

remainder of the funds collected, totaling more than $4 million, minus $300,000 total that was provided to the Flores family to provide for their sustenance and security and legal fees paid to their attorneys, were voluntarily surrendered to the government and are subject to forfeiture pursuant to the terms of the defendant's plea agreements and the agreed motion for a preliminary order of forfeiture filed with this Court.

The government went to elaborate lengths to determine whether the Flores brothers were truthful in the information they provided, including the immunization of those involved in the pickup and transportation of the money to determine whether any additional funds were being hidden from the government. The government found no evidence of the existence of additional funds. Without credible evidence to the contrary, and after an exhaustive investigation, the government does not believe that the Flores brothers are hiding assets from the government or this Court. Accordingly, the government does not believe that the Flores brothers' assets to be a factor in this sentencing beyond the above-described conduct of collecting, hiding for a limited period of time, and improperly using funds without informing the government.

### *Need to Promote Deterrence*

The need to promote deterrence is also impacted by the Flores brothers' culpability-cooperation balance. The need for individual deterrence is minimized to large degree by the extreme hurdles that the Flores brothers would face in any

attempt to return to drug trafficking. As two of the most well-known cooperating witnesses in the country, the Flores brothers (and their families) will live the rest of their lives in danger of being killed in retribution. They are essentially surrounded on all sides by some of the most violent actors in the criminal sphere. The barbarism of the cartels is legend, with a special place reserved for those who cooperate. Having cooperated against not only the leadership of the cartels, but also their sons, family members, and closest associates, the Flores brothers would in all likelihood be killed absent their protection from the government. As an illustration, against the direct admonishment of the government not to do so, the Flores brothers' father reentered Mexico in 2009 after the government facilitated his entry into the United States for his own protection. Within days, the father was kidnapped and presumed killed. A note left at the scene of the kidnapping made explicit that the father was taken as a direct consequence of the Flores brothers' cooperation. The Flores brothers also face danger of retaliation from their former U.S.-based associates. These threats make a return to drug trafficking next to impossible for these defendants.

The need for general deterrence must also be considered. Again in the ordinary course, this case would scream for a substantial sentence to deter others from engaging in similar conduct. This remains a necessity here. The Flores brothers are in a way the ultimate success story from a criminal prospective. They rose from street level drug trafficking in Chicago all the way to the top of the cartel

20

world, along the way earning millions of dollars in profit. From the point of view of an aspiring drug trafficker, this success would be something to emulate and a considerable prison sentence would be appropriate to deter others from attempting to follow suit. This need for deterrence, however, must be offset by the legitimate interest in promoting cooperation by those engaged in criminal activity. In this regard, the Flores brothers represent perhaps the best case scenario for high-level cooperation in the narcotics realm. The Flores brothers began their cooperation on their own accord, before they were arrested, and while they still had the full faith of their co-conspirators. The results they obtained would not have been possible had they waited until they were in custody before beginning to cooperate with the government. And, as detailed above, once they began cooperating, there cooperation was extraordinary and hugely impactful. For this reason, an appropriate balance must be struck between general deterrence and fostering cooperation as a viable alternative to persisting in a high-level criminal enterprise.

### Personal Danger and Risk

The issue of personal safety and risk is also relevant to an appropriate sentence under 3553(a). The Flores brothers and their families are forever at risk due to their cooperation. The government remains confident in its ability to protect the Flores brothers, even after they have served their prison sentence. However, the threat to the Flores brothers and their family will continue to affect them after they serve any sentence imposed—through limitations on their freedom of

21

movement (necessary in order to ensure their safety), and through the ever-present fear of retribution that will exist, regardless of what steps are taken to ensure their protection. This fear often serves as a complete bar to defendants who are contemplating cooperation. That the Flores brothers overcame this fear and put themselves in a position to gather the extraordinary evidence they did is yet another exceptional aspect of their cooperation that serves to offset their criminal liability.

