## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 CR 383-8 |
| v. | ) | |
| | ) | Hon. Sharon Johnson Coleman |
| FELIPE CABRERA-SARABIA, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT CABRERA-SARABIA'S AMENDED CLARIFICATIONS AND OBJECTION TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM[1]

Defendant **FELIPE CABRERA-SARABIA**, by and through his attorneys **RALPH E. MECYZK**, **MERVYN M. MOSBACKER JR.**, and **ROBERT L. RASCIA**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits the following Clarifications and Objection to the Presentence Investigation Report's imposition of the four-point enhancement for a leadership role, pursuant to United States

---

[1] This memorandum has been amended to correct minor clerical and factual mistakes.

Sentencing Guideline § 3B1.1(a), and the accompanying Sentencing Memorandum. For the reasons set forth below, Mr. Cabrera-Sarabia respectfully requests that this Honorable Court impose a sentence well below the probation department's recommendation of 250 months' imprisonment, which sentence is sufficient yet not greater than necessary to effectuate the goals of § 3553(a).

## I.    INTRODUCTION

Mr. Cabrera-Sarabia stands before the Court because of his association with the Sinaloa Cartel, which ceased 11-and-a-half years ago, almost to the very day. Had he never had the grave misfortune of crossing paths with Ismael Zambada Garcia over 15 years ago, he would not be in this position today.

Mr. Cabrera-Sarabia's offense was unquestionably serious: he participated in the distribution of illegal drugs into the United States. The charge to which he pled guilty, and of which he will be convicted, stems from a singular drug transaction that occurred on November 13, 2008; additonally, he admitted to helping to distribute a larger quantity of drugs as part of relevant conduct. This is not the first time the federal government has used sweeping, multi-defendant indictments to dismantle drug trafficking networks, and it will not be the last. Today, Mr. Cabrera-Sarabia seeks not to

justify his actions, but rather to provide insight into his true character and the arduous circumstances he confronted.

As a consequence of his recruitment into the cartel, Mr. Cabrera-Sarabia lost not only the career and livelihood he had spent his life building, but also — and more importantly — his role as a son, husband, father, and grandfather. He asks the Court to impose a lenient sentence to allow him to re-enter society and try to contribute in a meaningful and positive way.

## II. CLARIFICATIONS TO THE PSR

### a. Clarification to PSR, Page 7, ¶ 8:

The PSR states the following, "During the meeting, at the direction of one of the individuals at the meeting, arrangements were made for the defendant to purchase heroin belonging to Zambada Garcia, who was in Chicago." Mr. Cabrera-Sarabia wishes to clarify that Zambada Garcia was not in Chicago, and tat Cabrera Sarabia was <u>not</u> going to purchase that heroin. At the meeting, which occurred in Mexico, Zambada Garcia directed Cabrera-Sarabia and Margarito Flores (who with his brother, Pedro Flores, were going to buy Zambada Garcia's PSR heroin in Chicago) to exchange telephone numbers so that they could communicate with each other concerning the sale of Zambada Garcia's heroin, which was already in Chicago.

### b. Clarification to PSR, Page 7, ¶ 11:

The PSR states that the courier who picked up the $715,000 was "working with the defendant." Mr. Cabrera-Sarabia wishes to clarify that there was only one courier who picked up the money, at least to his knowledge. The courier was working with and for Salvador Chaidez-Arambula, with whom Zambada Garcia had contracted to bring the proceeds of the sale of Zambada Garcia's heroin back to Mexico. Mr. Cabrera-Sarabia was in telephonic contact with the Salvador Chaidez-Arambula and with the Flores brothers concerning the transfer of the money.

### c. Clarification to PSR, Pages 7-8, ¶ 13-14:

The PSR quotes Special Agent Todd Smith about Cabrera-Sarabia's family drug trafficking organization being "...involved in manufacturing and trafficking in marihuana and heroin in Mexico." Agent Smith even claims that Cabrera-Sarabia, "...was a multi-ton supplier to the Flores brothers and numerous other customers." This statement is demonstrably false. It is clear from the stipulated factual basis that Cabrera-Sarabia did not know the Flores brothers until he was introduced to Margarito Flores by Zambada Garcia at a meeting that occurred at the end of October 2008 in Sinaloa, Mexico, and was ordered to stay in communication with him regarding the sale of the heroin that Zambada Garcia had in Chicago.

