IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 09 CR 383-8 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FELIPE CABRERA SARABIA, | ) | |
| | ) | Chicago, Illinois |
| Defendant. | ) | July 25, 2023 |
| | ) | 1:30 o'clock p.m. |

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

APPEARANCES:

For the Plaintiff: HON. MORRIS PASQUAL
Acting United States Attorney
BY: MR. ANDREW C. ERSKINE
219 S. Dearborn St., Suite 500
Chicago, Illinois 60604

For the Defendant: RALPH E. MECZYK & ASSOCIATES
BY: MR. RALPH E. MECZYK
MR. GINO PERONTI
33 N. Dearborn Street, Suite 1830
Chicago, Illinois 60602

LAW OFFICE OF MERVYN M. MOSBACKER, JR.
BY: MR. MERVYN M. MOSBACKER, JR.
2777 Allen Parkway, Suite 1000
Houston, Texas 77019

MR. ROBERT L. RASCIA
650 N. Dearborn Street, Suite 700
Chicago, Illinois 60654

APPEARANCES (Continued):

Also Present: MS. JESSICA COOK, Probation Officer
MS. CATALINA JOHNSON, Interpreter

Court Reporter: MS. JOENE HANHARDT
Official Court Reporter
219 S. Dearborn Street, Suite 1744-A
Chicago, Illinois 60604
(312) 435-6874

* * * * * * * * * * * * * * * * * *

PROCEEDINGS RECORDED BY
MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

THE CLERK: 09 CR 383, USA vs. Felipe Cabrera Sarabia.

MR. ERSKINE: Good afternoon, your Honor, Andrew Erskine on behalf of the United States.

THE COURT: All right.

MR. MOSBACKER: Your Honor, Mervyn Mosbacker on behalf of Mr. Cabrera.

THE COURT: All right.

MR. MECZYK: Good afternoon, your Honor, Ralph Meczyk on behalf of Mr. Cabrera.

THE COURT: All right.

MR. RASCIA: Good afternoon, your Honor, Robert Rascia for Mr. Cabrera, as well.

THE COURT: All right.

Anybody else?

MR. PERONTI: I am counsel to Mr. Meczyk and my name is Gino Peronti, P-e-r-o-n-t-i.

THE COURT: All right. A crowded table there.

And we have Mr. Cabrera Sarabia, himself.

THE INTERPRETER: Good afternoon, your Honor, Catalina Johnson, Court Interpreter.

THE COURT: All right. Thank you, Ms. Johnson.

Do you want to be seated? You can be seated in a chair. That is fine.

We also have Probation.

THE PROBATION OFFICER: Good afternoon, your Honor,

Jessica Cook from Probation.

THE COURT: All right. Thank you, Ms. Cook.

You may stay seated there, also.

All right. Is everyone ready for sentencing today?

MR. ERSKINE: Yes, your Honor.

MR. MECZYK: Yes, your Honor.

THE COURT: All right. Good.

All right. I am getting my papers together.

(Brief pause.)

THE COURT: All right. Mr. Cabrera Sarabia, do you recall when the Court took your guilty plea?

THE DEFENDANT (Through the Interpreter): Yes, your Honor.

THE COURT: All right.

And, at that time, I told you at one point in time if I accepted that guilty plea, we would be looking at a sentencing date further in the future from that date.

Do you recall that?

THE DEFENDANT (Through the Interpreter): Yes, your Honor.

THE COURT: All right.

And, so, I also told you at that time that when sentencing you, which is a difficult task in any case, that I would be looking at a lot of different resources, including briefs on your behalf by your lawyers; by the government

counsel; I would also be looking at the recommendation of the Probation Department, after doing a very extensive sentencing report, the PSR.

And do you recall that?

THE DEFENDANT (Through the Interpreter): Yes, your Honor.

THE COURT: And I would be looking at the sentencing Guidelines, in addition to the charges that you were convicted of, and how all of that interacted and came into the sentencing calculations, which would be argued in court at a later time.

Do you recall that?

THE DEFENDANT (Through the Interpreter): Yes, your Honor.

THE COURT: Do you recall me also stating that it is my charge, it is my duty, to keep my sentencing sufficient, but not greater than necessary?

Do you recall that?

THE DEFENDANT (Through the Interpreter): Yes. Yes, your Honor.

THE COURT: All right.

There was an agreement that the sentencing recommendation by Probation would be provided to each side.

Government, do you have yours?

MR. ERSKINE: Yes, your Honor.

THE COURT: Defense, do you have yours?

MR. MOSBACKER: Yes, your Honor.

THE COURT: And you have had a chance to review it with your client?

MR. MOSBACKER: Yes, your Honor.

THE COURT: All right.

You had the entire Presentence Investigation Report; is that correct?

MR. MOSBACKER: That is correct, your Honor.

THE COURT: All right.

And I am going to ask you now, are there any changes or adjustments to that report for the defense?

MR. MOSBACKER: Yes, we do have an objection that we do wish to argue, that does affect the Guideline range.

THE COURT: All right.

Then please do so now.

MR. MOSBACKER: Well, your Honor, I would like to first go into some history of Mr. Cabrera, or would you want to hear that later?

THE COURT: I would rather hear the objections and deal with them. I mean, you can get into the 3353 sentencing factors required at a later time -- a larger argument -- but I am just trying to, again, to make sure everybody is on the same page.

And I have ruled on what those objections are, so that the parameters are clear when you get into your arguments as to

the sentencing factors, if that is okay with you?

MR. MOSBACKER: Yes, your Honor. Thank you.

THE COURT: All right. That is more comfortable for me.

MR. MOSBACKER: And I would ask the Court for permission to have Mr. Meczyk address the specific objections.

THE COURT: All right.

Mr. Meczyk?

MR. MECZYK: Your Honor, thank you.

May I try to convince you, then?

THE COURT: I am here to be convinced. I keep an open mind to the very end.

MR. MECZYK: Always, your Honor. Thank you.

THE COURT: All right.

Take your time stepping up.

MR. MECZYK: Thank you very much.

May it please the Court?

THE COURT: It does.

MR. MECZYK: Your Honor, Mr. Cabrera has a stout and vehement objection to the enhancement, what is commonly known as leader/organizer.

And my friends on the other side, of course, you read their submissions; and, you, of course, read our submissions. And the thrust of our argument is that you can, indeed, rely on the hearsay of the government's witness. And that would be

Mr. Vicente Zambada.

And I know you have read -- I am confident that you have read -- the transcripts where Mr. Zambada is a witness in the trial against Mr. Guzman in New York City; and, as well as the statements that were provided to you by my friends on the other side, Mr. Zambada's prepared statement to the grand jury.

Your Honor, of course, you know -- and I don't have to tell you -- that hearsay is certainly admissible in a sentencing hearing. Except there is a caveat to that hearsay and that hearsay has to be reliable hearsay. It has to be corroborated hearsay -- or it should be, at the very least.

And, here, we don't have Mr. Vicente Zambada brought before you as a witness and put under oath and placed under oath.

Not that I would even assert that the oath would mean anything to him. But when he testified in New York City against Mr. Guzman in that trial, there is something I know that would make -- that, indeed, and I am not certainly being presumptuous, but it would have to make -- you give you pause or some hesitation in this case because the question is here: What foundation is there for any of these conversations that implicate other people and implicate Mr. Cabrera? What foundation was laid? Who did he have these conversations with?

It runs through the entire testimony.

Who did he have these conversations with? When did he

have these conversations?

It -- the common denominator in his entire testimony is, "I was told."

"I was told by," so and so.

"I was told by German."

"I was told my Rocha," other co-conspirators.

But the question is when was he told? And, many times, who told him?

You know, your Honor, I want to tell you, even before I get into that trial transcript, and from our written submissions, we know what happened to Mr. Zambada -- Vicente Zambada.

When he was arrested in Mexico and he was extradited to this country, back to Chicago, he had asserted -- he had made a claim, and I would submit to you a wild and patently absurd claim -- he had filed -- if I may have a moment?

(Brief pause.)

MR. MECZYK: His counsel had filed before His Honor Jack Cocio an affirmative defense. And that affirmative defense was that he had immunity from prosecution from the DEA and Homeland Security; and, moreover, not only did he have immunity, that he had public authority to act on behalf of the Sinaloa Cartel from the Drug Enforcement Administration, as well as from Homeland Security, and the highest echelons in the United States government.

In other words, they had given him his blessing to continue to commit crimes; to continue to act -- to commit crimes -- with impunity, as long as he would continue to inform the DEA, Homeland Security about other cartels -- I am sorry, "other cartels," I should say, other factions in these cartels. As long as he would give that information, he would have immunity.

And, to that end, your Honor, his lawyers filed in this courthouse his motion to dismiss all counts against him on the grounds that the government had conferred immunity on him -- immunity -- and asserted, as I have said, the defense of public authority.

And this was litigated.

But, you know, your Honor, very incisively, Judge Castillo had asked this question: "You know, this is all well and good, these -- " I am sorry, let me back up; that he wanted to have an evidentiary hearing -- was there a dispute that would require an evidentiary hearing?

Were there any counter-affidavits filed?

There were certainly admissions made on behalf of Mr. Zambada, by his attorney -- attorney admissions -- as though he had spoken. The same thing.

Yet, your Honor, what is truly remarkable is that he never filed an affidavit to corroborate, to support these patently absurd defenses that he had.

And Judge Castillo said, "How can I give you a hearing if you won't even come into this courthouse with an affidavit corroborating, backing up and supporting what you are claiming here?"

And do you know what happened to that, your Honor? Nothing.

Judge Castillo had ruled -- had decided -- against Mr. Zambada because he raised no factual dispute necessary to decide his motion.

So, this motion that he filed, these claims that he had authority, that he was actually going to be -- if I can just give you a little context.

There was a Mr. Loya, who acted as the --

THE COURT: A Mr., who?

MR. MECZYK: Loya, L-o-y-a, your Honor.

And he -- my recollection is, that he -- acted -- he was an attorney for the Senior Mr. Zambada, known as El Mayo. And he was sort of the ambassador, if you will, the consigliere to him, his legal advisor and, also, the ambassador from the Sinaloa Cartel to the DEA.

And, now, Mr. Vicente, the son, was to take that role and he would become the ambassador or the emissary, if you will -- or, I should say, now His Excellency -- to the United States government.

This is the patently absurd claims that he made.

And, of course, the government opposed it vigorously and Judge Castillo rightly dismissed it as being absurd.

And this is the person who now is making these hearsay allegations uncorroborated and, more importantly, your Honor, unreliable. And that is the touchstone for a hearing such as this.

It is hearsay. But is it reliable hearsay?

And, respectfully, our client says it is not. And we say stoutly that it is not reliable hearsay.

Your Honor, I want to give you just a few examples, without belaboring the point, and I know you have read everything.

You know, at one point there was a meeting in 2008 where Felipe Cabrera is present. And he is present with other informers, the Floreses. And there is a claim that Mr. Zambada, Vicente, is also present.

And, during this meeting, Vicente asked the Floreses -- Vicente asked the Flores twins, the two people who were at this meeting in the mountains of Durango -- he asked for weapons of war. Weapons of mass destruction.

