FILED

JUN 11 2025

Judge Sharon Johnson Coleman
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

OVIDIO GUZMAN LOPEZ

No. 09 CR 383-22

Judge Sharon Johnson Coleman

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, ANDREW S. BOUTROS, the United States Attorney for the Southern District of California, ADAM GORDON, the Narcotic and Dangerous Drug Section of the Criminal Division, United States Department of Justice, defendant OVIDIO GUZMAN LOPEZ, and his attorney, JEFFREY LICHTMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2. The Twelfth Superseding Indictment in case number 09 CR 383-22 ("the Twelfth Superseding Indictment") charges defendant with conspiracy to possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code, Section 846 (Count One), engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), (b), and (e)(1)(A) (Count Two), conspiracy to import a controlled substance into the United States, and to manufacture and distribute a controlled substance intending and

knowing it would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 963 (Count Three), money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (Count Five), and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United State Code, Section 924(c) (Count Nine).

3.      The Indictment transferred pursuant to Fed. R. Crim. P. 20, and set forth in this matter at docket entry 1071 ("the SDNY Indictment"), charges defendant with engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), (b), and (c) (Count One), conspiracy to import a controlled substance into the United States, and to manufacture and distribute a controlled substance intending, knowing, and having reasonable cause to believe it would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 963 (Count Two), conspiracy to possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code, Section 846 (Count Three), using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a drug trafficking crime, in violation of Title 18, United State Code, Section 924(c) (Count Four), conspiracy to possess machine guns and destructive devices in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(o) (Count Five), and money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (Count Six).

4.     Defendant has read the charges against him contained in the Twelfth Superseding Indictment and the SDNY Indictment, and those charges have been fully explained to him by his attorney.

5.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charges to Which Defendant Is Pleading Guilty

6.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the Twelfth Superseding Indictment: Count One, which charges defendant with conspiracy to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code, Section 846; and Count Two, which charges defendant with knowingly and intentionally engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), (b), and (e)(1)(A).

7.     In addition, by this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the SDNY Indictment: Count One, which charges defendant with knowingly and intentionally engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), (b), and (c); and Count Two, which charges defendant with conspiracy to import a controlled substance into the United States, and to manufacture and distribute a controlled substance intending, knowing, and having reasonable cause to believe it

3

would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 963.

### Factual Basis

8.     Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the Twelfth Superseding Indictment, and of the charges contained in Counts One and Two of the SDNY Indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

   a.     With Respect to Count One of the Twelfth Superseding Indictment (09 CR 383-22)

Beginning no later than in or about May 2008, and continuing until at least on or about October 21, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant OVIDIO GUZMAN LOPEZ did conspire with Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, Joaquin Guzman Lopez, Joaquin Guzman Loera, Ismael Zambada Garcia, Damaso Lopez Nunez, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, 500 grams or more

4

of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

More specifically, as of May 2008, Joaquin Guzman Loera ("Chapo") and Ismael Zambada Garcia ("Mayo") were the co-leaders of a transnational drug trafficking organization based in Mexico known as the "Sinaloa Cartel." Under the leadership of Guzman Loera and Zambada Garcia, the Sinaloa Cartel operated as an affiliation of drug traffickers and money launderers located in multiple countries throughout the world who coordinated and pooled their collective resources in order to: (1) transport drugs from countries of supply in Central and South America to Mexico; (2) transport drugs through Mexico and into the United States; (3) distribute drugs to wholesale customers in the United States; and (4) collect, launder, and transfer the proceeds of drug trafficking.

Guzman Loera and Zambada Garcia, and members and associates of the Sinaloa Cartel under them, including four of Guzman Loera's sons—GUZMAN LOPEZ, Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, and Joaquin Guzman Lopez (collectively, "Los Chapitos")—coordinated their drug trafficking activities to import and manufacture large quantities of cocaine, heroin, methamphetamine, and marijuana, including from Central and South American

5

countries. GUZMAN LOPEZ and others coordinated the transportation and storage of these drug loads within Mexico, and they further coordinated their drug trafficking activities to smuggle large quantities of cocaine, heroin, methamphetamine, and marijuana, from Mexico across the United States border, and then into and throughout the United States, including Chicago, Illinois, and elsewhere.

