UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 09 CR 383 |
| v. | |
| JOAQUIN GUZMAN LOPEZ | Judge Sharon Johnson Coleman |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ANDREW S. BOUTROS, the United States Attorney for the Southern District of California, ADAM GORDON, the Criminal Division's Money Laundering, Narcotics and Forfeiture Section, defendant JOAQUIN GUZMAN LOPEZ, and his attorney, JEFFREY LICHTMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.     The Thirteenth Superseding Indictment in this case charges defendant with conspiracy to possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code, Section 846 (Count One), engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), (b), and (e)(1)(A) (Count Two), conspiracy to import a controlled substance into the United States, and to manufacture and distribute a controlled substance intending and knowing it would be unlawfully imported into the United

States, in violation of Title 21, United States Code, Section 963 (Count Three), money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (Count Five), and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United State Code, Section 924(c) (Count Eight).

3. Defendant has read the charges against him contained in the Thirteenth Superseding Indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the Thirteenth Superseding Indictment: Count One, which charges defendant with conspiracy to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code, Section 846; and Count Two, which charges defendant with knowingly and intentionally engaging in a continuing criminal enterprise, in violation of Title 21, United States Code, Sections 848(a), (b), and (e)(1)(A). In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

**Factual Basis**

6.      Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the Thirteenth Superseding Indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

a.      With respect to Count One of the Thirteenth Superseding Indictment:

Beginning no later than in or about May 2008, and continuing until at least on or about April 5, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant JOAQUIN GUZMAN LOPEZ did conspire with Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, Ovidio Guzman Lopez, Joaquin Guzman Loera, Ismael Zambada Garcia, Damaso Lopez Nunez, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and 1,000 kilograms or more of a mixture and

substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

More specifically, as of May 2008, Joaquin Guzman Loera ("Chapo") and Ismael Zambada Garcia ("Mayo") were the co-leaders of a transnational drug trafficking organization based in Mexico known as the "Sinaloa Cartel." Under the leadership of Guzman Loera and Zambada Garcia, the Sinaloa Cartel operated as an affiliation of drug traffickers and money launderers located in multiple countries throughout the world who coordinated and pooled their collective resources in order to: (1) transport drugs from countries of supply in Central and South America to Mexico; (2) transport drugs through Mexico and into the United States; (3) distribute drugs to wholesale customers in the United States; and (4) collect, launder, and transfer the proceeds of drug trafficking.

Guzman Loera and Zambada Garcia, and members and associates of the Sinaloa Cartel under them, including four of Guzman Loera's sons—GUZMAN LOPEZ, Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, and Ovidio Guzman Lopez (collectively, "Los Chapitos")—coordinated their drug trafficking activities to import and manufacture large quantities of cocaine, heroin, methamphetamine, and marijuana, including from Central and South American countries. GUZMAN LOPEZ and others coordinated the transportation and storage

4

of these drug loads within Mexico, and they further coordinated their drug trafficking activities to smuggle large quantities of cocaine, heroin, methamphetamine, and marijuana, from Mexico across the United States border, and then into and throughout the United States, including Chicago, Illinois, and elsewhere.

GUZMAN LOPEZ acted as a logistical coordinator who, on behalf of Guzman Loera and the Sinaloa Cartel's members and associates, caused multi-kilogram quantities of cocaine, heroin, methamphetamine, and marijuana to be transported from Mexico to the United States border, and then into and throughout the United States for distribution. GUZMAN LOPEZ further caused drug proceeds to be collected from customers in the United States and laundered and transferred from the United States to Mexico and elsewhere for the benefit of the Sinaloa Cartel's members and associates. GUZMAN LOPEZ and others pooled their collective resources and coordinated their activities to cause large quantities of cocaine and other drugs and drug precursor chemicals to be imported from Central and South American countries, including Colombia, Ecuador, Venezuela, Peru, Panama, Costa Rica, Honduras, and Guatemala, and from elsewhere, to Mexico, using various means, including cargo aircraft, private aircraft, submarines and other submersible and semi-submersible vessels, container ships, supply vessels, go-fast boats, fishing vessels, buses, rail cars, tractor trailers, automobiles, and private and commercial interstate and foreign carriers. After the drugs and drug precursor chemicals arrived in Mexico, the

conspirators used shared resources to unload and store the drugs in Mexico.