### *The Defendants' History and Characteristics*

The culpability/cooperation balance is relevant to an analysis of the Flores brothers' history and characteristics.[11] Since they were teens, the Flores brothers have engaged in an unbroken chain of criminal conduct that culminated in their status as massive distributors for two notorious and violent cartels. This is a long history that would normally justify a long prison term. However, as described above, the Flores brothers' cooperation serves as the counterbalance. An additional element to these competing dynamics is the Flores brothers' history of violence, or lack thereof. For obvious reasons, a violent history calls for a substantial sentence and greatly reduces the credibility and viability of a witness. Despite an exhaustive investigation, the government has not uncovered any acts of violence performed by the Flores brothers that could be corroborated by sufficient, credible evidence.

---

[11] In addition to the conduct described herein which predated their incarceration, while in BOP custody, the Flores brothers have been subject to various administrative disciplinary actions and sanctions. The government will produce additional information regarding these matters upon request by the Court.

The government did learn of two specific <u>allegations</u> of violence: (1) that the Flores brothers were involved in the murder of ██████████ in Chicago; (2) and that the Flores brothers were involved in the murder of Guadalupe Ledesma in Mexico. ███████████████████████████████████████████████████████████ The government reviewed the entire file of the investigation of this murder by state authorities and found no credible evidence of the Flores brothers' involvement. Moreover, multiple defendants were convicted for the murder, including a defendant who cooperated with the state. This defendant did not implicate the Flores brothers in any way.

Guadalupe Ledesma was a former associate of the Sinaloa Cartel to whom the Flores brothers owed a debt. A single witness has stated that he was told by others that the Flores brothers were directly responsible for Ledesma's murder. Well before this witness's statement, the Flores brothers described to the government the circumstances of Ledesma's murder. According to the Flores brothers, Ledesma caused Pedro Flores to be kidnapped over a drug debt. Pedro Flores was later released after payment was made and Chapo intervened. The Flores brothers stated that Ledesma lied to Chapo over the circumstances and amount of the debt and that Ledesma was ultimately killed. The Flores brothers denied any involvement in this murder. The Flores brothers further stated that Chapo offered them the opportunity to kill Ledesma, but they declined by stating that they did not want to engage in violence.

23

The competing version of events from the other witness is largely the same with respect to the lead up events; however, the witness stated that the Flores brothers were actually responsible for Ledesma's murder. Although the government has found this witness to be credible in the past, because the government has not corroborated the witness's statement in any way, the government does not believe that there is sufficient evidence, even by a preponderance standard, to conclude that the Flores brothers were responsible for this murder and accordingly do not believe that these allegations should affect their sentence.[12]

## VII. Government's sentencing recommendation

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed in the plea agreements in this matter that the defendants should be sentenced to no less than 10 years and no more than 16 years, and that the parties shall be free to recommend any sentence within the agreed range. The government recommends that the Court impose sentence at or near the low-end of the agreed range. A sentence at or near the low-end of this range strikes the appropriate balance between culpability and cooperation, accomplishes the sentencing goals set forth in § 3553(a).

---

[12] It is plausible that the witness is being truthful, but received false information from third parties about the Ledesma murder.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the government respectfully requests that the Court depart from the applicable Guidelines range and sentence defendants at or near the low-end of the agreed range of 10-16 years' imprisonment set forth in the defendants' plea agreements.

Respectfully submitted,
ZACHARY T. FARDON
United States Attorney

By:    *s/Michael Ferrara*
MICHAEL FERRARA
THOMAS D. SHAKESHAFT
ERIKA CSICSILA
NAANA FRIMPONG
GEORGIA ALEXAKIS
KATHRYN MALIZIA
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7649

Dated: January 14, 2015

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the following document:

**GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION TO DEPART FROM THE APPLICABLE GUIDELINE RANGE**

was served January 14, 2015, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case filing pursuant to the District Court's Electronic Case Filing (ECF) system as to ECF filers.

Respectfully submitted,
ZACHARY T. FARDON
United States Attorney

By:     <u>*s/Michael Ferrara*     </u>
MICHAEL FERRARA
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7649