As noted earlier, that there is no proof that Cabrera-Sarabia dealt multi-ton quantities to the Flores brothers (an impossibility, since the Flores

4

brothers were arrested in Mexico, on behalf of U.S. authorities, at the end of November 2008, less than a week after the November 22, 2008 delivery of the $715,000 to a courier working for Chaidez Arambula). There is absolutely no proof that Cabrera Sarabia dealt multi ton amounts of anything to any "other customers."

Likewise, the prosecutor alludes to the fact that Cabrera-Sarabia "directed" his brothers as part of the distribution of narcotics that form part of the relevant conduct in this case. This is incorrect. Cabrera-Sarabia worked with one of his brothers, Luis Alberto Cabrera-Sarabia, and with Ernesto Madueño, who worked for Ismael Zambada Garcia, and they were on equal footing as co-conspirators. None of them had any managerial role over each other.

### d. Clarification to PSR, Page 7, ¶ 48:

The PSR accidentally refers to Mr. Cabrera-Sarabia as "she." Further, the last line of the paragraph indicates that Mr. Cabrera-Sarabia has a valid driver's license in Illinois. He does not. But an inquiry of the database maintained by the Illinois Secretary of State turns up a Felipe Cabrera with a date of birth of 05/04/1979, who resides at 4334 N. Francisco Ave., Chicago, IL 60618-1410. That is not Cabrera-Sarabia, whose date of birth is 08/23/1971, and who resides at the Metropolitan Correctional Center in Chicago, IL.

### III.   OBJECTION TO MR. SARABIA'S ROLE IN THE OFFENSE
Page 8, ¶ 22; Objection to the Imposition of the Leadership Enhancement Pursuant to U.S.S.G. § 3B1.1(a)

The probation department applies a four-point leadership enhancement without explanation because it opines that Mr. Cabrera-Sarabia "coordinated deliveries of multi kilogram or[sic] heroin, he directed his brothers and others in drug distribution and bringing money from the United States back to Mexico." PSR ¶ 22.  However, the department's position appears to be based on ¶ 14 of the PSR, in which a DEA Special Agent and prosecutor discuss their opinion of Mr. Sarabia's family's drug operation. The agent and prosecutor's opinions, however, are not record evidence. The only record evidence at this point is in the factual basis included in Mr. Cabrera-Sarabia's plea agreement.  He pled guilty to one specific distribution of narcotics and acknowledged that he is responsible for more narcotics by virtue of the conspiracy, but did not admit to directing or leading others. As such, as of now, there is an insufficient factual basis to apply the leadership enhancement.

It is the government's burden to prove the enhancement by a preponderance of the evidence. *United States v. Are*, 590 F.3d 499 (7th Cir. 2009).  Here, the government fails to cite a single 302, witness statement, or trial transcript.  The record is utterly devoid of evidence upon which the Court could base a decision to apply the enhancement.

Should the government provide an adequate factual basis with cites to admissible evidence that supports the application of an enhancement under § 3B1.1, Mr. Sarabia will address the issue more fully in his response brief. It should also be noted that merely playing an essential role in a narcotics transaction, such as being a distributor or middleman of a narcotics transaction, does not alone satisfy the requirements for application of an aggravating role. *United States v. Brown*, 944 F.2d 1377 (7th Cir. 1991). (finding application of an aggravating role was improper in the case of a defendant who oversaw the use of his home as a site for offloading drug shipments and who also sold drugs to customers for resale); *see also United States v. Parmelee*, 42 F.3d 387 (7th Cir. 1994) (finding that a pilot did not play an aggravating role in a human-smuggling ring even though he coordinated with a coparticipant about arrivals and departures and purchased a beeper for his coparticipant). The factual basis in this case at most shows that Mr. Cabrera-Sarabia was following the instructions of Zambada in communicating with co-conspirators The Flores brothers were actually acting at the direction of government agents). There is no evidence that Mr. Cabrera-Sarabia recruited or supervised accomplices.