He wanted RPGs . He wanted heavy fire power. He wanted rockets to destroy an embassy -- the United States Embassy -- in Mexico City, or a media outlet, because his uncle had been arrested by the Mexican authorities.

And he wanted to avenge that arrest. He wanted to

send his receipt from the DEA 6s that were given to you. They wanted to avenge his arrest in the Smoke, which is a colloquialism for Mexico City.

And, yet, when he testified in New York City under oath, he was asked directly that question. And I can paraphrase it instead of getting directly into a transcript.

He was asked the question, "Why did you need these weapons, essentially?"

And he denied it was for revenge to commit murder upon innocent people and take out the United States embassy.

When I think of that, I think of Oklahoma City, except even worse here in something as densely populated as Mexico City.

But he denied it under oath and he said, "Oh, no. I wanted those weapons because we were fighting. We were in a war with the Beltran Leyvas, and another faction. Nothing about revenge.

"It is okay. We were just fighting other bad guys," if you will.

That is the person who my adversary -- I should say my friend on the other side -- wants to rely.

He tells his story -- another patently absurd story -- that there was war going on between a rival faction, the Arellano and Felix Brothers, and they were killing people in his organization -- his criminal organization -- in Culiacan.

And he was told to be very careful, to stay close to his father.

Now, this is in New York -- in the testimony in New York -- City. "Stay close to my father because one of the targets was to harm me," meaning him, "to kill me, so they could harm my father."

That, your Honor, a few months later, he meets the same people who are his would-be assassins in Tijuana. And he meets them face-to-face.

And why would he meet people who are his known enemies? He meets them and he says, "What are you doing here?"

I am sorry, one of his friends says -- Amado (phonetic) -- he says, "He is with me," referring to Zambada. "He doesn't have anything to do with this. He is just with me."

And they left the house. Nothing happened to them.

Here is his avowed blood enemy and he just lets him go.

The stories he tells, they keep -- to say it is disingenuous is an understatement.

He talks about El Chapo's -- one of his -- escapes, the first escape from a Mexican penitentiary. And he recounts how Chapo is taken out in a laundry cart and that he has to go through certain checkpoints.

He doesn't say who tells him this. He doesn't

really -- he provides some details. You know, this is information of his escape that could be read in the newspaper.

For what he knows, he could have been in Spain where he spent a great deal of his time and, then, he finds out about these things.

Again, your Honor, there was no foundation for any of the claims he makes.

I am not disparaging counsel -- well, on cross-examination in that case.

But I should actually go back. Let me untwist my words.

Not disparaging counsel. It was the United States government inquiring him, where they never established a foundation.

"Where did you get this information?"

And the reason I am telling you this, your Honor, it is the same thing in this case and the same thing in the DEA-6s. Where did they -- where did he -- obtain this information?

From, whom?

We don't know.

Now, I can tell you what motive he might have, because after he filed his affirmative defense and his motion to dismiss, he sat for two years at the MCC in a cell -- at the SHU, it's called, the Special Housing Unit -- for over two

years, in a space that is not bigger than a parking space.

And his lawyer said repeatedly -- and he was actually held in draconian conditions.

So, after two years, literally being put in a box, without any exercise, without any real meaningful privileges, now he has a story to tell. And my assertion -- my submission -- to you would be that, at that point, he would be willing to say anything to please the government.

Again, that underscores the question of reliability, of believability.

Is this hearsay? And, in this case, it could be triple hearsay, for all we know. Is this hearsay a reliable hearsay? Is it corroborated?

And, you know, in New York, your Honor, he was asked a question about corroboration. He said, "Well, in many of the conversations I have had with people, I had eavesdropping equipment," very sophisticated eavesdropping equipment where he would record telephone conversations, radio communications. He had that. Where is it?

What backs him up?

Nothing. Not a thing.

THE COURT: Mr. Meczyk, while you are looking through your items, how about your focus on the cases that you feel back you up in your position that --

MR. MECZYK: I am sorry, your Honor.

THE COURT: I am sorry.

How about --

THE COURT: It is not you. It is my age and my hearing.

THE COURT: No, no, no. I should have remembered. No problem.

It does not put you or your client at a disadvantage. You are doing fine.

MR. MECZYK: Thank you.

THE COURT: I am just asking a question if you can move us along to the case law that you are relying on to support your position that this enhancement is not necessary, warranted or should not be considered by the Court.

MR. MECZYK: Certainly, your Honor.

May I step back a moment?

THE COURT: Yes, you may.

MR. MECZYK: Thank you.

(Brief pause.)

MR. MECZYK: Your Honor, I was hoping you didn't ask me that question because I am not prepared for that.

(Laughter.)

MR. MECZYK: But I have read it. I prepared that. I am losing part of my presentation, but I think I will be able to answer the Court's question.

THE COURT: I mean, you just argued factually so well

and put so much into it at this point, the Court was going to -- that portion that this Court is also going to -- have to rely on heavily.

MR. MECZYK: Certainly.

THE COURT: All right.

MR. MECZYK: Well, your Honor, you know, I know you know the cases in the Seventh Circuit are generally -- they are really -- all over the place. There are criterion, but they are not exclusive criterion for leader/organizer. Many things that you can certainly examine: Factors, such as decision-making authority, if that is what you are questioning me about.

And, in this case, I can depart from my notes for a moment and tell you that Mr. Cabrera did not exert any decision-making authority over anyone.

You have received, I know, the transcripts. And correct me if I am wrong, if you need me to refer you to anything.

If you need me to refer you to a particular transcript, I can.

But the question is: Did Mr. Cabrera assert any -- and that is really one of what I think the strongest arguments that you should not assess it; and, I will tell you why, of course -- that he exerted any decision-making authority.

Your Honor, in this case, Felipe Cabrera, I would submit to you -- and it is, I think, evident from the tapes

that were made by the Flores brothers, the surreptitious recordings -- that Mr. Cabrera did not control the people -- or, I am sorry, the individual -- one or more individuals; here, one -- to collect the proceeds of the contraband in Chicago.

It is our position and corroborated, might I add, not like the government's witness, corroborated, by the fact that he asked the Flores twins on the telephone, "Did you deliver 715,000?"

Your Honor, he did not even know the amount that they were supposed to collect from the collector. Felipe's role in this case is that he is not -- these are not -- people who are working for him.

The best analogy I can come up with is that they are independent contractors. It is a person named Chavita -- I have to say Chavita Charver (phonetic) -- if you will.

They were in the business of collecting money in Chicago, as couriers, and bringing it back to Mexico.

As a matter of fact, it is very telling -- very telling -- one of the brothers, I think it is Margarito Flores, on the telephone tells Mr. Cabrera that the courier had a tail; that he had information that he was being surveilled possibly by law enforcement.

And Mr. Cabrera says, "He had a tail? He had a tail? Let me find out about it."

And, then, in another phone call he says, "I can't reach them."

Can you imagine a leader/organizer, someone who exerts control or authority, someone who should know what is going on, assuming it is such an egregious amount of $715,000 -- almost, you know, three-quarters of a million dollars -- and not know who is doing, what? Who is in charge of, what?

All he did was to facilitate the money and keeping tabs on the progress of the movant of the money. That was his role.

Zambada brought the contraband to Chicago. And there had to be a way of getting it out.

And, your Honor, Mr. Cabrera didn't know.

May I be excused from the lectern one moment?

THE COURT: Sure.

MR. MECZYK: I want to find something.

(Brief pause.)

MR. MECZYK: Your Honor, it is part of our submission, probably -- I have it right here.

Leave to approach the lectern, again?

Thank you.

Your Honor, this comes from a Drug Enforcement Administration report, DEA-6. It is a DEA-6 prepared on March the 25th of '09. And Mr. Cabrera had already been in custody in Mexico.

And a confidential source noted that, "Felipe, last name unknown, asked the confidential source's advice on how to get the proceeds from the heroin sales back to Mexico.

"Felipe was not willing to risk the loss, so he did not completely determine a money shipment method."

He didn't even know how to -- how to -- repatriate the funds back; or, I should say -- that is the wrong word -- to extract the funds back.

And do you know, what? I think it is a fair way to surmise -- and this isn't wild speculation -- that someone like this confidential source lets word out that Cabrera is looking for someone.

So, in that milieu, in the grapevine, Mr. Cabrera doesn't recruit anyone. There is no evidence of that. And that would be one of the criterion for you to consider whether or not he is a leader/organizer: Did he recruit anyone?

And there was not one wit of evidence, or even anything that you can infer -- reasonably infer -- from, that he recruited anyone.

And, I think, it is just as easy to say that this confidential source may have known someone, and it's like the old Marine slogan, "We are looking for a few good men." And, here, a few bad men show up and they became couriers. We don't know.

But we do know clearly, from the government's own

evidence that they produced in this hearing, that Mr. Cabrera did not know. He was uncomfortable, sought advice, "How do I bring this back?"

His role is just to find out what the progress is, what the status is, of the money.

I hope that answers some of your questions.

THE COURT: Proceed.

MR. MECZYK: Thank you, your Honor.

I just want to get back to Mr. Zambada. And I don't want to belabor the point, but, you know, they asked him in New York at the trial -- and this is absolutely incredulous -- "Who is Chupata?"

And he says, "I know him by 'Juan.'

"What is his real name?

"I know it was 'Juan.'"

He didn't know his last name. But, yet, he says, "Oh, Chupata? I am his son's godfather. I christened one of his sons. I am the godfather for the baptism of one of his sons, one of 33, a nickname that they gave him, that is his son."

Wait a minute. He doesn't even know his last name. Again, it is these little things, these little things that add up in this mosaic of who he really is.

And they asked him, too, in New York, "When did you meet the Flores brothers?"

And he said, "The first time I ever met them was in 2008 on the mountain -- " I am sorry, no, he said he met them, I apologize -- that he met them around 2005, the Flores brothers' twins, their father and Mayo.

And, yet, in the DEA 6s, when he is -- when he proffers here and he is debriefed, he said, "Oh, I met him another time. I met him on the mountain in 2008."

He is asked one question that is so profound to me -- and, again, your Honor, it is in another book. I am sorry for the disorganization, but I just want to bring it out to you.

(Brief pause.)

MR. MECZYK: Now, the subject during that testimony in New York was, "Who was present at that meeting on the mountain?"

He names a number of people: Chapo, Guzman-Rocha, the Flores brothers and other people.

And the examiner, after he mentions Felipe, the examiner says, "What was Felipe Cabrera's involvement in drug transactions?"

Here is a wide open question. The subject is lasered in. And he said, "Oh, he was there just to -- my father had sent for him to introduce him to some clients who wanted to buy heroin in Chicago."

Nothing about what you received in the government's submission, in the prepared statement that was given to him,

where he parroted it in front of the grand jury -- and I don't mean to make it a homonym, I am sorry, but where he read this statement -- and he said, "Felipe Cabrera was involved with his brothers in another far-flung organization."

Here he was asked under oath, "Who is he?"

And all he gives you is just that.

It is also interesting -- and I might as well bring it out now -- that in the government's submission, that they said, "In 2009, there was a six-ton load of cocaine that my father bought from Columbian sources. And my father sold one ton to Felipe Sarabia, and it was ultimately destined for Felipe's cocaine customers in Chicago."

Now, this is in 2008 -- late 2008.