GUZMAN LOPEZ acted as a logistical coordinator who, on behalf of Guzman Loera and the Sinaloa Cartel's members and associates, caused multi-kilogram quantities of cocaine, heroin, methamphetamine, and marijuana to be transported from Mexico to the United States border, and then into and throughout the United States for distribution. GUZMAN LOPEZ further caused drug proceeds to be collected from customers in the United States and laundered and transferred from the United States to Mexico and elsewhere for the benefit of the Sinaloa Cartel's members and associates. GUZMAN LOPEZ and others pooled their collective resources and coordinated their activities to cause large quantities of cocaine and other drugs and drug precursor chemicals to be imported from Central and South American countries, including Colombia, Ecuador, Venezuela, Peru, Panama, Costa Rica, Honduras, and Guatemala, and from elsewhere, to Mexico, using various means, including cargo aircraft, private aircraft, submarines and other submersible and semi-submersible vessels, container ships, supply vessels, go-fast boats, fishing vessels, buses, rail cars, tractor trailers, automobiles, and private and commercial interstate and foreign carriers. After the drugs and drug precursor chemicals arrived in Mexico, the

6

conspirators used shared resources to unload and store the drugs in Mexico.

GUZMAN LOPEZ used shared networks of couriers affiliated with the Sinaloa Cartel, and coordinated their activities to cause large quantities of cocaine, heroin, methamphetamine, and marijuana, at times in shipments of hundreds or thousands of kilograms, to be transported from various locations in Mexico to the United States border where the drugs were then stored in multiple warehouses, stash houses, and safe houses located in the areas of Tijuana, Mexicali, and elsewhere.

GUZMAN LOPEZ and others used shared networks of couriers affiliated with the Sinaloa Cartel, and coordinated their activities to cause drugs to be smuggled across the United States-Mexico border using multiple means, including through the use of vehicles, rail cars, and tunnels.

GUZMAN LOPEZ and others used shared networks of couriers and stash house operators affiliated with the Sinaloa Cartel, and coordinated their activities to cause drugs to be unloaded and stored at multiple stash house, safe house, and warehouse locations in Southern California and elsewhere.

GUZMAN LOPEZ and others used shared networks of couriers affiliated with the Sinaloa Cartel to cause cocaine, heroin, methamphetamine, and marijuana to be transported throughout the United States, including to Chicago, Illinois, using various means, including cars, trucks, rail cars, and private and commercial interstate carriers. Members of the conspiracy directed the drugs to be stored in various stash houses and warehouses and then provided and distributed to additional

7

members and associates of the Sinaloa Cartel, as well to wholesale customers, on consignment, without requiring payment at the time of delivery, in multiple locations.

Cocaine, heroin, methamphetamine, and marijuana caused to be distributed by GUZMAN LOPEZ and others was further sold and distributed to additional wholesale customers in the greater Chicago, Illinois, area, and elsewhere in the United States and Canada.

GUZMAN LOPEZ and others used shared networks of money couriers and money launderers to cause drug proceeds to be collected from customers, counted, packaged, and transferred and laundered from the United States to Mexico, Colombia, and elsewhere using multiple means, including bulk cash smuggling, structured bank deposits, wire transfers, currency exchange transfers, alternative credit-based systems used to transfer money without the use of wires or other traditional means, goods-based systems in which items, including cars, helicopters, and airplanes, were purchased in one location and transferred to another location, and other methods.