GUZMAN LOPEZ used shared networks of couriers affiliated with the Sinaloa Cartel, and coordinated their activities to cause large quantities of cocaine, heroin, methamphetamine, and marijuana, at times in shipments of hundreds or thousands of kilograms, to be transported from various locations in Mexico to the United States border where the drugs were then stored in multiple warehouses, stash houses, and safe houses located in the areas of Tijuana, Mexicali, and elsewhere.

GUZMAN LOPEZ and others used shared networks of couriers affiliated with the Sinaloa Cartel, and coordinated their activities to cause drugs to be smuggled across the United States-Mexico border using multiple means, including through the use of vehicles, rail cars, and tunnels.

GUZMAN LOPEZ and others used shared networks of couriers and stash house operators affiliated with the Sinaloa Cartel, and coordinated their activities to cause drugs to be unloaded and stored at multiple stash house, safe house, and warehouse locations in Southern California and elsewhere.

GUZMAN LOPEZ and others used shared networks of couriers affiliated with the Sinaloa Cartel to cause cocaine, heroin, methamphetamine, and marijuana to be transported throughout the United States, including to Chicago, Illinois, using various means, including cars, trucks, rail cars, and private and commercial interstate carriers. Members of the conspiracy directed the drugs to be stored in

various stash houses and warehouses and then provided and distributed to additional members and associates of the Sinaloa Cartel, as well to wholesale customers, on consignment, without requiring payment at the time of delivery, in multiple locations.

Cocaine, heroin, methamphetamine, and marijuana caused to be distributed by GUZMAN LOPEZ and others was further sold and distributed to additional wholesale customers in the greater Chicago, Illinois, area, and elsewhere in the United States and Canada.

As a leader of the Sinaloa Cartel, GUZMAN LOPEZ employed individuals and provided security and territory for individuals who oversaw the manufacturing and distribution in Mexico, and the importation from Mexico into the United States for distribution, of large quantities of fentanyl powder and pills. The fentanyl powder and pills were smuggled into the United States by the Sinaloa Cartel's couriers, using vehicles and tunnels that went from Mexico into the United States.

GUZMAN LOPEZ and others used shared networks of money couriers and money launderers to cause drug proceeds to be collected from customers, counted, packaged, and transferred and laundered from the United States to Mexico, Colombia, and elsewhere using multiple means, including bulk cash smuggling, structured bank deposits, wire transfers, currency exchange transfers, alternative credit-based systems used to transfer money without the use of wires or other traditional means, goods-based systems in which items, including cars, helicopters,

and airplanes, were purchased in one location and transferred to another location, and other methods.

GUZMAN LOPEZ and others used, and caused to be used, various means to evade and escape law enforcement and military personnel—including on or about October 17, 2019, at Culiacán in Sinaloa—and to protect their drug distribution activities, including: obtaining guns and other weapons; bribing corrupt public officials; and inciting violence, engaging in violence, and threatening violence, including murder, kidnapping, assault, and battery, including against law enforcement, rival drug traffickers, and members of their own drug trafficking organization.

Following Guzman Loera's arrest in 2016 and extradition in 2017, GUZMAN LOPEZ and his brothers assumed their father's former role as leaders of the Sinaloa Cartel, along with Zambada Garcia and Damaso Lopez Nunez. Eventually, GUZMAN LOPEZ, his brothers, and others amassed greater control over the Sinaloa Cartel by threatening to cause violence, and causing violence, against Damaso Lopez Nunez and his family and associates.