It should also be noted that if the four-point leadership enhancement applies, as the government contends, Mr. Cabrera-Sarabia's total offense level is 41, and based on a criminal history category of I, the applicable

guidelines range is 324-405 months' imprisonment. *See* PSR at ¶¶ 19-28, 33. If the enhancement does not apply, the appropriate offense level is 37, reducing the advisory range to 210-262 months' imprisonment. *Id.* Should the Court not apply a leadership enhancement, Mr. Cabrera-Sarabia would argue that he is safety valve eligible, further reducing his offense level to 35, resulting in a guidelines range of 168-210 months' imprisonment.[2]

## IV. SENTENCING MEMORANDUM AND ANALYSIS OF THE § 3553(a) FACTORS

### A. The Nature and Circumstances of the Offense (§ 3553(a)(1))

Opinions on the United States' war on drugs can be debated. Undoubtedly though, the importation and distribution of significant quantities of drugs is a serious crime. It is a serious crime not just because it is a violation of the country's drug laws, but because illegal drugs have a deleterious effect on consumers. Drugs ruin communities. They have negative health effects on users, cause users to commit other crimes in order to obtain money to purchase more drugs, and cause users to neglect their families and communities. Drugs have an especially negative impact on already

---

[2] Mr. Cabrera-Sarabia has no objection to the proposed conditions of supervised release in the PSR, but notes that since he will be deported following his incarceration, there is no need to impose any supervised release in this case.

impoverished communities, which are often underserved with government resources, education, grocery stores, and the like.[3]

Mr. Cabrera-Sarabia forthrightly accepts responsibility for his role in providing the community with an illicit substance. That said, he reiterates what he stated above. Mr. Cabrera-Sarabia pled guilty to one specific charge, in which he admitted that, at the direction of Ismael Zambada, in approximately October/November of 2008, Mr. Cabrera-Sarabia communicated with the Flores brothers about the distribution of 13 kilograms of heroin and later communicated with Chaidez Arambula about receiving $715,000 for that heroin. Plea Agreement at 4-5. Mr. Cabrera-Sarabia further acknowledged that the amount of drugs constituting relevant conduct attributable to him, that was reasonably foreseeable to him, and for which he is responsible, is in excess of 150 kilograms of cocaine and in excess of 30 kilograms of heroin that a co-conspirator possessed during the course of the conspiracy. Government's Version of the Offense, at 4; Plea Agreement at 5; PSR at ¶ 4.

It should also be noted that Mr. Cabrera-Sarabia made efforts to cooperate with the government by providing information via attorney

---

[3] Robin Ghertner & Lincoln Groves, *The Opioid Crisis and Economic Opportunity: Geographic and Economic Trends*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Sept. 2018) (noting that "areas with lower economic opportunity are disproportionately affected by the opioid crisis").

proffers, in addition to participating in three in person proffer interviews (two with U.S. Attorney's Office for the Northern District of Illinois; and one, concerning an individual being extradited from Mexico to Washington D.C., with Trial Attorneys from the Department of Justice, Narcotics and Dangerous Drugs Division). Government's Version of the Offense, at 6; *see also United States v. Knox*, 573 F.3d 441, 453 (7th Cir. 2009) (affirming that a district court may consider a defendant's cooperation with the government as a basis for the reduced sentence, irrespective of whether the government has moved for a § 5K1.1 motion).

### B. The History and Characteristics of Mr. Sarabia (§ 3553(a)(1))

Mr. Cabrera-Sarabia's identity has been uniquely influenced by his upbringing in Mexico. His parents, who have been together for over 50 years, raised Mr. Cabrera-Sarabia and his nine siblings in the rural, mountainside village of Vascogil in Durango, Mexico. PSR, ¶ 40-1. The family endured severe poverty, often not having enough to eat, and resorting to growing their own harvests of corn and beans. *Id.* at 42. As the eldest child, he shouldered the responsibility of contributing to the financial support of his family and regularly cared for his younger brothers and sisters. *Id.* at ¶ 41-2. These circumstances forced him to grow up faster than his peers; at the mere age of six, Mr. Cabrera-Sarabia left elementary school to help his father herd cattle.

*Id.* at ¶¶ 42, 59. By 12 years old, he was independently managing his own herd, and by 18, he was buying and selling cattle himself. *Id.* at ¶ 59.