This meeting supposedly, that took place on the mountain in October of 2008, was just for some kilograms.

And I am not diminishing anything here. Please don't misunderstand. But not that quantity. It was for several kilograms of cocaine.

And Felipe, according to what we know, doesn't have any customers in Chicago, that an induction was supposed to be made for him.

Yet, how do you go from having that introduction for several kilograms of contraband to buying and having in place an infrastructure and customers and people working for you in Chicago in only three months? That, I would, again, assert is

preposterous.

So, you go from meeting, from an introduction, to, "Can I sell you some heroin? I want you to meet some customers here in Chicago."

Yet -- yet -- he has the wherewithal to have this big, this organization, presumably five or more people, and he is a leader/organizer.

This is all based on the uncorroborated, unreliable, word of a person who is not worthy of any credibility; certainly, is not reliable; certainly, not someone that you can say, "You know, what? This is a serious matter. I can enhance this man's sentence a great deal, many years in the penitentiary, in addition to what he served on the word of Vicente Zambada."

And, again, Judge Castillo was faced with the exact same -- and I know you are a person, an independent Article III judge -- I am only saying this because Judge Castillo did it, that isn't authority. It is certainly, I thought, a thoughtful way of handling this kind of evidence.

And, in the same indictment, Judge Castillo says, "I am not going to let the government use this exact same type of evidence. I am not going to allow it. Bring him in. Subject him to cross-examination, instead of cross-examination absentia. Bring him in. Put him under oath."

And, as I have said, I don't think his oath would mean

anything, but, yet, he would be subject to cross-examination. You would be able to judge his demeanor. You would be able to judge the veracity of what he said. And we would be able, I respectfully submit, be able to impugn his credibility or impeach his credibility.

(Brief pause.)

THE COURT: Counsel, I am going to tell you, you are coming up almost, like, close to almost an hour.

MR. MECZYK: Your Honor, when I --

THE COURT: And this is not --

MR. MECZYK: -- when I hear that, it is the red light going on.

THE COURT: It is like the red light, yes. In the old days, it is the red light.

MR. MECZYK: I got it. I got it.

Your Honor, thank you very much for your attention to me.

THE COURT: All right.

Now, seriously, Mr. Meczyk, if there is something else, especially in terms of the case --

MR. MECZYK: No. I think I am confident that you get my point. And I am sorry to be so long.

THE COURT: That is quite all right. I was just trying to give you a warning before we got to the red light plan.

MR. MECZYK: I get it. Thank you, your Honor.

(Laughter.)

THE COURT: All right.

You're welcome.

MR. MECZYK: Thank you.

THE COURT: Thank you.

All right?

And, so, that is your main objection, though, Mr. Meczyk, again, to the leadership -- the four points that is included into the calculation?

MR. MECZYK: Yes, your Honor.

THE COURT: Are there any other objections you need to make me aware of right now?

MR. MECZYK: Your Honor, that was my role in this case -- speaking of roles -- and that would be assuming the leader/organizer.

THE COURT: Okay.

All right. Thank you very much.

MR. MECZYK: Thank you very much.

THE COURT: We will deal with that issue first.

I will go back and make sure there is not a few others. If there are, we are going to go ahead and let Mr. Erskine address that --

MR. MECZYK: Thank you, your Honor.

THE COURT: -- since that is the major, major issue.

All right?

Go ahead, Mr. Erskine.

MR. ERSKINE: Thank you, your Honor.

Just one quick clarification before I address that. And I think this is really important for the Court's understanding and context in the sentencing.

As set forth in Paragraph 15 of the plea agreement, the defendant was arrested in Mexico on December 23rd, 2011. And he was arrested on Mexican charges, as well as American charges.

His Mexican case was ultimately reversed and he has been in custody ever since then.

So, at the end Mr. Meczyk said, you know, "Give him a sentence on top of the time he has already served." But, just to be clear, the parties do anticipate that this defendant is going to be getting credit for his time in custody, going all the way back to 2011.

THE COURT: All right.

MR. ERSKINE: So, I think it is just really important for the Court to keep that in mind.

THE COURT: I am looking at it right now: Paragraph 15 of the plea agreement, Page 11.

MR. ERSKINE: Yes, exactly.

THE COURT: Proceed.

MR. ERSKINE: So, your Honor, just to focus for a

moment -- to focus for a moment -- on the Guidelines, you are well familiar with it. It is brought up in many, many cases in which you were the sentencing court. I just want to note a couple things about the 3B1.1 enhancement.

You don't need to be the top, top leader of a conspiracy. There is not only one leader contemplated by this Guideline within a conspiracy. You can have multiple people who get the enhancement. Really, all you need to do is be directing, at least, one other person. And that person just needs to be a participant. Doesn't even need to be a charged or convicted co-conspirator.

And that is in Application Note 1.

THE COURT: Uh-huh.

MR. ERSKINE: You know, obviously, a cooperating source or an undercover is not a participant, but anyone else who is criminally culpable, charged or not for a crime, is a participant.

And, then, also, interestingly, in Application Note 2, it talks about how the defendant, to get this adjustment, must have been an organizer, leader, a manager or supervisor of one or more other participants.

That is at that point of law where it need be just, at least, one.

But, then, it goes on, "An upward departure may be warranted, however, in the case of a defendant who did not

organize, lead, manage or supervise another participant, but who was, nevertheless -- " " -- who, nevertheless, exercised management responsibility over the property, assets or activities of a criminal organization."

So, we reject the defense's position. But even accepting their version of the facts, I think the second part of Application Note 2 applies and would call for an upward departure.

But if you look at the plea agreement, the plea agreement makes clear on the factual basis that a leadership enhancement, a 4 level, is appropriate here.

Firstly, you know, the difference between four levels, three levels, two levels, that is a function, as the Court knows, just of how many people were involved in the crime. And this was the Sinaloa Cartel. There were many people involved. But I haven't heard the defense make argument that that is the issue. I think it is either four levels or nothing here, pretty much.

And, so, the question is, okay, well, you know, was -- against the backdrop of having five or more participants, was -- the defendant an organizer or a leader?

And, so, if you look at the factual basis, what happened here -- and, again, it is not the entirety of what the Court ought to consider when sentencing the defendant, but what happened -- in the particular transaction that is described in

the -- or two transactions, really, happened in the plea agreement is, essentially, Mayo -- El Mayo -- who was then and continues to be, you know, one of the leaders --

THE COURT INTERPRETER: Sir, could you please slow down and talk louder?

THE COURT: All right.

Are you having trouble hearing him?

THE COURT INTERPRETER: Yes, your Honor.

THE COURT: All right.

Let's see, Madam Court Reporter, can you go back -- I don't know when that happened.

(Record Read.)

THE COURT: Mr. Erskine?

MR. ERSKINE: So, yes, your Honor.

THE COURT: All right.

MR. ERSKINE: So, if you look at the plea agreement, it is describing -- the factual basis is the transaction that took place.

And, in essence, what has happening is El Mayo, then one of the two leaders of the Sinaloa Cartel -- and, again, we are talking about the highest levels of the Cartel -- they are having a meeting. And the meeting is with Mayo, with Mayo's son, Vicente Zambada, who Mr. Meczyk just talked about at length, Felipe Cabrera and, then, the Flores twins, who were the cooperators.

So, Mayo, essentially, says, "Hey -- " and I am paraphrasing, of course, but -- "I want to sell these guys heroin," the Flores twins. "Please take -- do this transaction."

And, so, Cabrera does.

For the purposes of this transaction, at a minimum, he is stepping into Mayo's shoes and he is overseeing the transaction.

Meanwhile, Mr. Cabrera is not flying up to Chicago, picking up kilos of heroin and, then, delivering them to the Flores twins. No, he is working through other people. He is causing other people to deliver the drugs -- the heroin -- you know, in the Chicago suburbs, to a courier for the Flores twins.

And, then, later on, in communication about payment, you know, there -- he is helping to oversee and coordinate the receipt of the payment.

And, yes, he did not know the dollar amount that was delivered; but, even the CEO of -- or, I mean, it doesn't surprise -- it wouldn't be surprising that a person in management of any given company won't necessarily know every little last detail of how much money was handed off in Chicago. But that is not the question.

He was tasked with overseeing this operation, including the people executing that operation, and he did that.

And even if they were independent contractors, they are still participants. They are still people who are criminally culpable for the activity at issue. And he was -- it was his responsibility, at the charge of Mayo, to see that through. And that is what he did.

So, that answers the question without even delving into all of the Vicente Zambada stuff.

But, you know, your Honor, as I included in the sentencing memorandum, Zambada did talk about the defendant Cabrera and the fact that he was -- he worked with his brothers, that he was -- the leader of his brothers' group of drug traffickers; that he had a worker, a lieutenant by the name of Lupe.

And Mr. Meczyk talked about corroboration. There is no reason to question this. I mean, as the plea agreement stipulates, Vicente Zambada was at the very meeting -- he was at the meeting -- where Cabrera was introduced to the Flores twins. His father was Mayo, the person who the plea agreement acknowledges Cabrera was working under at this time.

So, he was right up close, up front, and had a firsthand view into the goings on of Mr. Cabrera.

So, based principally on the facts of the plea agreement, itself, but, also, as supported by the information provided by Mr. Zambada, the government thinks that the record supports applying this enhancement.

THE COURT: All right.

Thank you very much.

As to any other objections? I am not going to rule on it right now. I just want to know.

MR. MOSBACKER: No, your Honor, not any other objection. But I do want to clarify a couple of things on the factual basis of this objection.

THE COURT: The factual basis for this objection?

MR. MOSBACKER: There is a factual basis in the plea agreement --

THE COURT: Yes.

MR. MECZYK: -- which Mr. Erskine, I guess by mistake, misstated.

THE COURT: Oh, just now?

MR. MOSBACKER: Yes.

THE COURT: All right.

Go ahead.

MR. MOSBACKER: He said there were two Flores brothers at that meeting. There was only Pedro Flores at the meeting. The factual basis says that very clearly. It says Pedro and Margarito, before this, had been recruited by DEA and were working for him. But Pedro was the only one there.

And the factual basis does not say, "Felipe, take care of this transaction. These guys are in -- want heroin to buy in -- Chicago."

Mr. Zambada says specifically that, "The heroin is already in Chicago."

Felipe had nothing to do with getting the heroin to Chicago. So, he is not overseeing any heroin transaction.

All that happens -- and all that the factual basis says -- is that Mr. Zambada ordered Felipe and Pedro to exchange phone numbers, so they could keep in communication.

And Felipe's only job was to keep the communication with the Flores brothers and the guy that was in charge of bringing the money back, Chavez Arambula.

That was his only function. And he was unaware of the details, including the amount of the money; who the courier was. Salvador Chavez Arambula was in charge of that.

And the transcripts of the conversations with the Flores brothers -- and, by the way, Mr. Sarabia was in Durango, Mexico. He wasn't in Chicago. He wasn't anyplace close. He was in communication with them through the telephone.

He had no idea what the quality of the heroin was because Pedro, in one of the conversations said, "Oh, this quality of Mr. Zambada's heroin is poor. It's a lot worse. It's not good, like it was Chapo's heroin."

Chapo Guzman.

And Felipe says he would look into it.