GUZMAN LOPEZ and others used, and caused to be used, various means to evade and escape law enforcement and military personnel—including on or about October 17, 2019, at Culiacán in Sinaloa—and to protect their drug distribution activities, including: obtaining guns and other weapons; bribing corrupt public officials; and inciting violence, engaging in violence, and threatening violence, including murder, kidnapping, assault, and battery, including against law

8

enforcement, rival drug traffickers, and members of their own drug trafficking organization.

Following Guzman Loera's arrest in 2016 and extradition in 2017, GUZMAN LOPEZ and his brothers assumed their father's former role as leaders of the Sinaloa Cartel, along with Zambada Garcia and Damaso Lopez Nunez. Eventually, GUZMAN LOPEZ, his brothers, and others amassed greater control over the Sinaloa Cartel by threatening to cause violence, and causing violence, against Damaso Lopez Nunez and his family and associates.

b.     With Respect to Count Two of the Twelfth Superseding Indictment (09 CR 383-22)

Beginning no later than in or about May 2008, and continuing until at least on or about October 21, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant OVIDIO GUZMAN LOPEZ, together with Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, Joaquin Guzman Lopez, and others, did knowingly and intentionally engage in a continuing criminal enterprise, in that GUZMAN LOPEZ committed violations of Title 21, United States Code, Sections 841(a), 848(e), 952(a), 959(a), 960, and 963, which violations were part of a continuing series of violations of those statutes undertaken by GUZMAN LOPEZ, in concert with five or more other persons, with respect to whom GUZMAN LOPEZ occupied a supervisory and management position, and was one of several principal administrators, organizers, and leaders of the continuing criminal enterprise, and from which continuing series of violations GUZMAN LOPEZ obtained substantial

income and resources, and which continuing criminal enterprise received in excess of $10 million in gross receipts during one or more twelve-month period for the manufacture, importation, and distribution of heroin, cocaine, methamphetamine, and marijuana. The violations involved at least 300 times the quantity of a substance described in Section 841(b)(1)(B) of Title 21, United States Code, namely, 30 kilograms or more of a mixture and substance containing a detectable amount of heroin, 150 kilograms or more of a mixture and substance containing a detectable amount of cocaine, 15 kilograms or more of a mixture and substance containing a detectable amount of methamphetamine, and 30,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana. All in violation of Title 21, United States Code, Sections 848(a), 848(b), and 848(e)(1)(A).

Specifically, beginning no later than 2012, and continuing until January 5, 2023, GUZMAN LOPEZ worked with his father, Joaquin Guzman Loera, his brothers—Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, and Joaquin Guzman Lopez—and others, to engage in a continuing criminal enterprise, namely, the Sinaloa Cartel. GUZMAN LOPEZ, his father, his brothers, and others worked together to source and manufacture narcotics—including heroin, cocaine, methamphetamine, and marijuana—transport the narcotics through Mexico, and cross the narcotics over the border into the United States for distribution. In the course of this work, GUZMAN LOPEZ served as a supervisor and manager within the Sinaloa Cartel, as well as one of several principal administrators, organizers, and

leaders. Among other things, GUZMAN LOPEZ employed and ultimately managed numerous individuals who assisted in manufacturing, transporting, storing, and distributing narcotics, as well as numerous individuals who served as armed security for GUZMAN LOPEZ and other members of the Sinaloa Cartel.

GUZMAN LOPEZ and his associates engaged in the continuing criminal enterprise by means of, among other things, a continuing series of violations of Title 21, United States Code, Sections 841(a), 848(e), 952(a), 959(a), 960, and 963, including as described below.

As alleged in Violations Seven and Eight of the Twelfth Superseding Indictment, in or about 2013, GUZMAN LOPEZ, his father, his brothers, and others imported cocaine into the United States. The cocaine crossed over the border through a tunnel that ran between Nogales, Sonora in Mexico, and Nogales, Arizona, in the United States. GUZMAN LOPEZ possessed portions of this cocaine within the District of Arizona intending that it be further distributed.