GUZMAN LOPEZ acknowledges the offense of conviction, including conduct within the scope of the conspiracy that was reasonably foreseeable to him, involved more than 36 kilograms of fentanyl, 90 kilograms of heroin, 450 kilograms of cocaine, 45 kilograms of methamphetamine, and 90,000 kilograms of marijuana.

b.    With respect to Count Two of the Thirteenth Superseding Indictment:

Beginning no later than in or about May 2008, and continuing until at least on or about April 5, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant JOAQUIN GUZMAN LOPEZ, together with Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, Ovidio Guzman Lopez, and others, did knowingly and intentionally engage in a continuing criminal enterprise, in that GUZMAN LOPEZ committed violations of Title 21, United States Code, Sections 841(a), 848(e), 952(a), 959(a), 960, and 963, which violations were part of a continuing series of violations of those statutes undertaken by GUZMAN LOPEZ, in concert with five or more other persons, with respect to whom GUZMAN LOPEZ occupied a supervisory and management position, and was one of several principal administrators, organizers, and leaders of the continuing criminal enterprise, and from which continuing series of violations GUZMAN LOPEZ obtained substantial income and resources, and which continuing criminal enterprise received in excess of $10 million in gross receipts during one or more twelve-month period for the manufacture, importation, and distribution of heroin, cocaine, methamphetamine, and marijuana. The violations involved at least 300 times the quantity of a substance described in Section 841(b)(1)(B) of Title 21, United States Code, namely, 30 kilograms or more of a mixture and substance containing a detectable amount of

heroin, 150 kilograms or more of a mixture and substance containing a detectable amount of cocaine, 15 kilograms or more of a mixture and substance containing a detectable amount of methamphetamine, and 30,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana. All in violation of Title 21, United States Code, Sections 848(a), 848(b), and 848(e)(1)(A).

Specifically, beginning no later than 2012, and continuing until January 5, 2023, GUZMAN LOPEZ worked with his father, Joaquin Guzman Loera, his brothers—Ivan Archivaldo Guzman Salazar, Jesus Alfredo Guzman Salazar, and Ovidio Guzman Lopez—and others, to engage in a continuing criminal enterprise, namely, the Sinaloa Cartel. GUZMAN LOPEZ, his father, his brothers, and others worked together to source and manufacture narcotics—including heroin, cocaine, methamphetamine, and marijuana—transport the narcotics through Mexico, and cross the narcotics over the border into the United States for distribution. In the course of this work, GUZMAN LOPEZ served as a supervisor and manager within the Sinaloa Cartel, as well as one of several principal administrators, organizers, and leaders. Among other things, GUZMAN LOPEZ employed and ultimately managed numerous individuals who assisted in manufacturing, transporting, storing, and distributing narcotics, as well as numerous individuals who served as armed security for GUZMAN LOPEZ and other members of the Sinaloa Cartel.

GUZMAN LOPEZ and his associates engaged in the continuing criminal enterprise by means of, among other things, a continuing series of violations of Title 21, United States Code, Sections 841(a), 848(e), 952(a), 959(a), 960, and 963, including as described below.

As alleged in Violations Seven and Eight of the Thirteenth Superseding Indictment, in or about 2013, GUZMAN LOPEZ, his father, his brothers, and others imported cocaine into the United States. The cocaine crossed over the border through a tunnel that ran between Nogales, Sonora, in Mexico, and Nogales, Arizona, in the United States. GUZMAN LOPEZ possessed portions of this cocaine within the District of Arizona intending that it be further distributed.

As alleged in Violation Ten of the Thirteenth Superseding Indictment, in or about January 2014, GUZMAN LOPEZ invested, along with others, in an approximately forty-ton shipment of marijuana that was transported to Hermosillo, Sonora, Mexico, with the intent that it be imported into and distributed within the United States. GUZMAN LOPEZ and others intended to transport the marijuana from Sonora to Tijuana, Mexico, and to transport the marijuana into the United States using an underground tunnel that GUZMAN LOPEZ's workers had constructed. However, before the marijuana was transported to Tijuana, approximately twenty tons of marijuana were seized by law enforcement in or around

Hermosillo. Of the remaining approximately twenty tons, approximately three to four tons were transported to and sold in or around Los Angeles, California.