Over the course of this time, Mr. Cabrera-Sarabia began living with Hipolita Medina, the woman with whom he would spend his life and start a family, in a small house he and his father built together a mere 50 meters from his childhood home. *Id.* at ¶ 44. Together, they had four children: two sons, Oscar and Louis, and two daughters, Maria and Carolina. *Id.* Mr. Cabrera-Sarabia and his family often struggled with the ramifications of living in an isolated community, as did most residents of Vascogil. *See* Exh. No. 1 at 3 (Ms. Medina's letter to the Court). During Ms. Medina's second pregnancy, for example, Mr. Cabrera-Sarabia spent three days trying to sell a cow and a horse, in hopes of being able to afford traveling to the city of Durango (some 224 miles away) for a safe hospital birth and proper clothing for their soon-to-be newborn daughter. *Id.* The lack of modern infrastructure limited the opportunities for gainful employment, made it difficult to obtain medical care, and overall restricted the ability of those in the town to break free from the grips of poverty. *Id.*

After facing these realities, Mr. Cabrera-Sarabia strived to transform Vascogil into a self-sufficient town and improve the quality of life for his family and neighbors. *Id.* Mr. Cabrera-Sarabia collaborated with the municipality of Santiago Papasquiaro to install piping for clean, running

water into the homes of Vascogil and to support the construction of a church, which continues to serve the community to this day. Exh. No. 1 at 22 (letter from Mr. Cabrera-Sarabia, a community representative). As a town judge, an unpaid role he was elected to for approximately four years, he oversaw the buying and selling of cattle and land, and also enlisted the expertise of engineers from a nearby mining company to build a roadway system linking Vascogil with surrounding villages. *Id.* at 21; PSR at ¶ 60. Mr. Cabrera-Sarabia became a main pillar of support for those in Vascogi and was elected their representative 4 months before he was arrested at the end of 20011. The pressure to provide for both his community and family, however, began to take a toll.

By 2008, the Sinaloa Cartel, headquartered in nearby Culiacán, was battling for dominance over territory across Mexico against other prominent drug trafficking organizations.[4] Towards the end of that year, Mr. Cabrera Sarabia crossed paths with men working for Mr. Zambada Garcia, and ultimately, with Mr. Zambada Garcia himself, who offered him the opportunity to work for him and his organization, the Sinaloa Cartel (the first task done for Zambada Garcia is the subject of Count 5 of the indictment, to which he pled guilty). In this way, Mr Cabrera Sarabia was able to alleviate

---

[4] June S. Beittel, *Mexico: Organized Crime and Drug Trafficking Organizations*, CONG. RSCH. SERVS. (Summary, para. 3) (Jun. 7, 2022).

concerns he had regarding the future of his family and his hometown. PSR at ¶ 8. Mr. Cabrera-Sarabia's decision to accept this enticement is one that he will always deeply regret. Exh. No. 1, at 1-2. While Mr. Cabrera-Sarabia's well-intentioned motivations do not excuse his role in the drug distribution conspiracy, they do shed light on how he arrived at the lowest point in his life.

December 23, 2011, marked the beginning of the end. Two days before Christmas, law enforcement violently arrested Mr. Cabrera-Sarabia at his home in Mexico in front of his family. PSR at ¶ 35. A couple of his children even required treatment for trauma from witnessing the physical abuse their father suffered at the hands of the authorities. *Id.*

From the time of his arrest in Mexico in late 2011 to his extradition to the United States in 2020, Mr. Cabrera-Sarabia endured abuse while incarcerated in Mexico. It was a military reaction group of sixteen agents who arrested him at his home, exercising acts of violence and physical torture on him before making him available to the competent authority. During his arrest and while in their custody, the members of the military who arrested him tortured him — by violently beating him and by blindfolding and asphyxiating him with a bag over his head on four or five different occasions. PSR at ¶ 54. He finally underwent hernia surgery in September 2022, to repair some of the damage he sustained as a result of that beating. *Id.* at ¶ 51. For much of the time he was in prison in Mexico, the conditions of the

prisons were horrific, and he was confined to his cell in solitary confinement 24 hours a day. While he was detained for eight years, five months, and nineteen days in various Mexican federal prisons, the Defendant Cabrera Sarabia was subjected to separate inhuman and degrading acts of torture by his captors.

The loss of the life he once knew was swift and forceful. The nearly 12 years that followed, however, have moved devastatingly slow.