Well, Felipe looked into it. And in Vicente's statements he said that Felipe called him and said, "Hey, these

guys say the heroin is poor and they are going to not give us the money, like, they would for the good heroin."

It was all a ruse by Pedro Flores; but, by that ruse, you can see that Mr. Cabrera did not know about the quality of the heroin because he had nothing to do with it. He didn't transport it up there. It was up there before Mr. Zambada recruited him.

And, by the way, the Sinaloa Cartel was probably the most powerful cartel in Mexico at that time. Chapo Guzman and Vicente Zambada were co-equal leaders of that cartel.

Mr. Zambada was in charge, as the whole state of Durango, as one of the states he was in charge of.

(Brief pause.)

THE COURT: Go ahead.

MR. MOSBACKER: He had the whole state of Durango. It was one of the states he was in charge of.

Mr. Cabrera Sarabia was a native of Durango; lived high in the mountains; and, when Mr. Zambada, basically, says, "I want you to come to this meeting," and asks you to do something for the first time -- this was the first thing he asked him to do -- he asked him to communicate.

That is what he asked him. It is not a direction. It is not leadership. It is not managing it. It is just communicating between the Flores brothers and Salvador Chavez.

THE COURT: All right.

MR. MOSBACKER: With that, your Honor, is, basically, to summarize.

And, also, keep in mind that Vicente Zambada, as far as reliability, he was arrested in January of 2009, just a few months after that meeting, and just a couple of months after the heroin was taken up there, prior to Mr. Cabrera joining Mr. Zambada.

And Mr. Cabrera was not working for Zambada before this.

So, all of the things that he says that happened in 2009 -- Vicente Zambada, all of those, anything after January of 2009; early January, where he was arrested in Mexico City, essentially, turned over by DEA to the Mexican authorities -- all of the rest of this is either made up or it is based on some uncorroborated hearsay, your Honor.

THE COURT: Thank you very much, counsel.

MR. ERSKINE: And --

THE COURT: Wait. I am going to give you a chance, Mr. Erskine.

Is there anything else in your response to what you feel that Mr. Erskine said?

MR. MOSBACKER: No, your Honor.

THE COURT: All right.

Mr. Erskine, you do get a few more words in response to that.

MR. ERSKINE: Thank you.

All I would like to do is just quote a few parts of the plea agreement --

THE COURT: Sure. Please do.

MR. ERSKINE: -- and ask the Court to consider it and interpret it, using common sense, as well as understanding what value is the defendant adding if the defense version of these facts is accurate?

THE COURT: Proceed.

MR. ERSKINE: So, I am on Page 3 of the plea agreement.

THE COURT: Uh-huh.

MR. ERSKINE: It says, "During the meeting, at the direction of Zambada Garcia, Margarito Flores agreed that he and Pedro Flores would make arrangements with Cabrera to purchase heroin belonging to Zambada Garcia that was located in Chicago."

As an aside, again, Cabrera Sarabia never came up to Chicago to deliver those kilograms of heroin from where they were being stored, to the final destination.

THE COURT: Uh-huh.

MR. ERSKINE: Continuing on, "Cabrera acknowledges that sometime later, in October, 2008, at the direction of Zambada Garcia, Cabrera communicated with Individual A, who then instructed his workers about providing approximately 13

kilograms of heroin, already in Chicago on credit, to Pedro and Margarito Flores, by associates of the Flores brother, so that the Flores brothers could further distribute the heroin."

Again, Cabrera makes the phone call to Individual A, who is a participant, and the workers are participants, and that results in those workers providing the 13 kilograms of heroin.

I don't know what could have possibly happened over their call if it wasn't some sort of direction along the lines of, "Okay. Deliver the drugs."

What is the call about, if it is not about delivering the drugs to the -- causing the drugs to be delivered to the -- Flores twins?

Then, later, on Page 4 -- and this is in the context where the Flores twins are complaining about the quality of the heroin -- "In response, Cabrera responded, 'They are all the same,' meaning that the quality was the same as the quality of Guzman-Loera's heroin."

Later in the conversation, when Cabrera spoke with Pedro Flores, Cabrera said that, "The other customers had not complained about the quality of the heroin; and, that maybe the Flores' brothers' customers were more demanding."

So, he is aware of other customers. This is not just his only task is to be some sort of messaging service, vis-à-vis the Flores twins.

The next page, Page 5 at the top, finally, "Cabrera and Pedro Flores discussed arranging for couriers to deliver and receive payment for the 13 kilograms of heroin."

And, then, finally, after the money is delivered, "In a later telephone call, Cabrera also told Margarito Flores that the couriers saw vehicles during the money exchange that appeared suspicious; meaning, they appeared to be associated with law enforcement."

So, it is the kind of feedback that would go to Cabrera, who was managing the operation, and that you would expect to go back to a manager.

THE COURT: All right.

Anything else, Mr. Erskine?

MR. ERSKINE: No, your Honor.

THE COURT: All right.

Thank you very much for that presentation.

As to additional -- no additional argument on this point, counsel. I have got the plea agreement.

MR. MOSBACKER: Yes, your Honor.

THE COURT: Do you have additional objections?

MR. MOSBACKER: No additional objections, your Honor.

THE COURT: Then I am going to find out if they have any objections.

Then I will deal with whether or not I am adopting or how I am adopting the Presentence Investigation Report. All

right?

If there is no further objections on behalf of the investigation report -- not the recommendation, not the ultimate sentence, but on the calculation -- there is no other from the defense?

MR. MOSBACKER: No, your Honor.

THE COURT: All right.

Mr. Erskine, do you have any objections or adjustments to make?

MR. ERSKINE: No, your Honor.

THE COURT: All right.

There not being any objections, I think this is a good time, while the interpreters are getting settled, I am going to take a very short break and I will come out and rule on what the calculations are. Okay?

Thank you.

(Brief recess.)

THE COURT: Are we set?

THE INTERPRETER: Yes, your Honor.

THE COURT: Okay. Thank you.

All right. The Court took a break -- as people are coming in, the Court took a break -- at the close of the arguments regarding whether or not the Court should adopt the Presentence Investigation Report that has been presented and the calculations therein, or whether I should sustain any

objections that came before me.

As Mr. Meczyk so aptly stated, at sentencing the Court can consider hearsay. It can. But it is not unfettered hearsay. It is not hearsay of any type, at any level, and the Court understands that.

So, they are claiming that there is no corroboration for the grand jury testimony that was given by Mr. Vicente regarding Mr. Cabrera's participation in the offense.

(Brief pause.)

THE COURT: All right.

And the first thing the Court wants to say on that subject is that the government, at least at this stage -- and this Court -- is not relying solely on Mr. Vicente's testimony.

In addition to having Mr. Vicente's testimony or statement in front of the grand jury, even though there was no additional affidavit, as was argued, there was no additional information prior to that, the Court notes that this Court held a full hearing on a guilty plea and I gave full admonishments as to what that involved.

And I gave a full repetitive colloquy, with interpreters present, to Mr. Cabrera. And that included, when I got to the factual statement in support, not only explaining what that was, but after it was given -- I believe there was four pages of it that everyone should have a copy of in the plea agreement -- stating the facts in this case, and including

Mr. Vicente's statement about Mr. Cabrera's participation and that of the other people involved -- the Flores brothers and El Mayo, all of that -- that that was read in open court, with an interpreter; and, at the close of that, I asked the government, "Does that complete the statement of facts to support this charge?"

They said, "Yes."

I turned to Mr. Cabrera and said the same thing: "Does that complete it?  Do you wish to make any changes?  Is any of it, that you would like to not agree with, make any changes?"

I said it three or four different ways, to give him a chance to respond to the statements that were made.

So -- and, then, after that, I said, "What is your plea?"

He said, "Guilty."

With him saying "Guilty" after that statement of facts in support of the charge read by the government, and his opportunities to correct it, deny it, change it, question it, none of that having happened, this Court does believe that does corroborate the statements that were made.

That is further corroboration.  This isn't just a statement hearsay.  This is a statement that has been corroborated by the defendant, himself, when he plead guilty. These are the facts.  This isn't some just random statement.

So, I believe there is corroboration with that.

And as to there being the factual basis, and him pleading guilty, the Court further, again, asked him if he acknowledged whether or not he had those conversations; the amounts involved; the drugs involved; there was no change to any of the statement that was read or given.

So, the Court then looks at the section of the Sentencing Guidelines 3B1.1, which assesses the four point levels for a defendant who is an organizer or leader of a criminal activity with five or more participants.

And when I look at that and I read that, the Court is going to say, "Government, I don't know if, other than those with the dispute that I am hearing now, whether or not the government has presented enough evidence to support the four-level enhancement."

However, looking at that, the Court does believe, after reading Comment 4 and what it requires, the Court does believe that a Level 3 enhancement is clearly there. That is despite the defense's arguments, focusing on the credibility of Mr. Vicente's grand jury testimony and their argument that that is the only factual basis so far to support this enhancement.

This is based even on the defendant's own argument as to what his role would be as, at the most, I think defendant is admitting that he was maybe a middleman participant, some type

of supervisor or middle management, I guess, would be probably the better phrase, is the way you are claiming it.

And, in fact, to follow up on that, you cited -- the defense cited -- two cases in the Seventh Circuit that are more than 20 years old, and cited those cases in support for their position.

I believe the Seventh Circuit has a few more current cases, including U.S. vs. Triplett, and that is a Seventh Circuit case from 2021 that specifically says, "Overseeing daily operations and hiring workers to pick and sell heroin is sufficient to warrant a four-level enhancement."

I am saying we are looking at a three-level enhancement, based on the fact there was clearly El Mayo and the Flores brothers.

El Mayo was the head of everybody. And, then, you had the Flores brothers sometimes giving him direction; people asking about the quality of drugs; him responding, "Well, my customers are looking for different things."

There is a lot of back and forth there which, in this Court's mind, clearly shows he has some supervisory authority and he is in management at some level.

He may not be the leader, but there is some management of a group of more than five or more people. And I think that has clearly been shown here.

And, so, instead of the four-level enhancement, this

Court believes the evidence and the arguments presented today show that there is a three-level enhancement that would be appropriate.

So, that is one point off. It was 39, I believe, is the level.

Am I correct, Probation?

THE PROBATION OFFICER: It is 41, your Honor.

THE COURT: It is 41?

Okay. So, we take it down to 40, correct?

THE PROBATION OFFICER: Yes, your Honor.

THE COURT: All right.

And, then, the Guideline range would be, what, Probation?

THE PROBATION OFFICER: 192 to 365.

THE COURT: What is it, again? Say it, again, the range?

THE PROBATION OFFICER: 292 to 365.

THE COURT: Oh, you said "192."

THE PROBATION OFFICER: I am sorry, 292 to 365. My apologies.

THE COURT: Okay.

Again, 292 to --

THE PROBATION OFFICER: 365.

THE COURT: All right.

So, that is the new Guideline range.

And the Criminal History Category is still a I?

THE PROBATION OFFICER: Yes, your Honor.

THE COURT: All right.

So, for the defendant, Mr. Cabrera Sarabia, the Court is going to rely on the calculations that have been presented here.

The statutory provisions in this case, based on the charge that you were convicted of, ten years to life; supervised release, ten years -- I am sorry, five years -- to life; a $10 million fine; and, $100 special assessment, along with a questionable, if this Court gave it, community restitution.