As alleged in Violation Ten of the Twelfth Superseding Indictment, in or about January 2014, GUZMAN LOPEZ invested, along with others, in an approximately forty-ton shipment of marijuana that was transported to Hermosillo, Sonora, Mexico, with the intent that it be imported into and distributed within the United States. GUZMAN LOPEZ and others intended to transport the marijuana from Sonora to Tijuana, Mexico, and to transport the marijuana into the United States using an underground tunnel that GUZMAN LOPEZ's workers had constructed. However,

11

before the marijuana was transported to Tijuana, approximately twenty tons of marijuana were seized by law enforcement in or around Hermosillo. Of the remaining approximately twenty tons, approximately three to four tons were transported to and sold in or around Los Angeles, California.

As alleged in Violation Thirty-Four of the Twelfth Superseding Indictment, in or about December 2018, GUZMAN LOPEZ and others caused the kidnapping and murder of Jesus Antonio Munoz Parra, also known as "Montana," in Sinaloa, Mexico.

As alleged in Violation Thirty-Five of the Twelfth Superseding Indictment, in or about May 2021, GUZMAN LOPEZ and others caused the murder of Mario Nungaray Bobadilla, also known as "Liebre," in Phoenix, Arizona.

As alleged in Violation Thirty-Six of the Twelfth Superseding Indictment, in or about October 2021, GUZMAN LOPEZ and others caused the kidnapping and murder of Geovanni Hurtado Vicente, also known as "Amigo," in Jalisco and Sonora, Mexico.

GUZMAN LOPEZ acknowledges that the continuing criminal enterprise in which he engaged involved more than 90 kilograms of heroin, 450 kilograms of cocaine, 45 kilograms of methamphetamine, and 90,000 kilograms of marijuana, for which he is accountable. GUZMAN LOPEZ further acknowledges he engaged in the continuing criminal enterprise in concert with more than five other individuals, and that the enterprise received more than $10 million in gross receipts during a twelve-month period. GUZMAN LOPEZ further acknowledges that GUZMAN LOPEZ caused bribes to be paid to law enforcement officers in Mexico to facilitate the

12

commission of the offense. GUZMAN LOPEZ further acknowledges that he maintained laboratories in Mexico used to produce methamphetamine, and that he maintained offices in Mexico and the United States that he used to store and distribute narcotics.

c. With Respect to Count One of the SDNY Indictment

From at least in or about 2014, up to and including on or about January 25, 2023, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, defendant OVIDIO GUZMAN LOPEZ, a/k/a "Raton," and others known and unknown, engaged in a continuing criminal enterprise (the "Continuing Criminal Enterprise"), in that GUZMAN LOPEZ knowingly and intentionally participated in a continuing series of violations of Title 21, United States Code, Chapter 13, Subchapters I and II, including, among others, the fentanyl importation conspiracy charged in Count Two of the SDNY Indictment and the fentanyl trafficking conspiracy charged in Count Three of the SDNY Indictment, and other violations of Title 21, United States Code, Sections 841(a), 846, 848(e), 952(a), 959(a), 960, and 963, which violations were undertaken by GUZMAN LOPEZ in concert with five and more persons with respect to whom GUZMAN LOPEZ was one of several principal administrators, organizers, and leaders of the Continuing Criminal Enterprise, and where the violations involved at least 300 times the quantity of mixtures and substances containing a detectable amount of fentanyl described in Title 21, United

13

States Code, Section 841(b)(1)(B), and resulted in the Continuing Criminal Enterprise receiving $10 million and more in gross receipts during a 12-month period of its existence for the manufacture, importation, and distribution of fentanyl, in violation of Title 21, United States Code, Sections 848(a), 848(b), and 848(c). More specifically, GUZMAN LOPEZ and others engaged in the CCE through a series of violations of Title 21, United States Code, Chapter 13, Subchapters I and II, including but not limited to those set forth below.