GUZMAN LOPEZ acknowledges that the continuing criminal enterprise in which he engaged, involved more than 90 kilograms of heroin, 450 kilograms of cocaine, 45 kilograms of methamphetamine, and 90,000 kilograms of marijuana, for which he is accountable. GUZMAN LOPEZ further acknowledges he engaged in the continuing criminal enterprise in concert with more than five other individuals, and that the enterprise received more than $10 million in gross receipts during a twelve-month period. GUZMAN LOPEZ further acknowledges that GUZMAN LOPEZ caused bribes to be paid to law enforcement officers in Mexico to facilitate the commission of the offense. GUZMAN LOPEZ further acknowledges that he maintained offices in Mexico and the United States that he used to store and distribute narcotics.

7.     Defendant, for purposes of computing his sentence under Guideline § 1B1.2, stipulates to having committed the following additional offense:

On or about July 25, 2024, in the State of Sinaloa, Mexico, the District of New Mexico, and elsewhere, defendant JOAQUIN GUZMAN LOPEZ did unlawfully seize, confine, kidnap, abduct, and carry away and hold for reward and otherwise Individual A, and willfully transported Individual A in foreign commerce, in violation of Title 18, United States Code, Section 1201(a)(1).

More specifically, prior to July 25, 2024, GUZMAN LOPEZ arranged for a meeting in Sinaloa, Mexico, involving Individual A and others. For the purpose of luring Individual A to the meeting, GUZMAN LOPEZ communicated to Individual A that Individual A's presence was needed to resolve a disagreement between GUZMAN LOPEZ and others.

On July 25, 2024, GUZMAN LOPEZ was present at the meeting location when Individual A arrived. GUZMAN LOPEZ asked Individual A to come speak with him in a private room in the building, in which, unbeknownst to Individual A, GUZMAN LOPEZ had removed the glass from a floor-to-ceiling window. Once both men were in the room alone, GUZMAN LOPEZ closed and locked the door. At that time, as coordinated by GUZMAN LOPEZ, multiple men working for GUZMAN LOPEZ entered the room through the window and placed handcuffs on Individual A and a bag over his head. The men, who were armed with firearms, then carried Individual A outside through the window, and placed him across their laps in the backseat of a waiting pickup truck. GUZMAN LOPEZ also entered the truck, and it drove 10 to 15 minutes to an air strip where a small plane awaited. The men loaded Individual A onto the plane, which GUZMAN LOPEZ and a pilot boarded as well. Individual A was zip-tied to one of the seats. After the plane took off, GUZMAN LOPEZ prepared a drink with sedatives, some of which he drank himself, and some of which he gave

to Individual A. As GUZMAN LOPEZ had previously directed, the pilot flew the plane from Mexico into the United States, and the plane landed in New Mexico.

GUZMAN LOPEZ coordinated and committed the kidnapping of Individual A, among other reasons, in the hopes of receiving cooperation credit from the United States government for himself and his brother. However, GUZMAN LOPEZ acknowledges that the United States government did not request, induce, sanction, approve, or condone the kidnapping. GUZMAN LOPEZ further acknowledges that, as discussed below, he will not receive cooperation credit for the kidnapping, nor will his brother.

8.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

9.     Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a.     Count One carries a maximum sentence of life imprisonment and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on

this count. This count also carries a maximum fine of $10,000,000. Defendant further understands that with respect to this count the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

      b.    Count Two carries a mandatory sentence of life imprisonment. This count also carries a maximum fine of $2,000,000. Defendant further understands that the judge also may impose a term of supervised release of not more than five years.

      c.    Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

10.    Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the

defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 1, 2025 Guidelines Manual.

b. **Offense Level Calculations**.

<u>Counts One and Two</u>

i. The base offense level is 52, pursuant to Guideline § 2D1.5(a)(1), because the offense level from Guideline § 2D1.1 applicable to the underlying offense is 48, as follows:

1. The base offense level is 38, pursuant to § 2D1.1(a)(5) and (c)(1), because the offense of conviction and relevant conduct for which defendant is accountable involved more than 36 kilograms of fentanyl, 90

kilograms of heroin, 450 kilograms of cocaine, 45 kilograms of methamphetamine, and 90,000 kilograms of marijuana.

2. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(1), because a dangerous weapon, including a firearm, was possessed.

3. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(2), because defendant used violence, made a credible threat to use violence, and directed the use of violence.

4. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(5), because the offense involved the importation of methamphetamine and defendant is not subject to an adjustment under § 3B1.2.

5. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(11), because defendant bribed a law enforcement officer to facilitate the commission of the offense.

ii. The offense level is increased by two levels, pursuant to Guideline § 2D1.1(b)(12), because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

Stipulated Offense

iii. The base offense level is 32, pursuant to Guideline § 2A4.1(a).

iv.    Two levels are added, pursuant to Guideline § 2A4.1(b)(3), because a dangerous weapon was used, namely, firearms.

Grouping

v.    The counts of conviction and stipulated offense each constitute a separate group pursuant to Guideline § 3D1.2.

vi.    Pursuant to Guideline § 3D1.4, defendant receives 1 unit for the counts of conviction. Pursuant to Guideline § 3D1.4(a), because the stipulated offense has an offense level that is 9 or more levels less serious than the offense level for the counts of conviction, that offense conduct counts as 0 units. Because there is 1 unit, no levels are added to the group with the highest offense level, resulting in a combined offense level of 52.

vii.    The government understands that defendant will truthfully admit the conduct comprising the offense(s) of conviction, and truthfully admit or not falsely deny any additional relevant conduct for which the defendant is accountable under Guideline § 1B1.3. Therefore, based upon facts now known to the government, defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the government and the Probation Office with all

requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

viii.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

ix.     Pursuant to Guidelines Chapter 5, Part A, Application Note 2, an offense level of more than 43 is to be treated as an offense level of 43.

c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level, is 43 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines sentence of life imprisonment, in addition to any supervised release and fine the Court may impose.

Defendant also acknowledges that he is subject to a statutory mandatory minimum sentence of life imprisonment as well as a mandatory minimum sentence of ten years' imprisonment.

e.      Defendant and his attorney and the government acknowledge that the guidelines calculations set forth in this Agreement are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands the above calculations are based on information now known to the government and that further review of the facts or applicable legal principles may lead the government to change its position on the guidelines calculations. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the defendant's, the probation officer's, or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of a change in the government's position on the guideline calculations or the Court's rejection of these calculations.

f.      Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing.

The parties may correct these errors by a statement to the Probation Office or the Court, setting forth any changes in either parties' position regarding the guidelines calculations. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

12.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois, the United States Attorney's Office for the Southern District of California, and the United States Department of Justice, Money Laundering, Narcotics and Forfeiture Section (collectively, the "Offices"). This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding.

13.     Defendant agrees to the postponement of his sentencing.

## Agreements Relating to Sentencing

14.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall (1) move the Court, pursuant to Guideline

§ 5K1.1 and 18 U.S.C. § 3553(e), to depart downward from the mandatory minimum sentence on Count Two of the Thirteenth Superseding Indictment, and (2) move the Court, pursuant to Guideline § 5K1.1, to depart downward from the Guideline sentence. The government shall not make a motion pursuant to 18 U.S.C. § 3553(e) as to Count One of the Thirteenth Superseding Indictment, so in no case will defendant's sentence be less than the 10-year mandatory minimum sentence on Count One. Defendant understands that the decision to depart from the applicable guideline sentence and, in the case of Count Two of the Thirteenth Superseding Indictment, the mandatory minimum sentence of life imprisonment, rests solely with the Court. Defendant further understands that the government reserves the right to make whatever recommendation it deems appropriate regarding the extent of any downward departure. Defendant further understands that in no case will he receive credit in connection with the Stipulated Offense.

15.    If the government does not move the Court, pursuant to Guideline § 5K1.1 and—as to Count Two of the Thirteenth Superseding—18 U.S.C. § 3553(e), to depart from the applicable guideline sentence as set forth above, paragraphs 12, 13, and 14 of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence of life imprisonment without any

downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1 or 18 U.S.C. § 3553(e).