Mr. Cabrera-Sarabia's substantial time in custody has provided him with the opportunity to reflect on his past decisions. Exh. No. 1, at 1-2. He laments bowing to financial pressures and is ashamed of his participation in the instant offense. *Id.* He understands the gravity of his misconduct and its consequences not only on his family, but also on the citizens of the United States and Mexico. *Id.*

Moreover, it is evident from the letters of support provided by Mr. Cabrera-Sarabia's family members and community leaders he collaborated with over the years that his achievements and generosity earned him extraordinary admiration and respect throughout and beyond his home village. It is equally clear from Mr. Cabrera-Sarabia's own letter to the Court that he remains humbled by and grateful for their continued support and draws strength from the prospect of returning home to his family. His daughters and sons reflect upon their childhood memories with their father

fondly, recalling their family trips to Vascogil where they would distribute fruit to the community together, as well as his "conviction, effort, and dedication" to his work. *Id.* at 11, 13. All four convey their gratitude for the efforts Mr. Sarabia went to in order to ensure they were as educated and prepared for life as possible. *Id.* at 9, 10, 13, 16. His daughter, Caroline, states that she and her siblings were raised "in a home of love and fun" and that her father "always reminds us that we must live with dignity, that studying and working is the most powerful tool to have a life worth living." Exh. No. 1, at 7-8. She adds that Mr. Cabrera-Sarabia taught her that "no matter what happens, you can always be a better person if you decide to change course." *Id.* at 8. His longtime friends and colleagues share these sentiments, attesting to his compassion and seeking mercy from the Court. *See* Exh. No. 1, at 20-9. Just as Mr. Cabrera-Sarabia dedicated the better part of his life to looking after his family and community, they all similarly have pledged their assistance and support to him in his time of need and upon his release from custody.

## C.  The Need for the Sentence Imposed (§ 3553(a)(2))

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary — taking into account the need to promote respect for the law, provide just

punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(D). Mr. Cabrera-Sarabia's negligible risk for recidivism and substantial period of incarceration have served, thus far, militate in favor of a below-guideline sentence.

### i.   Providing Just Punishment (§ 3553(a)(2)(A))

From the time of his arrest in Mexico in late 2011 to his extradition to the United States in 2020, Mr. Cabrera-Sarabia endured abuse while incarcerated in Mexico. Members of the military team that arrested him tortured him — blindfolding and asphyxiating him with a bag over his head on four or five different occasions. PSR at ¶ 54. He finally underwent hernia surgery in September 2022, to repair some of the damage he sustained as a result of the torture he endured. *Id.* at ¶ 51.  Much of his time, up to eight years, was spent in near solitary confinement.  *Id.*

Now, in federal custody in the United States, the conditions present a different type of psychological torture: he is over 1,500 miles away from every single one of his family members, each of whom still resides in Mexico. *See generally* Exh. No. 1 (letters of support to the court); PSR at ¶ 41. There is no question that this case has taken an extreme emotional and financial toll on Mr. Cabrera-Sarabia; for over a decade, he has missed pivotal moments in his parent's, children's, and grandchildren's lives. His wife and children would

make the long trek everyweek down to Guadalajara to see Mr. Cabrera-Sarabia while he was in custody in Mexico. Exh. No. 1 at 6. However, since his extradition, he has not been able to see any of his sons or daughters in over three years. PSR at ¶ 53.

In determining a just sentence, many courts have considered the severity of pretrial confinement conditions. *See, e.g., United States v. Behr*, 2006 WL 1586563, at *14 (S.D.N.Y. 2006) (imposing a below-guideline sentence because the defendant's harsh pretrial custody conditions were "a penalty sufficient to afford just punishment" and acknowledging that another district court had reduced a defendant's sentence by one-third on that same ground); *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (holding that the court may stray from the guidelines "on the ground of harshness of conditions of presentence confinement" because the Sentencing Commission likely had not considered such conditions); *United States v. Gallo*, 653 F. Supp. 320, 336 (E.D.N.Y. 1986) (noting that "[t]he inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period of time, are undeniably severe").