The Guideline provisions are now -- and I didn't write them down, again -- they are now what, again, Probation?

THE PROBATION OFFICER: The custody range is 292 to 365 months.

THE COURT: All right.

So, the custody range is 292 to 365 months.

Still, a supervised release of five years to life.

And the fine level, does it change or is it the same, from 25,000 to 10 million?

(Brief pause.)

THE PROBATION OFFICER: Actually, your Honor, it is 50,000 to 10 million.

THE COURT: So, it is not going to go up, Probation.

It is going to come down.

It can't be going up.

On the information I have, based on your report and recommendation, I show 25,000 to 10 million. Was that incorrect?

THE PROBATION OFFICER: I see that, your Honor, and that is incorrect.

Based on the fine table I am looking at, for any offense Level 38 and above, the minimum is $50,000.

THE COURT: 50,000 to 10 million?

THE PROBATION OFFICER: My mistake.

THE COURT: All right. No problem. I just want to make sure I am giving Mr. Cabrera Sarabia the correct information and most recent. All right?

And that would be the fine that the Court could levy, if the Court found it appropriate.

And a hundred dollar special assessment remains. All right.

So, sir, with those Guidelines, those calculations, that is what the Court is going to start at.

As I think I told you, I look at the Guideline calculations as a point of starting. The Court can go above it, the Court can stay within it or the Court can go below it; do you understand, as far as levying a sentence?

Do you understand that I can stay within those

Guidelines, 292 months to 365 months, and the others.

Do you understand what I am saying now?

THE DEFENDANT (Through the Interpreter): Yes, I understand.

THE COURT: I can stay within it, go above or go below. All right?

THE DEFENDANT (Through the Interpreter): Yes.

THE COURT: So, now, I am going to have your lawyer argue further on behalf of the use of the sentencing factors under 3553(a), which are factors that can help adjust where the Court feels that this case should be, as far as what sentence for you personally is sufficient, but not greater than necessary.

Counsel, the floor is yours.

MR. MOSBACKER: Thank you, your Honor.

May I inquire on one thing? We did receive a modified calculation from the Probation officer, that it was a Level 39.

THE COURT: Well, you know, what? You are right. I have a 39 on my recommendation. That is why I said 38.

Is there something else that has been changed?

THE PROBATION OFFICER: There hasn't been a supplemental filed.

In the body of the report, the calculation, with the four-level increase, is 41. And the Guideline range included on my recommendation section is for 41 and 1.

That 39 at the top of the page for a Total Offense Level on the recommendation is incorrect.

THE COURT: So, the recommendation -- you are talking about the body of the -- in the body of the -- recommendation it is 41, correct?

THE PROBATION OFFICER: In the body of the report it is 41, which is the calculation with the four-level increase.

There is an error on the Total Offense Level on the recommendation page.

THE COURT: On the front page there is an error?

THE PROBATION OFFICER: That is correct.

THE COURT: All right.

Is that your understanding, Mr. Erskine?

MR. ERSKINE: Yes, your Honor.

The Base Offense is 38, based on the drug amount.

There is a plus 2 for a dangerous possessed.

THE COURT REPORTER: I am sorry, could you repeat that?

MR. ERSKINE: Sorry.

The Base Offense Level is 38, based on the drug amount.

THE COURT: Uh-huh.

MR. ERSKINE: There is a plus 2 for a firearm possessed.

THE COURT: Uh-huh.

MR. ERSKINE: The Court just ruled a plus 3 for Role in the Offense.

So, that all comes to 43, minus 3 for timely acceptance of responsibility, brings us to 40.

THE COURT: All right.

It brings us to 40, instead of 39.

And, now, we are switched, since I took one off because of the three point enhancement.

MR. ERSKINE: So, sorry.

What I just calculated was following the Court's ruling.

THE COURT: That is the 40?

MR. ERSKINE: Yes.

THE COURT: Okay.

MR. ERSKINE: So, it was 41 before.

THE COURT: All right. It was 41 before. All right.

I will just say this: I know we give the opportunity for the defendants to rely on these.

And, you know, people like me, everybody is not a math wiz, when you see a Total Offense Level of 39, and it is the most recent recommendation, people rely on that.

MR. MOSBACKER: Your Honor, we did. And I think Mr. Erskine probably did, as well, with his recommendation, which is squarely in the middle of that range of 39.

He recommend 240 months, your Honor.

THE COURT: He did.

But, actually, his recommendation is below. So --

THE PROBATION OFFICER: And just to be clear --

THE COURT: Yes, sure, you know that, because his recommendation was below.

Go ahead.

THE PROBATION OFFICER: Just to be clear, the custody range is correct for 41 and 1. So, it is a hundred percent my error that I did not carry over the Offense Level properly on the recommendation page.

THE COURT: So, it is 41 and 1, is the correct one?

THE PROBATION OFFICER: As we calculated it, your Honor, yes, with the plus 4 enhancement.

THE COURT: Before I just made my ruling --

THE PROBATION OFFICER: Correct.

THE COURT: -- or now?

So, again, what is it as of this moment that I am adopting as to the calculations?

THE PROBATION OFFICER: 40 -- an Offense Level of 40 -- your Honor.

THE COURT: 40.

THE PROBATION OFFICER: With a Criminal History of I.

THE COURT: 40?

THE PROBATION OFFICER: Correct.

THE COURT: All right. I am just making sure it is

40.

And that, really, does not affect what Mr. Erskine did.

Mr. Erskine's is based on, I think, something more, in terms of disparity. And I will let him argue that. But it is not based on that calculation.

So, I would just go ahead with your argument.

MR. MOSBACKER: Yes, your Honor.

THE COURT: Yes. Go ahead.

MR. MOSBACKER: I would like to address the 3553(a) sentencing factors.

THE COURT: Please do.

MR. MOSBACKER: And I want to start out by going through his personal history, family history, community history and his actions, as a member of his family and his community.

THE COURT: Uh-huh.

MR. MOSBACKER: I am sure the Court read his background. He came up, basically, in a very poor family. He was raised with a family. His mother and father, who are still living, his far was in the cattle-raising business and selling cattle. And they also had agriculture -- basically, to feed themselves -- corn and beans.

They were very poor. He started working at the age of six years old tending to the smaller animals on the ranch; and, then, was going to school until the age of 12, when he quit

school and began helping his father with the cattle business.

He moved, basically, in with Ippolita Mezzina Vermutas (phonetic) at age 15. And they lived in a house that he and his father built close to the family home.

And, by the age of 18, he had his own herd of cattle.

He has a wife, Ippolita Mezzina Vermutas. She has been his wife for 37 years.

His oldest son, Oscar Cabrera Medina, is in the cattle business, in place of his father, since he has been incarcerated, and continues that business enterprise.

His other siblings are all college educated. One is Maria Christina Cabrera Medina. She has a degree in public accounting; Carolina Cabrera Medina has a Master's Degree in Business Administration and Finance.

THE COURT: I am sorry, maybe I misunderstood. You said his other siblings? Are you speaking --

MR. MOSBACKER: I am talking about his other --

THE COURT: Children?

MR. MOSBACKER: -- children.

THE COURT: All right.

MR. MOSBACKER: Excuse me, your Honor.

THE COURT: Okay. You threw me off.

All right. I am listening. Go ahead.

MR. MOSBACKER: She has a Master's Degree in Business Administration and Finance.

And Luiz Felipe Cabrera Medina has a degree in Business Administration.

And that shows the extent to which Mr. Cabrera was invested in his children.

He moved from --

THE COURT: Just hold up on one second.

Can the children who were just named, if you are here, can you stand?

MR. MOSBACKER: I don't believe they are here, your Honor.

THE COURT: None of them are here?

MR. MOSBACKER: There may be one attending by telephone.

THE COURT: Okay. That is good. Proceed.

I just was going to give people the opportunity to stand up.

Go ahead.

MR. MOSBACKER: He moved his family to Durango in the late '90s. And the specific purpose for that was to get better schools, so his children could advance.

He always emphasized to them that schooling and studies was the way to advance in the world.

And you can see the results of his, basically, inculcation of value into his children.

What is interesting to note, also, is he was invested

in the children of his ranch workers. He had a little school that they attended.

And, also, when his daughter Carolina was young, she learned English pretty well. And he would take her to the ranch to teach English to the children of his ranch hands.

Eventually, he was able to help his community, Vascogil, in Durango. Even though he was living in Durango, he was still helping the community.

When he was 18, he got the mining company, that has a big mine there, to arrange to make a road to Vascogil, to make it easier for community members.

He also arranged to have, later on, a municipality that was close to Vascogil, lay water lines so each resident could have water.

He arranged for the mining company to help with materials. And they expanded the school there in Vascogil.

And he was known for various acts of charity in the community, including providing medical care, paying for medical care when needed for -- expressly for -- his ranch hands and their families, and sometimes for other persons in the community.

One of his neighbors in Durango talks about his kindness -- financial kindness -- covering expenses of a funeral; paying for surgeries, if needed; supporting scholarships for young persons, who eventually graduated from

the university with that kind of financial help.

The mayor of an adjoining city, San Juan De Camarones, sent a letter signed by representatives, as well, for the Court to consider. She said that Mr. Cabrera was chosen by the villagers to be a judge for four years. And a judge consisted of persons who, basically, oversaw the buying and selling of cattle or herd animals.

He brought vaccines back from Durango and distributed them to different cattle raisers.

He furnished supplies for the school there in Vascogil. And he was -- according to her, he was -- always generous with his ranch employees.

Finally, I would like to -- on this family history and personal history, like to -- note that Mr. Cabrera is different than other drug lords -- and he is not a drug lord, but other drug persons -- involved with the Sinaloa Cartel.

The drug lords of that cartel, every one of their children seems to be involved in drug trafficking. The Guzman boys are all recently indicted -- well, I don't know recently, but it was unsealed -- all four young men that Chapo Guzman was the father of, were involved in drug trafficking, currently with fentanyl.

Vicente Zambada, obviously, was involved in drug trafficking.

And you can see that Mr. Cabrera took great care to

keep his family out of that. And, instead, they are productive members and educated members of society.

The Sinaloa Cartel, obviously, was very powerful. It still is. And it was sort of difficult for Mr. Cabrera to turn down an offer from Ismael Zambada-Garcia who, basically, controlled his state and other states.

I would like to talk about his incarceration and his arrest.

As we noted for the Court, when he was arrested by military -- Mexican military -- members, they beat him and tortured him, essentially, in front of his family.

A couple of his children are still being seen or seeing psychologists for post traumatic stress.

They beat him. They put a bag over his head, slapped his ears, which sustained some damage.

And the beating, as the probation officer notes and the PSI states, resulted in a hernia, which just was recently operated on in 2022.

So, since the beating in detention in Mexico, he has been in pain for many years.

And, then, the conditions in the prison are harsh conditions. And, as the Judge is well aware, there have been decisions out of this circuit that harsh conditions can be considered in determining what the sentence should be for a person found guilty of a crime.

And I don't think there could be much harsher conditions or much harsher initial arrest than the arrest he suffered, and the conditions he suffered in prison in Mexico.