As described above in Paragraphs 8(a) and (b), the factual statements of which are also incorporated into GUZMAN LOPEZ's plea to Count One of the SDNY Indictment, GUZMAN LOPEZ was one of the leaders of the Sinaloa Cartel. Starting in at least approximately 2014, GUZMAN LOPEZ and his brothers led the Sinaloa Cartel, including its fentanyl trafficking operation. Among other things, GUZMAN LOPEZ employed individuals who oversaw the manufacturing and distribution in Mexico, and the importation from Mexico into the United States for distribution, of thousands of kilograms of fentanyl powder and hundreds of thousands of fentanyl pills. The fentanyl powder and pills were smuggled into the United States by the Sinaloa Cartel's couriers, using vehicles and tunnels that went from Mexico into the United States.

In addition to overseeing the Sinaloa Cartel's drug-trafficking operation, GUZMAN LOPEZ also participated, personally and with others, in the Sinaloa Cartel's fentanyl trafficking. For example, from at least in or about 2018, through at

14

least in or about 2020, GUZMAN LOPEZ knowingly and intentionally manufactured and distributed, and possessed with intent to distribute, significant quantities of fentanyl pills and powder which, at GUZMAN LOPEZ's direction, were imported into the United States and also within Mexico knowing that such fentanyl was reasonably likely to be imported to the United States. As another example, in or about 2020, operating out of a compound in or around Culiacán, Mexico, maintained by GUZMAN LOPEZ where drugs and firearms were stored, GUZMAN LOPEZ sent narcotics, including bulk quantities of fentanyl to the U.S.-Mexico border, for importation into the United States.

To protect and further the Sinaloa Cartel's fentanyl trafficking operation, GUZMAN LOPEZ and his associates regularly used machineguns and perpetrated violence against law enforcement officials, civilians, and rival drug traffickers. For example, on or about January 5, 2023, members of the Sinaloa Cartel engaged in a shootout, using AK-47s and other military-grade weapons, with Mexican law enforcement authorities in an attempt to prevent GUZMAN LOPEZ's arrest, which resulted in the deaths of dozens of individuals.

In addition to overseeing and directly participating in the Sinaloa Cartel's drug-trafficking operation, including fentanyl, GUZMAN LOPEZ oversaw the collection of the Sinaloa Cartel's proceeds from the sale of narcotics, including fentanyl, in the United States. After the fentanyl and other drugs were sold in the United States, money launderers working for GUZMAN LOPEZ were responsible for

15

ensuring that any drug proceeds generated in the United States were ultimately received by GUZMAN LOPEZ and other members of the Sinaloa Cartel in Mexico. The money launderers had different ways of getting the U.S. drug proceeds to GUZMAN LOPEZ and to other members of his organization in Mexico. For example, individuals working with and for GUZMAN LOPEZ laundered money from the United States to Mexico using bulk cash transport, wire transfers, trade of goods, and cryptocurrency. On multiple occasions, launderers working for GUZMAN LOPEZ sent each other a photograph of a U.S. dollar bill with a unique serial number, which served as proof of ownership of the money being laundered out of the United States and into Mexico and allowed the launderers to then retrieve in Mexico the same amount of money that had been delivered to GUZMAN LOPEZ's launderers in the United States.

        d.      With Respect to Count Two of the SDNY Indictment

From at least in or about 2014, up to and including on or about January 25, 2023, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, OVIDIO GUZMAN LOPEZ, a/k/a "Raton," and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause

16

to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, and (iii) manufacture, distribute, and possess with intent to distribute on board an aircraft registered in the United States, 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 963.

More specifically, and as set forth above in Paragraph 8(c), the factual statements of which are incorporated into GUZMAN LOPEZ's guilty plea to Count Two of the SDNY Indictment, GUZMAN LOPEZ oversaw and directly participated in the Sinaloa Cartel's drug-trafficking operation, including involving fentanyl, which, among other things described in Paragraph 8(c), manufactured, distributed, and possessed with the intent to distribute, thousands of kilograms of fentanyl, which were intended to, and were, imported from Mexico to the United States.