16.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

17.     Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.     After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, (1) the government will move to dismiss the remaining counts of the Thirteenth Superseding Indictment as to defendant, (2) the government will move to dismiss the Eleventh and Twelfth Superseding Indictments as to defendant, and (3) the government will dismiss the indictment as to defendant in 18 CR 81 in the United States District Court for the District of Columbia.

### Forfeiture

19.     Defendant understands that, by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property

constituting or derived from proceeds obtained, directly or indirectly, as a result of the offenses.

20.    Defendant agrees to the entry of a personal money judgment in the amount of $80,000,000, which represents proceeds traceable to the offenses. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

21.    Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

22.    Defendant understands that forfeiture shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

23.    Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

24.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 09 CR 383.

25.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the Offices and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

26.     Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge

25

sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the Thirteenth Superseding Indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.

Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.     **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), as detailed in paragraph 14, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums

provided by law, and including any order of forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

27. Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Waiver of Conflict

28. With regard to any possible conflict of representation, and in addition to the colloquy conducted by the Court with defendant on July 30, 2024, defendant understands the following:

a.    Jeffrey Lichtman represents Joaquin Guzman Loera, Ovidio Guzman Lopez, Ivan Guzman Salazar, Jesus Alfredo Guzman Salazar, Jose Angel Canobbio Inzunza, and Noel Lopez ("the Other Clients"). Lichtman has a duty of loyalty to the Other Clients and cannot use any information he obtained from the Other Clients while representing defendant in this matter.

b.    In every criminal case, including this one, the defendant is entitled to the assistance of counsel whose loyalty to the defendant is undivided, and who is not subject to any force or consideration that might in any way intrude upon the attorney's loyalty to his client's interests.

c.    Lichtman is required by his duty of loyalty to serve the best interests of the Other Clients as well as defendant's best interests.

d.    Lichtman cannot advise or help defendant in doing anything that would hurt the Other Clients, even if it is in defendant's best interest to do so.

e.    Lichtman cannot help defendant in providing assistance to the Government that might hurt the Other Clients, even if it turns out that doing so might be in defendant's best interest.

f.    Lichtman may have to refrain from making certain arguments even though such arguments may be beneficial to defendant, because of his representation of the Other Clients.

g. Defendant has had the opportunity to speak with Lichtman about the conflict-of-interest issues that arise because of his representation of the Other Clients.

h. Defendant has the right to consult with a lawyer other than Lichtman to help determine whether defendant wishes Lichtman to represent them in this case.

29. Understanding the above, defendant agrees to continue to be represented by Lichtman, and defendant knowingly and voluntarily waives any potential conflict caused by Lichtman's simultaneous representation of the Other Clients.

### Presentence Investigation Report/Post-Sentence Supervision

30. Defendant understands that the government in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall endeavor to ensure that the relevant facts and sentencing factors, as applied to the facts, are brought to the District Court's attention fully and accurately, including facts related to the defendant's criminal conduct and related conduct, and any relevant information concerning the defendant's background, character, and conduct that the District Court may consider under 18 U.S.C. § 3661 in imposing a sentence.

31. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and

shared among the Court, the Probation Office, and the government regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

32.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the government of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

33.     Defendant agrees to cooperate with the government in collecting any ordered fine for which defendant is liable, including providing financial statements and supporting records as requested by the government.

34.     Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including one or more offenses to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

## Conclusion

35.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

36.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant further understands that in the event he violates this Agreement and is found in breach of this Agreement, he will not be permitted to withdraw his guilty plea. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

37.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

38.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

39.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 12/01/2025

_____
ANDREW S. BOUTROS
United States Attorney
Northern District of Illinois

_____
JOAQUIN GUZMAN LOPEZ
Defendant

_____
ADAM GORDON
United States Attorney
Southern District of California

_____
JEFFREY LICHTMAN
Attorney for Defendant

_____
MARGARET A. MOESER
Chief
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice

_____
ANDREW C. ERSKINE
MICHELLE J. PARTHUM
MICHAEL MAIONE
Assistant U.S. Attorneys