Indeed, the Seventh Circuit itself has recognized that unduly harsh conditions can justify a lower sentence. In *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 646 (7th Cir. 2007), the Circuit adopted the reasoning of its sister courts and ruled that that "conditions of confinement

might warrant a sentencing judge's attention if a defendant can show that the conditions were unusually harsh." The Court, in doing so, noted that brief confinement in merely unpleasant conditions does not rise to the level of "so substandard or onerous" as to warrant special consideration. *Id.* (citing *United States v. Dyck*, 334 F.3d 736, 741 (8th Cir. 2003)). Here, the conditions and torture that Mr. Cabrera-Sarabia endured in Mexico for over eight years without a doubt surpass mere unpleasantness and enter the realm of unusually harsh circumstances.

Mr. Cabrera-Sarabia likewise faces the very real prospect of facing unduly harsh conditions post-sentencing. Although his behavior has remained admirable throughout his time in custody, the Bureau of Prisons routinely places high-profile defendants and those with former ties to organized drug networks in the most restrictive settings. These placements involve onerous restrictions on inmates' daily schedules and communication with the outside world, including family members.

In light of the above, a sentence below the advisory guideline range properly takes into consideration the extensive duration and harshness of the pretrial conditions he endured, coupled with the circumstances he will likely face following his sentencing.

ii.   General Deterrence (§ 3553(a)(2)(B))

Is general deterrence a thing? Have any sentences imposed thus far in America's never-ending war on drugs stopped the proliferation of drug trafficking in this country? There has yet to be a single published study by an academic, attorney, government official, or the like that shows causation or correlation between an increase in prison time for a particular type of crime and a corresponding reduction in that type of crime going forward. "In spite of its central importance, and the very high expectation we have that legal punishment and criminal justice policies can inhibit crime, we do not have very solid and credible empirical evidence that deterrence through the imposition of criminal sanctions works very well."[5] In fact, at least when it comes to the ultimate punishment, the opposite is true.[6]

Based on the above, any argument put forth by the government that stands for the proposition that putting these particular defendants in jail will deter other people from committing drug crimes lacks a basis in reality.

---

[5] Professor Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765 (2010).

[6] *See* Amnesty International, *A Clear Scientific Consensus That The Death Penalty Does Not Deter*, AMNESTY INTERNATIONAL USA (Jun. 18, 2009), https://www.amnestyusa.org/a-clear-scientific-consensus-that-the-death-penalty-does-not-deter/ (noting that that an overwhelming majority of scientists agree that the death penalty has no deterrent effect and have exposed studies purporting otherwise as "flawed and inconsistent").

Moreover, it is the certainty of punishment rather than its severity that sends a message to the community.[7]

Moreover, the need for general deterrence has been satisfied by the government's decision to extradite him from Mexico and bring charges against him in the first place. Other individuals who may be tempted to venture into the world of drug trafficking will know that the federal government is willing to bring foreigners to the United States for prosecution for importing drugs into this country.

### iii. Specific Deterrence (§ 3553(a)(2)(B))

"[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 491 (2011). Mr. Cabrera-Sarabia, now nearing 53 years old and approaching his twelfth year behind bars, is not the same man who was first brought into custody years ago. Having never spent time in jail before his arrest for this offense, Mr. Cabrera-Sarabia has already been significantly punished for his conduct. As someone whose commitment to public service has been the guiding force in his life, his fall from grace has been devastating to him and his family. He lives with the shame of his actions on a daily basis.

---

[7] *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199 (2013); *See also Five Things About Deterrence*, NAT'L INST. OF JUST., U.S. DEP'T. OF JUST. (May 2016) ("The certainty of being caught is a vastly more powerful deterrent than punishment.").

For the reasons Mr. Cabrera-Sarabia articulated in his letter to the Court, this Court can be confident that he will never commit this, or any other kind of, crime again. *See* Exh. No. 1 at 1-2. Furthermore, given the significant time he has spent in custody, and the arrest of the vast majority of his co-defendants, there is no reason to believe there is any way for Mr. Cabrera-Sarabia to return to a life of crime after he finishes his sentence and is deported to Mexico.

### iii.   Protecting the Public from Further Crimes of Mr. Cabrera-Sarabia (§ 3553(a)(2)(C))

At the outset, the parties and the probation department agree that Mr. Cabrera-Sarabia has zero criminal history points, placing him in criminal history category I. PSR, at ¶ 33. The United States Sentencing Commission discovered that criminal history score and criminal history category are "strong predictors" of recidivism.[8] Offenders with zero criminal history points who had prior contact with the criminal justice system (i.e., prior arrests) still present with a lower recidivism rate than those with one criminal history point. *Id.* at 15.