On that issue, finally, the Court, I am sure, is aware that there was a recent amendment to the Sentencing Guidelines concerning specifically this kind of case. There is a provision. It is 1B1.13(b)(4)(B), and it pertains to victims of abuse. That will go into effect in November. But I would ask the Court to consider that as a basis for a downward departure or downward variance.

And it, basically, states: "A victim of abuse of a defendant while in custody, serving the term of imprisonment sought to be reduced, was a victim of physical abuse resulting in serious bodily injury, as defined in the commentary, to be 1B1.1, that was committed by or at the direction of a correctional officer, an employee or contractor of the Bureau of Prisons or any other individual who had custody or control over the defendant."

In this case, the Mexican prison authorities had custody and control of him for eight-and-a-half years, your Honor. And the infliction occurred when he was taken into custody by the military police officers -- the military -- Mexican military officers.

And he did -- it did -- result in serious bodily injury. So, I would ask the Court to consider that in

determining how to fashion the sentence for Mr. Cabrera.

I believe that with the government agreeing, as part of the plea agreement, that the time period that was not credited to another sentence, is time that should be credited to his sentence.

Now, the provision, basically, to have full criteria, he was in official detention during the time period, which would be the eight-and-a-half years; he was detained for an arrest that happened after the commission of the charged offense.

Well, the charged offense was charged in 2009. He was arrested at the end of 2011. So, he fits that criterion.

He was detained for arrest on another charge.

Well, Mexican charges were what he was initially arrested on in Mexico; charges that he fought for eight-and-a-half years, until the Supreme Court reversed his conviction, basically, for bogus evidence.

THE COURT: The Mexican Supreme Court?

MR. MOSBACKER: The Mexican Supreme Court; yes, your Honor.

THE COURT: I was just being clear on the record.

Go ahead.

MR. MOSBACKER: Thank you, your Honor.

THE COURT: Go ahead.

MR. MOSBACKER: And, of course, the time period was

not credited to him in Mexico because it was reversed.

So, we would request that the Court consider that as grounds for departure, even though that specific -- not the grounds for departure, but we request that the Court credit that time to him in your sentence, your Honor, instead of waiting for the Bureau of Prisons and seeing if we have to file a 2441 petition with them, to get them to credit him that time.

He clearly deserves that time, according to the statute.

And, finally --

THE COURT: Before you say "finally," I want to ask you to hold that thought because we actually did this a little backwards from the way I usually do it.

MR. MOSBACKER: Yes, your Honor.

THE COURT: And, usually, I let the government make the statement; and, then, you get the very last word, along with your client.

So, why don't you hold your "finally" thought --

MR. MOSBACKER: Yes, your Honor.

THE COURT: -- and you get to come back and end it up.

Mr. Erskine knows this is usually my practice.

So, go ahead, Government.

MR. ERSKINE: I was surprised. I thought I had to --

THE COURT: Yes.

No. You know, but he has been, like, antsy to get up here and I just was reacting to that.

(Laughter.)

THE COURT: So, I wanted to go ahead and give him a say. Then I said, "No, that is not the way it should be. Mr. Erskine should be next."

Go ahead.

MR. RASCIA: Judge, I thought he was waving.

(Laughter.)

MR. ERSKINE: Your Honor, just while at the top of mind, I did pull up that amendment to the Guidelines that will be effective in November.

THE COURT: Uh-huh.

MR. ERSKINE: Of course, the Court can consider the showing in connection with 3553(a) factors, but it doesn't seem like the Guideline would apply because it does say, "For purposes of this provision, the misconduct -- i.e., the abuse -- must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger."

So, obviously, we don't have a conviction of a Mexican official who conducted the abuse, or a civil liability finding.

So, of course, the Court can consider the proffered facts as part of 3553(a).

THE COURT: All right.

Proceed with your argument, Mr. Erskine.

MR. ERSKINE: Yes, your Honor. Thank you.

The government recommends a below Guideline sentence of 240 months' imprisonment. And the principal reason for the recommendation of a below Guideline sentence would be the defendant's age. He is not -- he is in his 50s. So, hopefully, he still has a lot of life ahead of him. But, as far as a substantial sentence beyond what he has already served, the government is not seeking that.

But we do think that all things consider, 240 months would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Just one point in mitigation. The government -- or one additional point of mitigation. The government is not making a 5K or, really, basing its downward departure on this, but, you know, it is our policy to make known to the Court efforts towards cooperation.

The defendant did try to cooperate; did proffer a couple of times -- three times, I believe. However, just there were no opportunities to make any use of information provided.

So, the government does not ultimately believe he provided substantial assistance, but he did sit down a few times.

So, your Honor, as the Court has heard and is familiar

at this point, the defendant was operating at the highest levels of the Sinaloa Cartel. You know, whether he was coerced to get involved with Mayo, as is being suggested, or not, the point is he was dealing directly with one of the two leaders of the cartel.

And, you know, there is no real question about that. That is straightforward in the plea agreement.

He works directly for Mayo, with Mayo. That is described in the plea agreement.

And as Zambada provided information in a proffer that was provided to the defense, you know, at times Mayo would be hiding from law enforcement. And he actually stayed at defendant's ranch for periods of time. And Vicente Zambada would go and visit his father at the defendant's ranch.

So, you know, there was a close, I don't know if you want to call it a relationship or, what, but there was a lot of connection, supporting by the defendant, of Mayo while the defendant -- before his arrest.

And, clearly, as is set forth in the plea agreement, the transaction at issue, Mayo clearly trusted Felipe Cabrera. He put him in charge of this transaction.

You know, at a minimum, even if you view it in the light most favorable to the defendant, as they viewed these events, it is clear that Mayo trusts -- trusted -- Felipe Cabrera with the role that he gave him in that transaction.

So, again, he is operating at the highest levels of the Sinaloa Cartel.

And, as the factual basis also refers, it makes the reference to the other customers not complaining about the quality of the heroin. So, there is some insight, some understanding as to the goings on of Mayo's heroin operation.

And, as we have previously referred to, but just to repeat, Vicente Zambada did talk -- did provide information -- about Felipe Cabrera being -- purchasing one ton of cocaine -- one of the six tons of cocaine -- that had been obtained.

And there was -- I believe Mr. Mosbacker questioned whether or not Vicente would have been in custody or out of custody at that time. But in the statement that is included in the sentencing memo, he said Zambada -- Vicente Zambada -- talks about that he, "In addition to my role in directing Pacheco to cross the cocaine, I am further aware of the details of the shipment from my conversations with my father, Felipe and others."

So, this was a period of time where Vicente Zambada was still active, prior to his arrest, at least in part. So, he was aware of this load and that Felipe Cabrera was one of the purchasers.

And Zambada later talked about Cabrera being involved in ton quantity loads of marijuana.

And, of course, as part of the plea agreement, the

defendant acknowledged that he is accountable for what were the maximum thresholds of both, I think, cocaine and heroin under the 2008 Guidelines, which we are applying.

Of course, those numbers are in the plea agreement because that is the highest threshold. So, essentially, it was agreed that it was more than that.

So, what is clear -- and even in the sentencing response to the government's sentencing memo -- while disputing that he was a leader, essentially, acknowledged that he was a large distributor.

So, the defendant is a large distributor working at the -- or was a large distributor working at the -- highest levels of the Sinaloa Cartel.

So, all of that calls for a significant sentence, but it also needs to be one of the critical factors in the Guidelines in general, but, also, in this case, is avoiding unwarranted sentencing disparities.

And this is challenging for the Court admittedly, because this case was reassigned to the Court after it was initially with then Chief Judge Castillo, who sentenced the majority of the defendants to appear.

And, obviously, Page 2 of the PSR lists all of the co-defendants and the dispositions, to the extent that there have been dispositions. Many are fugitives still.

It is important, in the government's view, to

distinguish between cooperators and non-cooperators. Even though Mr. Cabrera did sit down and provide information, we certainly do not consider him a cooperator, in terms of the cooperators in this list.

So, for example, Pedro Flores; Margarito Flores; Vicente Zambada, who is not on this list, they are cooperators who received cooperation plea agreements and a 5K recommendation -- motions and recommendations -- at sentencing.

So, it is really not, in the government's view, all that useful to look at their sentences when trying to fashion an appropriate sentence in this case.

Another outlier that is just worth flagging is Edgar Manuel Valencia Ortega, who was only sentenced to 96 months. He was principally a money launderer. That -- I think that -- is what explains the vast majority of that really low sentence, in terms of this case, as well as he did provide some information, too, though, but did not receive a 5K.

This is not a perfect -- there is really no perfect analog co-defendant to Mr. Cabrera; but, the closest we have is to Tomas Arevalo-Renteria, who received 19 years. And he is Defendant 9. And he pled by a plea declaration. So, the plea declaration really just doesn't contain much, as far as facts.

But I have here a document, at Documents No. 434, which is the government's sentencing memorandum for that defendant. And it really -- the way he is described, it is

very similar to Mr. Cabrera, in the way that I think the Court perhaps views him and understands him. So, I am going to just quote from this document a little bit.

THE COURT: And, again, what was the name, again?

MR. ERSKINE: It is Tomas --

THE COURT: Arevalo-Renteria?

MR. ERSKINE: Correct.

THE COURT: Uh-huh.

Proceed.

MR. ERSKINE: So, I am reading from the government's sentencing memo, which is at 434, at Page 2, the section on Offense Conduct.

It says, "Arevalo-Renteria's role in the conspiracy was to act as a logistical coordinator, responsible for the distribution of cocaine and heroin transported from Mexico to Chicago.

"Arevalo-Renteria performed this role in multiple ways, including through the direction of couriers operating in the United States.

"For example, in October and November, 2008, Pedro Flores and Margarito Flores, who unbeknownst to Arevalo-Renteria, were cooperating with the government, agreed to purchase two separate shipments of heroin from the Sinaloa Cartel.

"The Flores brothers' primary contact for these two

shipments was Arevalo-Renteria;" and, then, it goes on to describe how the two shipments, one was 15 kilos and one was 12 kilos.

So, you know, kind of similar quantities, as far as those transactions are concerned, and similar facts being sort of the point person of the sale of these quantities of heroin to the Flores twins.

And, then, like, similar to this situation -- and I am continuing with the memo at Page 4 -- "In addition to these heroin transactions, as explained in the PSR, the conspiracy to which Arevalo-Renteria pled guilty, it involved multiple tons of cocaine and dozens of kilos of heroin.

"In his plea declaration, defendant stated that he did not dispute the amount of narcotics, for which he is accountable in his offense of conviction, is at least 150 kilograms of cocaine and 30 kilograms of heroin."

So, a similar thing here. In the plea agreement, he didn't dispute -- Mr. Cabrera did not dispute -- it was at least those amounts. And he was a part of this conspiracy that had, you know, much greater quantities of cocaine and heroin and marijuana as part of the conspiracy.

In the government's view, Mr. Cabrera is perhaps more culpable than this defendant, in light of his role in his family's group and in the quantities that he was moving, as described by Vicente Zambada, and in his direct access to Mayo

and his hiding of Mayo in the course of the conspiracy.

But I did want to note this one co-defendant because I do think it is, you know, at least a data point for the Court's consideration.