9.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

10.     Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

17

a.     As to each of Count One of the Twelfth Superseding Indictment and Count Two of the SDNY Indictment: A maximum sentence of life imprisonment and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count.  Each count also carries a maximum fine of $10,000,000. Defendant further understands that with respect to each count the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

b.     As to each of Count Two of the Twelfth Superseding Indictment and Count One of the SDNY Indictment: A mandatory sentence of life imprisonment. Each count also carries a maximum fine of $2,000,000. Defendant further understands that on each count the judge also may impose a term of supervised release of not more than five years.

c.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed a $100 special assessment on each of the charges to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

11.     Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and

18

circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

12. For purposes of calculating the Sentencing Guidelines in this matter, the parties agree on the following points:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the 2024 Guidelines Manual.

b. **Offense Level Calculations**.

i. The base offense level is 52, pursuant to Guideline § 2D1.5(a)(1), because the offense level from Guideline § 2D1.1 applicable to the underlying offense is 48, as follows:

1. The base offense level is 38, pursuant to § 2D1.1(a)(5) and (c)(1), because the offense of conviction and relevant conduct for

19

which defendant is accountable involved more than 36 kilograms of fentanyl, 90 kilograms of heroin, 450 kilograms of cocaine, 45 kilograms of methamphetamine, and 90,000 kilograms of marijuana.

2. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(1), because a dangerous weapon, including a firearm, was possessed.

3. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(2), because defendant used violence, made a credible threat to use violence, and directed the use of violence.

4. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(5), because the offense involved the importation of methamphetamine and defendant is not subject to an adjustment under § 3B1.2.

5. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(11), because defendant bribed a law enforcement officer to facilitate the commission of the offense.

6. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(12), because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

ii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and

20

if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the government and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

iii.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

iv.     Pursuant to Guidelines Chapter 5, Part A, Application Note 2, an offense level of more than 43 is to be treated as an offense level of 43.

c.     **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant has no criminal history points and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level, is 43 which, when combined with the anticipated criminal history category of I,

21

results in an anticipated advisory sentencing guidelines sentence of life imprisonment, in addition to any supervised release and fine the Court may impose. Defendant also acknowledges that he is subject to a statutory mandatory minimum sentence of life imprisonment as well as a mandatory minimum sentence of ten years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding calculations upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the

Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Cooperation

13.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois, the United States Attorney's Office for the Southern District of California, the United States Attorney's Office for the Southern District of New York, and the United States Department of Justice Narcotic and Dangerous Drug Section (collectively, the "Offices"). This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding.

14.     Defendant agrees to the postponement of his sentencing.

### Agreements Relating to Sentencing

15.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall (1) move the Court, pursuant to 18 U.S.C. § 3553(e), to depart downward from the mandatory minimum sentence on Count Two

23

of the Twelfth Superseding Indictment and Count One of the SDNY Indictment, and (2) move the Court, pursuant to Guideline § 5K1.1, to depart downward from the Guideline sentence. The government shall not make a motion pursuant to 18 U.S.C. § 3553(e) as to Count One of the Twelfth Superseding Indictment and Count Two of the SDNY Indictment, so in no case will defendant's sentence be less than the 10-year mandatory minimum sentence on these counts. Defendant understands that the decision to depart from the applicable guideline sentence and, in the case of Count Two of the Twelfth Superseding Indictment and Count One of the SDNY Indictment, the mandatory minimum sentence of life imprisonment, rests solely with the Court. Defendant further understands that the government reserves the right to make whatever recommendation it deems appropriate regarding the extent of any downward departure.

16. If the government does not move the Court, pursuant to Guideline § 5K1.1 and—as to Count Two of the Twelfth Superseding Indictment and Count One of the SDNY Indictment—18 U.S.C. § 3553(e), to depart from the applicable guideline sentence, as set forth above, paragraphs 13 and 14 of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence of life imprisonment without any downward departure for cooperation pursuant to

24

§ 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1 or 18 U.S.C. § 3553(e).