Although Mr. Cabrera-Sarabia had been arrested on charges that resulted in acquittals prior to his December 2011 arrest, he had never once served a term of imprisonment. A number of courts, including one within this

---

[8] *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, U.S. SENT. COMM'N, at 12 (Mar. 2017).

district, have deemed this factor relevant to sentencing. *See United States v. Patzer*, 548 F. Supp. 2d 612, 617 (N.D. Ill. 2008) ("It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentence imposed.") (quoting *United States v. Qualles*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)); *United States v. Villanueva*, No. 7-148, at *7 (E.D. Wis. Dec. 14, 2007) (concluding that a substantial term of incarceration was unnecessary for deterrence purposes where the defendant had never been to prison before); *United States v. Roque*, 536 F.Supp.2d 987 (E.D. Wis. 2008) (taking into consideration the significant impact of the defendant's first time in custody following his arrest).

Further, study upon study has shown that recidivism rates decrease with the age of defendants, while, at the same time, costs to the taxpayers of incarcerating individuals increase as they age. *See United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015) (noting that prisoners 50 years or older cost the federal prison system about eight percent (8%) more than younger prisoners, and these costs only rise with age); *United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("studies demonstrate that the risk of recidivism is inversely related to an inmate's age"); *United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) ("statistics suggest that past fifty years old there is a significantly lower rate of recidivism").

Even more, a defendant's age likely overstates the calculated recidivism risk, as "an inmate's physiological age averages 10-15 years older than his or her chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration."[9] The guidelines neither account for the inverse relationship between one's age and the likelihood of reoffending nor the compounding effect of prison itself.

Should the court impose a sentence below the probation department's recommendation of 250 months' imprisonment, release from the BOP will not give him free rein; Mr. Cabrera-Sarabia will be subject to removal proceedings and be deported back to Mexico. PSR at ¶ 47. Importantly, he understands the consequences of reengaging in any type of unlawful conduct or associating with any negative influences. Mr. Cabrera-Sarabia is wholeheartedly committed to leading a law-abiding life and cherishing the rest of his days with his wife, children and nine grandchildren.

## V.    Conclusion

Our highest court encourages sentencing judges to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

---

[9] *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, U.S. DEP'T OF JUST., OFF. OF INSPECTOR GEN., at 1-2 (Revised Feb. 2016).

the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Central to this principle is that "the punishment should fit the offender and not merely the crime." *Pepper*, 562 U.S., at 478 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). Mr. Cabrera-Sarabia does not seek to minimize his responsibility, but rather humbly asks this Court to consider the full scope of his life in determining his sentence. He is not the person the media portrays him to be; he is a loving son, devoted father, and valued member of his community.

Felipe Cabrera-Sarabia has accepted responsibility for his role in the offense, pled guilty, and agreed to the entry of a personal judgment order in the amount of $715,000, which represents the total amount of proceeds traceable to the offense. Taken together, the sentencing factors enumerated in § 3553(a) and consideration of the time Mr. Sarabia has served thus far — over 11 years in harsh pretrial custody conditions — supports a finding that a sentence below the 168 months' incarceration recommended by the probation department is sufficient, but not greater than necessary, to adequately address this offense.

Respectfully Submitted,

/s/ Ralph E. Meczyk
**RALPH E. MECZYK**

/s/ Mervyn M. Mosbacker, Jr.
**MERVYN M. MOSEBACKER, JR.**


/s/ Robert L. Rascia
**ROBERT L. RASCIA**

*Attorneys for Mr. Sarabia*




**Ralph E. Meczyk & Associates**
33 N. Dearborn St., STE 1830
Chicago, IL 60602
(312) 332-2853
rmeczyk@meczyklaw.com

**Law Office of Mervyn M. Mosbacker, Jr.**
2777 Allen Parkway, STE 1000
Houston, TX 77019
(713) 526-2246
mervynmosbacker@yahoo.com

**Robert L. Rascia**
650 N. Dearborn St., STE 700
Chicago, IL 60654
(312) 994-9100
rrascia@rasciadefense.com