So, in light of all of that, your Honor, in light of the mitigation we noted, but principally the aggravation in this offense, the government believes a sentence of 240 months' imprisonment would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

On the question of the prior credit, my recommendation would be to, essentially, for the Court to determine the sentence it would give and, then, perhaps we can talk about the most -- the best way to put that into effect, because depending on what it ends up being could dictate one approach versus another, as far as whether the J&C says this -- references the Mexico time -- or does not.

THE COURT: Okay.

Thank you very much, Mr. Erskine.

So, Mr. Mosbacker, do you wish to continue and give me a final statement?

MR. MOSBACKER: Yes, your Honor. I just want to hit one last issue.

THE COURT: Please.

MR. MOSBACKER: And that is cooperation.

THE COURT: Uh-huh.

MR. MOSBACKER: Mr. Cabrera cooperated fully: Two interviews here in the Northern District of Illinois; and, another interview in the Northern District, but conducted by trial attorneys from the Bureau of Narcotics and Dangerous Drugs in Washington, D.C., concerning another individual that he had interactions with and Zambada and others had interactions with.

And he cooperated fully with giving information on that individual.

THE COURT: Well, counsel, I would just say, when you say he "cooperated fully" and you are making that part of the record, when the government said he attempted to cooperate and it didn't amount to anything, I don't know which one is better to have on the record for your client.

MR. MOSBACKER: Well, your Honor, why I say "cooperated fully" with that is --

THE COURT: I am just -- I am talking from a whole different standpoint than you trying to -- I am just trying to say, for what is out there on the record --

MR. MOSBACKER: Yes, your Honor.

THE COURT: -- are you sure you want to stand by that, as opposed to --

MR. MOSBACKER: I can say that --

THE COURT: -- saying that he attempted to do it and it didn't work out?

MR. MOSBACKER: No, he did not attempt to do anything, your Honor.

THE COURT: Okay, counsel. You can go ahead.

MR. MOSBACKER: What he did -- what he did -- was fully disclose everything he knew to this District and to Washington, D.C., concerning -- and the Washington, D.C. concerns an individual who is about to be extradited from Mexico. So, that is what I meant by "cooperated."

THE COURT: I totally understand you.

MR. MOSBACKER: And, your Honor, there is another thing that I hope the Court will note.

Mr. Cabrera had to fight the Mexican case for eight-and-a-half years. And he wasn't extradited until they got a final ruling.

If fact, he was extradited within days of getting a final ruling.

If they had not charged him with bogus charges in Mexico, he would have been here a lot earlier and would have been able to cooperate fully against persons who had not pled guilty.

THE COURT: That is speculation, but proceed. I hear you.

MR. MOSBACKER: Yes, your Honor.

And, as far as Tomas Arevalo, he was completely in a different situation. He didn't want to talk to the government.

He didn't cooperate at all. He just pled guilty, from my understanding, your Honor.

THE COURT: Okay.

MR. MOSBACKER: So, that puts him at a very different category and situation why he should be treated and given nineteen years, yet they are recommending twenty years to Mr. Cabrera when they say it is, basically, the same conduct.

Your Honor, I would ask that the Court, when it determines -- and the Court has determined what the Guideline level is -- that the Court depart, at least, a third of that Guideline level.

I would ask for more. There have been departures just for harsh conditions of that kind -- of that nature -- in district courts around the country.

I would ask, actually, considering the torture, the harsh treatment, the fact that he has, other than drug trafficking, a good personal background and he is magnanimous with other persons, I would ask for a downward departure of one half, your Honor, of the Guidelines -- the total Guidelines.

THE COURT: So, you are asking for 120 months?

(Brief pause.)

THE COURT: 120 months?

MR. MOSBACKER: Of the Guideline range.

THE COURT: Right, of the Guideline range.

MR. MOSBACKER: The Guideline range is --

THE COURT: So, you want half of -- you are not saying half of what the government is recommending?

MR. MOSBACKER: Not of what the government is recommending, no. Half of what the Guideline range is.

THE COURT: Of the Guidelines. Okay. All right. Thank you.

So, Mr. Cabrera, you now -- you have written a letter. I believe there is a written letter in the materials from you. But you also have the opportunity to address me, with the assistance of the interpreter, here in court, if you wish to.

You do not have to.

THE DEFENDANT (Through the Interpreter): Do I do it over there or over here (indicating)?

THE COURT: No, you can do it right there.

(Brief pause.)

THE COURT: One second. It looks like Mr. Meczyk wants to intervene here.

(Brief pause.)

THE DEFENDANT (Through the Interpreter): I ask my children for forgiveness. I ask my parents and my children and this Court for forgiveness, and for forgiveness from the government of the United States, for the offense that I committed.

I am completely regretful.

I also ask for an opportunity to return and to be

reunited with my loved ones, your Honor.

At this moment, I am placing my hand -- myself in the hands of God and in your hands. May your will be done.

May God bless you and your family.

That is all.

THE COURT: Thank you. Gracias.

All right. I am going take about ten minutes. I will be back out at a quarter to 4:00. Thank you.

(Brief recess.)

THE COURT: All right. Thank you for your patience.

So, as has been alluded to by the defense counsel, when they made their argument, their focus was on the 3553(a) factors, which is the focus that this Court goes to when considering what my sentence will ultimately be.

But unlike defense counsel's argument, which focused on the highlights of family and mitigating circumstances, et cetera, this Court always goes to the nature and circumstances of the offense.

If it wasn't for the nature and circumstances of the offense, we would not be here today. And, so, the Court believes that is the factor I have to start with.

And I do the same here as I do in every case, big or small.

This case is big: The subject matter, the amount of drugs. The serious drugs involved is more than large and it

has wreaked a lot of havoc on communities.

The heroin, the cocaine, the marijuana, illegal drugs have been brought into this country with the assistance, the management and participation of the cartel -- the Sinaloa Cartel -- as a whole; and, specifically, as to Mr. Cabrera Sarabia's participation in it.

And he did participate in more than a minimal way.

He dealt with quality issues, purity issues; you know, received complaints; followed up on complaints from customers; helped control and monitor the massive amount of quantities that crossed into this country.

He did it by directing others, and by getting direction from others, and carrying those out as he directed more than just one person, but multiple people. It was quite an organization and one that has wreaked havoc on this country for years. This isn't a one-off. This is for years. So, I don't think I need to dwell on the nature of this offense and the reason why we are here.

The Court also has to look at factors that include deterrence, both personal and deterrence in general.

There was a statement made in one of the arguments -- I think it was the defense brief -- "What is deterrence for drugs?"

I mean, it is sort of a flippant point; but, on the other hand, I agree. What is deterrence at this point? You

know, these cartels and these drugs dealers, whether big or small, they make so much money, you know, and there are so many moving parts to some of them. The question is: Are they deterred? Can the Court actually do something to deter this when you have millions of dollars involved here?

And, so, that is a real valid question and I don't know if a sentence that I give today will deter the general population.

I would hope -- based on hearing his background, based on what he has experienced thus far and having so many family members who are supportive, and community people, I would hope -- that he will be deterred individually by the sentence that I give.

The Court also focuses on, as I stated already, his family, the government officials.

I even got letters from grandsons, I think -- grandchildren -- about their grandpa.

I have gotten letters from charitable leaders and organizations, business leaders, about how he has given to his community -- the Durango community.

I will say this. You know, in Chicago, we need to give to our communities, too. We don't need to give them the drugs, you know, and the destruction that they get from these drugs. They don't need that kind of support.

So, I give you credit for how you have treated your

people in Durango with jobs -- legitimate jobs -- and family and education support and community support. That is all well and good for your community.

My community up here has been decimated.

So, I will also say this about family. You have a right to be proud of your young people, your adults and the people in your family who have gotten an education. Be really proud of that.

But I will also say that to do a comparison between what your children have been able to do and what some of the children in the other families, who are leading these organizations, are doing, I don't know if that is fair, to take credit for the good things that your kids do.

I have people here who come in and they have nurtured and tried to support their kids; and, even though the parents have done well, the kids are on drugs or the kids are getting into things.

And do we blame those parents usually? No, that is not fair. I do not know, as a parent, if it is fair to take the credit for all of the good that happens, but, then, say, "Oh, but you must be a bad parent. You must be a bad person. You are even more of a treacherous criminal because your kids are involved in trying to follow the family business."

I don't know if that is a valid comparison and I am not going to give that any further consideration.

And I am sorry that your family is going to miss you, but that is the cost of getting involved with these cases. You are not the only one to say, "Hey, my family is going to miss me. My grandkids are going to miss me. They are going to grow up while I am gone." That is the price.

So, as to the nature of the offense, obviously, the way I feel about drugs -- and I have talked about drugs -- public safety is an issue on this: To make sure we don't continue to have this coming into this country and try to stop it where we can.

I have talked about deterrence. I have talked about mitigation -- about what you have done for your family and community and what your family support is.

One of the big issues in this case is disparity of sentences, which we do try to avoid, if possible.

There are going to be other factors I haven't talked about, but these are the ones I am focused on, and the disparity of the sentence.

And that is where we come to looking at this list of different defendants who have been sentenced thus far. Some of them have not even been caught yet. Some are still out there.

But the one the government pointed to, I believe, is about as close as we can get. And that is Renteria. And I believe he got 228 months, is what Mr. Renteria got.

The Court also notes that he had a Level IV

enhancement, that Judge Castillo agreed with Probation on that one, was at a III. He gave him three points instead of the four-point enhancement.

And, so, the Court notes that it's similar, that I have just agreed that this should be a three-point enhancement, for the reasons I have stated.

The Court also notes that the other defendant had some issues with not great conditions while he was in custody, as we have here in this case.

Mr. Cabrera Sarabia talks about the conditions he suffered while in Mexican custody.

And the Court also notes you add to that, which is a reason, I think, this consideration is coming about and going to be included in the Sentencing Guidelines, is COVID and being in custody during the COVID pandemic and the kind of extreme steps that had to be taken for people to really stay safe, but not infect everybody in the whole jail. And that is something that the Court has sympathy with for everyone who was kept in custody during that time.

The government did also state mitigation should not only just be his family and circumstances, but also his age -- the defendant's age.

And even though I don't consider in the 50s to be old --

(Laughter.)

THE COURT: -- but the Court will take into consideration that at this stage in his life, he is older and being confined in custody for multiple years to come will take its toll further. The Court understands that and will take that into consideration.

Again, my charge at this point is to sentence Mr. Cabrera Sarabia to a sentence that is sufficient, but not greater than necessary. The Guidelines range is from 292 months to 365 months in custody.

The government has recommended 240 months.

The defense is asking me to go into half of the Guideline range, which will approximately be 180, I believe, months -- around that amount of time.

So, in keeping with everything I have stated, the Court believes a sentence that is sufficient in this case, but not greater than necessary, and taking into account his in-custody provisions that he had -- situations that he had -- prior, this Court believes the sufficient amount in this case should be one of 230 months in custody. 230.

Five years of supervised release.

No fine is going to be recommended.

No community restitution is recommended.

A hundred dollar special assessment.

That will be the Court's finding.

As to the supervised release conditions, first of all,

I consider them in the same way with the 3553(a) factors.

Considering whether these particular conditions are sufficient, but not greater than necessary, the Court looks at first, sir, the mandatory conditions in this case.

The mandatory conditions are just that. They will be mandatory during the time you are on supervised release. And they are, first of all, that you have to report to Probation within 72 hours of your release if you are in this country.