17.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

18.    Defendant agrees to pay the special assessment of $400 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

19.    After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, (1) the government will move to dismiss the remaining counts of the Twelfth Superseding Indictment and the SDNY Indictment as to defendant, and (2) the government will dismiss the indictment as to defendant in 18 CR 81 in the United States District Court for the District of Columbia.

### Forfeiture

20.    Defendant understands that, by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offenses.

21.    Defendant agrees to the entry of a personal money judgment in the amount of $80,000,000, which represents proceeds traceable to the offenses. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

22.    Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

23.    Defendant understands that forfeiture shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

24.    Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

25.     This Agreement is entirely voluntary and represents the entire agreement between the Offices and defendant regarding defendant's criminal liability in case 09 CR 383-22.

26.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the Offices and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

27.     Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

        a.      **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

                i.      The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge

27

sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

      ii.    If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

      iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the Twelfth Superseding Indictment and SDNY Indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

      iv.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

      v.    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.

28

Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

        b.    **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), as detailed in paragraph 15, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of forfeiture, in exchange for the concessions

29

made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

28.     Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Waiver of Conflict

29.     With regard to any possible conflict of representation, and in addition to the colloquy conducted by the Court with defendant on October 21, 2024, defendant understands the following:

a.     Jeffrey Lichtman represents Joaquin Guzman Loera, Joaquin Guzman Lopez, Ivan Guzman Salazar, Jesus Alfredo Guzman Salazar, and Jose Angel Canobbio Inzunza ("the Other Clients"). Lichtman has a duty of loyalty to the

30

Other Clients and cannot use any information he obtained from the Other Clients while representing defendant in this matter.

      b.    In every criminal case, including this one, the defendant is entitled to the assistance of counsel whose loyalty to the defendant is undivided, and who is not subject to any force or consideration that might in any way intrude upon the attorney's loyalty to his client's interests.

      c.    Lichtman is required by his duty of loyalty to serve the best interests of the Other Clients as well as defendant's best interests.

      d.    Lichtman cannot advise or help defendant in doing anything that would hurt the Other Clients, even if it is in defendant's best interest to do so.

      e.    Lichtman cannot help defendant in providing assistance to the Government that might hurt the Other Clients, even if it turns out that doing so might be in defendant's best interest.

      f.    Lichtman may have to refrain from making certain arguments even though such arguments may be beneficial to defendant, because of his representation of the Other Clients.

      g.    Defendant has had the opportunity to speak with Lichtman about the conflict-of-interest issues that arise because of his representation of the Other Clients.

31

h.     Defendant has the right to consult with a lawyer other than Lichtman to help determine whether defendant wishes Lichtman to represent them in this case.

30.     Understanding the above, defendant agrees to continue to be represented by Lichtman, and defendant knowingly and voluntarily waives any potential conflict caused by Lichtman's simultaneous representation of the Other Clients.

### Presentence Investigation Report/Post-Sentence Supervision

31.     Defendant understands that the government in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

32.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the government regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline

32

§ 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

33.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the government of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

34.     Defendant agrees to cooperate with the government in collecting any ordered fine for which defendant is liable, including providing financial statements and supporting records as requested by the government.

35.     Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to

33

an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

## Conclusion

36.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

37.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant further understands that in the event he violates this Agreement and is found in breach of this Agreement, he will not be permitted to withdraw his guilty pleas. Defendant understands and agrees that in the event that

34

the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

38.    Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

39.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

40.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 7/9/25

_____
ANDREW S. BOUTROS
United States Attorney
Northern District of Illinois

_____
OVIDIO GUZMAN-LOPEZ
Defendant

_____
ADAM GORDON
United States Attorney
Southern District of California

_____
JEFFREY LICHTMAN
Attorney for Defendant

_____
MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

_____
ANDREW C. ERSKINE
MICHELLE J. PARTHUM
Assistant U.S. Attorneys

36