And when you are released to Probation, they will give you your list of mandatory conditions that you must comply with.

And those would be, first of all, you cannot commit another federal, state or local offense during your time on supervised release; that you will be asked to take a drug test within your first fifteen days; and, if is it negative, I am not going to require you to take any more.

If it is positive, then you will be assessed for further drug treatment, a drug program.

Obviously, including not breaking any laws is included; narcotics -- illegal narcotics -- usage or possession.

Furthermore, you will cooperate with a DNA if the authorities ask you to do one.

And that is what the mandatory conditions will be in your case.

There are two other categories for the supervised release conditions and they are discretionary conditions.

The discretionary conditions are conditions that the Court is going to put in place, again, based on 3553(a).

And hold on a second.

(Brief pause.)

(Document tendered.)

THE COURT: Keep an extra for me always.

All right. Your discretionary conditions, sir, it says, "Discretionary," but, discretionary for you -- it is discretionary for me to give them. It is mandatory for you to do them.

Do you understand?

THE DEFENDANT (Through the Interpreter): I did not understand.

THE COURT: I am sorry?

THE DEFENDANT (Through the Interpreter): I did not understand.

THE COURT: All right.

So, again, supervised release has three categories of conditions.

Mandatory, did you understand that -- that you must do -- there must not be any crimes committed; you cannot possess a controlled substance of any sort; that you will cooperate with a DNA sample, if a collection is required; and, within fifteen

days of leaving custody, if you are still in the U.S., you will get a test for drugs within fifteen days for illegal substances.

And if you give that test and it is negative, there will be no further drug abuse conditions.

That is mandatory. You must do it. Do you understand?

THE DEFENDANT (Through the Interpreter): Okay. Yes, I understand.

THE COURT: There is another section that is "Discretionary."

"Discretionary" means it is a discretionary to me. It is my choice of whether I think you should have to do this condition. You don't get a choice. You have to follow it.

Do you understand?

THE DEFENDANT (Through the Interpreter): Yes, I understand.

THE COURT: All right.

And the one in that section that, I think, is the best one to comply with here, based on the Court's assumption that you will not be staying in this country after your release, is that not only that you report to Probation, as I stated, within 72 hours, but you cannot have, possess in any way, shape or form, any firearm while you are in this country -- a dangerous weapon.

Do you understand that?

THE DEFENDANT (Through the Interpreter): Yes, yes. All right. I understand.

THE COURT: You cannot knowingly meet or communicate with any person who you know to be engaged or planning to be engaged in any criminal activity.

Do you understand?

THE DEFENDANT (Through the Interpreter): Yes, yes. I do understand.

THE COURT: You will be surrendered to a duly authorized official of the Homeland Security Department for the United States to determine on the issue -- upward determination on the issue -- of deportability by the appropriate authority, in accordance with the laws that are in place at that time of the Immigration and Nationality Act.

Do you understand?

THE DEFENDANT (Through the Interpreter): Okay. Yes, I understand.

THE COURT: If you are deported, you shall not remain in this country without obtaining advance or express written consent of the United States government before coming back in.

Do you understand?

THE DEFENDANT (Through the Interpreter): Yes, yes. I understand.

THE COURT: And if you come, in after being deported,

that is a violation of the laws, that I just told you, you cannot violate a law while on supervised release.

Do you understand that?

THE DEFENDANT (Through the Interpreter): Yes, I understand.

THE COURT: Anything else on discretionary conditions, Mr. Erskine?

MR. ERSKINE: No, your Honor.

THE COURT: Anything else, Mr. Meczyk, or Mr. Mosbacker?

MR. MOSBACKER: No, your Honor.

MR. MECZYK: No, your Honor.

THE COURT: All right.

Then the last section, sir, is the Special Conditions.

The Special Conditions are that you will not enter into any agreement or act as an informer or special agent with a law enforcement agency without permission of this Court.

Do you understand that?

THE DEFENDANT (Through the Interpreter): Yes, I understand.

THE COURT: All right.

And if you are in -- I didn't say it before, but another condition is that if you get in any trouble with legal authorities, as an arrest, you have contact with them, in any way, shape or form in this country when you are out of custody,

that you have to make sure that if you have an assigned probation officer, you let them know as soon as possible before they let you know that they do know.

Do you understand that?

THE DEFENDANT (Through the Interpreter): Yes, I understand. Yes.

THE COURT: All right.

Anything else on the special conditions, the government?

MR. ERSKINE: No.

THE COURT: Any else, defense, on special conditions?

MR. MOSBACKER: No, your Honor.

THE COURT: All right.

Anything else from Probation, who is filling out the forms here?

THE PROBATION OFFICER: No, your Honor.

THE COURT: All right.

All right. Sir, you do have a right to appeal this Court's decision. You have fourteen days to file a Notice of Appeal. You need to talk to your lawyers.

You have a bunch of them. They all know the law. They can help advise you as to whether or not you should proceed with an appeal.

Do you understand that, sir?

THE DEFENDANT (Through the Interpreter): Yes, I

understand.

THE COURT: All right.

Anything else from the government?

MR. ERSKINE: No, your Honor.

THE COURT: Okay.

Anything else, defense?

MR. MOSBACKER: Yes. Just an inquiry, your Honor.

You did not credit him in this sentence with time in Mexico.

THE COURT: Well, what are you suggesting that a credit is -- for the time served before? Because I am going to tell you he doesn't get day for day for what he did in Mexico. That doesn't happen.

The Court did give him some credit -- and I mentioned it -- for giving him some, just based on the sentence I gave him.

So, basically, he got, like, a year-plus, I think credit, for the time he served in Mexico.

Do you have any authority to suggest I should be giving him day for day?

MR. MOSBACKER: Just the statutory authority.

THE COURT: What statutory authority that he gets day for day?

MR. ERSKINE: And, your Honor, I can speak to this.

THE COURT: Okay. Go ahead.

MR. ERSKINE: So, the same rule applies whether he is in Mexico or in the United States, which is that if he, basically, does time anywhere, that ends up not getting attributed to a case -- say, because the case gets -- he is acquitted, that it gets counted in the Court's sentence.

So, in this case, he was in prison -- or in jail -- in Mexico from December 23rd, 2011, until June 12th, 2020, which is 101 months and twenty days.

By operation of statute, you know, BOP is required under the statute to apply that to the Court's sentence.

So, the Court could very well enter the J&C and list 230 months. And BOP, on its end, is statutorily obligated to give the defendant credit for that time in Mexico.

The Court doesn't have to do anything else.

What I understand Mr. Mosbacker to be requesting is what is sometimes done -- and has been done in this case -- which is, essentially --

THE COURT: In this case?

In Mr. Renteria's case, it didn't look like it was done there. But go ahead.

MR. ERSKINE: Yes.

So, for example, it was done with regard to Vicente Zambada.

Judge Castillo -- the sentence that Judge Castillo announced was fifteen years. And, then, the J&C reads, "The

defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 169 months on Count 1.

"This sentence imposed includes credit for the 11 months of custody in Mexico, from March 18, 2009, to February 28, 2010."

THE COURT: Uh-huh.

MR. ERSKINE: So, there was 11 months, plus the 169, makes the 180, which is the fifteen years that Judge Castillo actually announced.

So, the Court's -- essentially, what the Court, at least, based on practice, the Court's -- options are at this point are to leave it be and let the statute perform its, you know, its rules and BOP will implement it, and just have the J&C state 230 months' custody; or, the Court could say, essentially, rounding the twenty days up to a month, that leaves 128 months.

So, the other option for the Court is to say he is confined for 128 months, and this already takes into account the credit for 102 months in custody in Mexico, between December 23rd, 2011, and June 12th, 2020.

THE COURT: What is your request, Mr. Mosbacker?

MR. MOSBACKER: Your Honor, my request is that the Court include it in the J&C.

THE COURT: Include, what?

Do you have your own figures?

MR. MOSBACKER: Yes.

THE COURT: What are they?

MR. MOSBACKER: The actual --

THE COURT: The 102 months?

He said 102 months.

MR. MOSBACKER: Your Honor, I believe he said --

THE COURT: No, he said credit for 102 months, which would bring him down --

MR. ERSKINE: So --

THE COURT: Is that not what you said? I am looking at you.

MR. ERSKINE: So, it would be 128 months' custody --

THE COURT: Uh-huh.

MR. ERSKINE: -- which takes into account --

THE COURT: Into consideration --

MR. ERSKINE: Yes.

THE COURT: -- the 102 months?

MR. MOSBACKER: The 102 months, yes, your Honor.

THE COURT: Right.

MR. MOSBACKER: That is what I would request the Court to do.

THE COURT: All right.

And you have no objection?

MR. ERSKINE: Correct.

THE COURT: There being no objection, the Court will give you that credit, and the J&C will read in the way that was just stated.

MR. MOSBACKER: Thank you, your Honor.

THE COURT: Anything else?

MR. MOSBACKER: No, your Honor.

THE COURT: No further request on where he goes? Nothing?

MR. MOSBACKER: Yes, your Honor.

Actually, I do have a request. He has family in San Pedro, California, which is just south of Los Angeles. We would ask the Court to recommend the facility in the Los Angeles area.

THE COURT: All I can do is make a recommendation, based on these charges and the conviction. I am not sure where he is going to go.

And BOP has the ultimate say, but I will put that on the "Information," that that is his request.

MR. MOSBACKER: Thank you, your Honor.

THE COURT: All right.

Is there anything else?

Mr. Mosbacker, double-check --

MR. MOSBACKER: No, your Honor.

THE COURT: -- with everybody.

You have got a big team there. You all want to make

sure that he has got what he needs.

I know all of you are working together for the good of --

MR. ERSKINE: Oh, your Honor, there is one last thing, actually.

THE COURT: Yes?

MR. ERSKINE: If I could have just one minute? I apologize.

THE COURT: Sure. No problem. Double-check everything.

(Brief pause.)

MR. ERSKINE: Your Honor, the government did file a motion for --

THE COURT: Forfeiture?

MR. ERSKINE: -- forfeiture. And that was part of the plea agreement --

THE COURT: Uh-huh.

MR. ERSKINE: -- for $715,000 of personal money judgment.

THE COURT: Yes.

MR. ERSKINE: So, we would just ask that that motion be granted.

THE COURT: All right.

Objection?

MR. MOSBACKER: No, your Honor. It was agreed to.

THE COURT: No objection. It was agreed to. It will be granted.

Just make sure we get the final forfeiture order.

MR. ERSKINE: Thank you.

THE COURT: All right.

Anything else from the government?

MR. ERSKINE: No, your Honor. Thank you.

THE COURT: Anything else from any counsel on behalf of defendant?

MR. MOSBACKER: I don't believe so, your Honor. No.

MR. MECZYK: No, your Honor.

MR. RASCIA: No, your Honor.

THE COURT: Everybody is good? All right.

Well, thank you very much for your presentations.

And I appreciate the people coming in support.

Sir, good luck to you.

Thank you very much.

MR. ERSKINE: Thank you, your Honor.

MR. MOSBACKER: Thank you, your Honor.

MR. MECZYK: Thank you, your Honor.

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Joene Hanhardt — September 19, 2024
Official Court Reporter